Daniel E. Rybeck, Esq. (DR8652)
**WEIR & PARTNERS LLP**
*A Pennsylvania Limited Liability Partnership*
The Liberty View Building
457 Haddonfield Road, Suite 420
Cherry Hill, NJ 08002
T: 856-662-1018
F: 856-662-1592
Attorneys for Defendants

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B. WILLIAMS, Plaintiffs, v. CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS, JAMES RIZZO, and IRAIDA AFANADOR, Defendants. | **CIVIL ACTION: 1:13-cv-06353 (JEI-AMD)** |

**<u>Notice of Motion for Summary Judgment</u>**

TO:     F. Michael Daily, Jr., Esq.
        F. Michael Daily, LLC
        Sentry Office Plaza
        216 Haddon Avenue, Suite 106
        Westmont, New Jersey 08108

**PLEASE TAKE NOTICE** that Defendants, City Of Camden, Eugene Emenecker,

William Revaitis, James Rizzo, and Iraida Afanador, will move before the Honorable Joseph E.

Irenas, Sr. U.S.D.C.J.,  United States District Court for the District of New Jersey, Camden

Vicinage, Mitchell H. Cohen U.S. Courthouse, 4th and Cooper Streets, Camden, New Jersey,

08101, for an Order granting the Motion for Summary Judgment in favor of the Defendants.

In support of this motion, Defendant will rely upon the attached Brief submitted herewith.

Oral argument is requested.

**WEIR & PARTNERS LLP**

/s Daniel E. Rybeck
DANIEL E. RYBECK, ESQUIRE

Dated: March 13, 2015

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B. WILLIAMS, Plaintiffs, <br><br> v. <br><br> CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS, JAMES RIZZO, and IRAIDA AFANADOR, Defendants. | **CIVIL ACTION:** <br> **1:13-cv-06353 (JEI-AMD)** |

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Daniel E. Rybeck, Esq.
**WEIR & PARTNERS LLP**
*A Pennsylvania Limited Liability Partnership*
The Liberty View Building
457 Haddonfield Road, Suite 420
Cherry Hill, NJ 08002
T: 856-662-1018
F: 856-662-1592
Attorneys for Defendants

## TABLE OF CONTENTS

TABLE OF CITATIONS .................................................................................. i

STATEMENT OF FACTS ................................................................................ 1

LEGAL ARGUMENT ...................................................................................... 18

Point I:
**THE SUMMARY JUDGMENT STANDARD** ............................................. 18

POINT II:
**ANY AND ALL OF PLAINTIFFS' CLAIMS AGAINST DEFENDANTS
THAT OCCURRED PRIOR TO OCTOBER 24, 2011 ARE BY THE
APPLICABLE STATUTE OF LIMITATIONS**.............................................. 19

POINT III
**PLAINTIFFS CANNOT PRODUCE ANY EVIDENCE TO SUPPORT
THEIR CLAIMS OF A VIOLATION OF THEIR 1ST AMENDMENT
RIGHT TO ASSOCIATE**.................................................................................. 20

**A.      Plaintiffs Did Not Engage in Constitutionally Protected Conduct** ............... 20.

**B.      Plaintiffs Cannot Prove a First Amendment Retaliation Claim
Against ESCO Revaitis or Insp. Emenecker** ................................................22

**C.      Plaintiffs Cannot Prove a First Amendment Retaliation Claim
Against CO Rizzo or Dir. Afanador** ...............................................................25

POINT IV:
**THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO
QUALIFIED IMMUNITY**.................................................................................. 27

POINT V:
**ALL CLAIMS BROUGHT BY PLAINTIFF AGAINST
THE CITY OF CAMDEN MUST BE DISMISSED** .................................... 28

CONCLUSION ................................................................................................. 31

# TABLE OF CITATIONS

## CASES

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).........................................18, 19

Andrews v. City of Phila., 895 F.2d 1469 (3d Cir. 1990) .................................... 30

Aschroft v. Iqbal, 129 S.Ct. 1937 (2009) ...........................................................25

Beck v. City of Pittsburgh, 89 F.3d 966 (3d Cir. 1996) ......................................30

Bielevicz v. Dubinon, 915 F.2d 845 (3d Cir. 1990) ............................................30

Board of County Commissioners v. Umbehr, 518 U.S. 668,
116 S.Ct. 2342, 135 L.Ed.2d 843 (1996)............................................................20

Bornstad v. Honey Brook Township, 2005 WL 2212359 ....................................27

Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526 (D.N.J. 2003)...............20

Brown v. Foley, 810 F.2d 55 (3d Cir.1987) .......................................................19

Carswell v. Borough of Homestead, 381 F.3d 235 (3d Cir. 2004).......................27

Cito v. Bridgewater Township Police Dept., 892 F.2d 23 (3d Cir.1989).............. 19

City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915 (1988)..................29, 30

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ..................................................18

Colburn v. Upper Darby Twp., 838 F.2d 663 (3d Cir. 1988)
cert. denied, 489 U.S. 1065 (1989).....................................................................25

Curley v. Klem, 298 F.3d 271 (3d Cir. 2000) .....................................................27

Curinga v. City of Clairton, 357 F.3d 305 (3d Cir. 2004)....................................21

Donahue v. Gavin, 280 F.3d 371 (3d Cir. 2000) ................................................27

Downey v. Coal. Against Rape & Abuse, Inc., 143 F. Supp. 2d 423
(D.N.J. 2001) ..............................................................................20

Fletcher v. O'Donnell, 867 F.3d 791 (3d Cir. 1989) ...........................30

Gittlemacker v. Prasse, 428 F.2d 1 (3d Cir. 1970) ............................25

Hersch v. Allan Products Company, 789 F. 2d 230 (3d Cir. 1986) ........18

Phyllis Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) .............21

Lee v. The Cnty. of Passaic,
2011 WL 3159130 (D.N.J. July 26, 2011) ......................................21

Kowalski v. L & F Products, 82 F. 3d 1286 (3d Cir. 1996) .................18

Matsushita Electric Industry Co. v. Zenith Radio Corp.,
475 U.S. 574 (1986) ..................................................................18

McTernan v. City of York, 564 F.3d 636 (3d Cir. 2009) .....................30

Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806 (1985)...................27

Monell v. New York City Dept. of Social Services, 436 U.S. 658 (1978)...........28-30

Montgomery v. De Simone, 159 F.3d 120 (3d Cir. 1998) ....................19

Myers v. Oklahoma Bd. of County Comm'rs, 151 F.3d 1313
(10th Cir. 1998) ........................................................................30

O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712,
116 S.Ct. 2353, 135 L.Ed.2d 874 (1996)........................................20

Pembaur v. City of Cincinnati, 475 U.S. 469 (1986) .........................29

Peppers v. Booker, No. 2012 WL 1806170
(D.N.J. May 17, 2012)............................................................22, 24

Perna v. Twp. of Montclair,
2006 WL 2806276 (D.N.J. Sept. 28, 2006).....................................21

Roberts v. U.S. Jaycees, 468 U.S. 609 (1984)...................................20

Rode v. Dellarciprete, 845 F.2d 1195 (3d Cir. 1988).........................25

Rutan v. Republican Party of Illinois, 497 U.S. 62 (1990)...................20

Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151 (2002)..........................................................27

Sterling v. Borough of Minersville, 232 F.3d 190 (3d Cir. 2000).........................................

Wallace v. Kato, 549 U.S. 384,  127 S.Ct. 1091,
166 L.Ed.2d 973 (2007)..........................................................................................19

Watson v. Abington Twp., 478 F.3d 144 (3d Cir. 2007).......................................................30

Wilson v. Garcia, 471 U.S. 261, 105 S.Ct. 1938,
85 L.Ed.2d 254 (1985)...........................................................................................19

## **RULES AND STATUTES**

N.J. S.A. 2A:14–2..................................................................................................19

FRCP 56 ..............................................................................................................18

42 U.S.C. § 1983 ...............................................................................................19, 29

## STATEMENT OF FACTS

1.      Plaintiff, Marshall Williams (hereinafter "Williams"), is a New Jersey licensed electrical contractor.  See ECF #1 at ¶10.

2.      Prior to 1998, Williams was a member of the International Brotherhood of Electrical Workers union (hereinafter "IBEW").  *Id.* at ¶11.

3.      In approximately 1998, Williams left IBEW and became an independent non-union electrical contractor.  *Id.* at ¶12.

4.      Initially, Williams worked as an independent contractor under the trade name of "Nico Electric," and in 2005 he formally incorporated his business as "Nico Electrical Contractor, Inc." (hereinafter "Nico").  *Id.* at ¶14.

5.      In 2002 Nico was awarded a contract (hereinafter "2002 Contract") to provide electrical maintenance services to the City of Camden for a period of, according to Plaintiffs' Complaint, three (3) years.  *Id.* at ¶15.

6.      The 2002 Contract term was not for 3 years, it was for two (2) years on an "as needed" basis.  See July 18, 2002 contract, attached hereto as Exhibit "1" and incorporated herein by reference.

7.      Shortly after being awarded the 2002 Contract, Williams alleges he received a telephone call from the then Chief Financial Officer (CFO) for the City of Camden, Richard Feliciano, wherein CFO Feliciano allegedly stated he received a telephone call from IBEW Assistant Business Manager Donald Norcross.  During the conversation between Mr. Norcross and CFO Feliciano, Mr. Norcross purportedly stated he [Mr. Norcross] wanted the 2002 contract to be rebid and that he [Mr. Norcross] did not want Williams performing any work for the City

1

of Camden.  See October 21, 2014 deposition transcript of Williams, attached hereto as Exhibit

"2" and incorporated herein by reference, at 24:22 to 25:20.

8.      Williams claims CFO Feliciano inquired of Williams during the aforementioned

telephone call what was going on between Williams and Mr. Norcross, to which Williams

replied that Mr. Norcross was "pissed off" that Williams was no longer a member of IBEW.  *Id.*

at 35:18 to 37:18.

9.      Williams claims he did not receive a single job during the term of the 2002

Contract.  See ECF #1 at ¶19.

10.     William Revaitis is a former member of IBEW, having ended his membership in

IBEW in 1994.  See November 5, 2014 deposition of William Revaitis, attached hereto as

Exhibit "3" and incorporated herein by reference, at 6:19 to 8:12.

11.     Mr. Revaitis was hired by the City of Camden as an electrical inspector in 1996,

and has been the Electrical Subcode Official (ESCO) since approximately 1999-2000.  *Id.* at 5:10

to 6:2.

12.     ESCO Revaitis never had any conversations with CFO Feliciano.  *Id.* at 11:2-9.

13.     Eugene Emenecker is a former member of IBEW, having retired from his

employment as a union electrician and from his membership in IBEW in November 1999  See

November 5, 2014 deposition transcript of Eugene Emenecker, attached hereto as Exhibit "4"

and incorporated herein by reference, at 6:4-7, 7:11-20.

14.     Mr. Emenecker has been employed since 2004 as an Electrical Inspector for the

City of Camden, Building Bureau.  *Id.* at 6:11-15.

15.     ESCO Revaitis is Insp. Emenecker's supervisor.  See Exhibit 3 at 6:3-7; see also

Exhibit 4 at 12:2-11.

16.     To perform electrical work in the City of Camden, an electrical contractor must obtain a permit by way of application to the Building Bureau, with the ESCO determining whether to issue the permit, and the Construction Official signing the permit once the work has been approved by way of inspection.  See Exhibit 4 at 17:9-21.

17.     After work is performed by an electrical contractor, an inspection is scheduled and subsequently performed.  *Id.* at 26:10-15.

18.     Since 2002, Plaintiffs claim they received "disparate treatment" from ESCO Revaitis and Insp. Emenecker, "aimed at discouraging [Plaintiffs] from performing non-union work within the City of Camden."  See ECF at ¶20.

19.     The "disparate treatment" by ESCO Revaitis and Insp. Emenecker claimed by Plaintiffs encompasses the following:

        a.  Plaintiffs' customers being told by ESCO Revaitis and Insp. Emenecker that Williams is a bad contractor; and

        b.  Jobs where Plaintiffs were the electrical contractors were failed by ESCO Revaitis and Insp. Emenecker for violations outside the scope of Plaintiffs' scope of work;

        c.  Jobs where Plaintiffs were the electrical contractors were failed by ESCO Revaitis and Insp. Emenecker when there was no violation as Plaintiffs' work was performed in accordance with the law.

See Exhibit 2 at 99:3 -16, 105:3-6.

20.     Within a month of being awarded the 2002 Contract, Williams alleges ESCO Revaitis inquired of Williams how Williams was going to deal with IBEW when attempting to perform work in the City of Camden, to which Williams responded "well, I'll just deal with it as

3

it comes, you know, just like every other day, I just take it day as it comes…Donald's not happy, but I'm just trying to survive." *Id.* at 41:1 to 42:21.

21.     During the aforementioned conversation between Williams and ESCO Revaitis, ESCO Revaitis did not mention Mr. Norcross. *Id.* at 42:22 to 43:3.

22.     Plaintiffs allege ESCO Revaitis made comments about how Williams was going to deal with IBEW on three (3) to four (4) separate occasions, stating "how you making out?", "getting any flak from the union?" and "guys that are local [union] probably look down upon you because you were a union member." *Id.* at 86:7 to 88:3.

23.     Other than the aforementioned 3-4 occasions when ESCO Revaitis asked Williams how Williams was dealing with the union between 2002 and 2004, ESCO Revaitis has never mentioned the union to Williams. *Id.* at 111:7 to 112:6.

24.     Plaintiffs allege that the evidence that Insp. Emenecker treated him disparately because of their non-union membership occurred on two (2) occasions:

      a.   During an inspection at 420 Chambers Street, Insp. Emenecker asked why Williams was not wearing a rubber suit when Williams was taking a panel cover off, and when Williams said he did not need a suit, Insp. Emenecker allegedly stated "see? Since you've been working nonunion you got away from all the good habits that we use out of the local."

      b.   During an inspection at 1302 Browning St., Insp. Emenecker stated to Williams "you know how you supposed to do it, y'all working out of the local before, you know that."

*Id.* at 109:1 to 111:6.

25.     Williams has never any problems with IBEW since being awarded the 2002 Contract. *Id.* at 43:16-18.

26.     James Rizzo became a Building Inspector with the City of Camden in 2005, he was promoted to Building Subcode Official, and then became the Construction Official (CO) in or around 2009.  See November 5, 2014 deposition transcript of CO Rizzo, attached hereto as Exhibit "5" and incorporated herein by reference, at 6:17 to 8:19.

27.     As the Construction Official, CO Rizzo oversees all of the Building Bureau, which included ESCO Revaitis.  See Exhibit 3 at 6:8-12; see also Exhibit 5 at 8:18-22.

28.     Iraida Afanador was the Director of the City of Camden Department of Code Enforcement up to January 2014.  See November 5, 2014 deposition transcript of Dir. Afanador, attached hereto as Exhibit "6" and incorporated herein by reference, at 4:18 to 5:1.

29.     As Director, Dir. Afanador was CO Rizzo's supervisor. *Id.* at 8:15-16.

30.     Plaintiffs claim the disparate treatment they received from ESCO Revaitis and Insp. Emenecker was reported by Plaintiffs to CO Rizzo and Dir. Afanador, and that CO Rizzo and Dir. Afanador "failed to take action, have ratified the aforesaid actions of their subordinates, and have continued the long existing policy of the City of Camden to discourage non-union contractors from working in the city."  See ECF #1 at ¶27.

**B.  Specific Inspections Claimed to be Unlawful**

   **1. 1302 Browning Street**

31.      Plaintiffs' claim Insp. Emenecker rejected their work at 1302 Browning Street without a reasonable basis.  See ECF #1 at ¶23.

32.     The property owner's name was Vynne Lewis.  See Exhibit 2 at 112:7-12; see also City of Camden Contractor Project listing, attached hereto as Exhibit "7" and incorporated herein by reference, at 5.

33.     The scope of work for this property was replacing a service cable that feeds to the electrical panel and connects to the utility company's line on an electrical pole.  See Exhibit 2 at 113:24 to 114:9.

34.     According to Williams, the electrical code states an existing service can be cut out, and so as to not deface Ms. Lewis' property, Williams cut the cable out where it could not be re-energized as the cable was embedded in the mortar facial.  *Id.* at 97:19-24.

35.     Plaintiffs completed the work, and Ms. Lewis scheduled an inspection in December 2012.  *Id.* at 118:3-11; see also Exhibit 7 at 5.

36.     During the inspection, Ms Lewis telephoned Williams and advised him that there was a problem with the inspection.  Insp. Emenecker then spoke to Williams on the phone, and Williams contends that Insp. Emenecker stated "you're going to do the job according to the fucking way I want it done or you're not going to get it passed," to which Williams responded "Gene, who's going to be responsible for defacing the lady's property?  Long as I cut the cable off where it can't be re-energized, it's legal."  See Exhibit 2 at 98:4-12.

37.     Williams and Insp. Emenecker screamed back and forth at one another, with Insp. Emenecker eventually hanging up the phone on Williams.  *Id.* at 118:12 to 119:17.

38.     Williams complained verbally and in writing to CO Rizzo about Insp. Emenecker's conduct during this inspection.  See Exhibit 2 at 123:22 to 124:23.

39.     Williams' complaint regarding Insp. Emenecker was the first time CO Rizzo became aware of Plaintiffs.  See Exhibit 5 at 9:3-23.

40.     It is Plaintiffs' position that Insp. Emenecker was required, per New Jersey law, to cite to a code section, and that the property owner be sent a notice that the work Plaintiffs performed met the code requirements and that Insp. Emenecker made a mistake.  See Exhibit 2 at 127:22 to 129:24.

41.     After speaking with Williams, CO Rizzo wrote Williams an email wherein he stated "I told you that I would speak to the electrical inspector and have either provide a code section to support his decision or reverse it."  See January 3, 2013 email, attached hereto as Exhibit "8" and incorporated herein by reference.

42.     CO Rizzo further requested in his January 3rd email to Williams "what was it that constituted conduct unbecoming a public official?  I need specific information, not vague and unclear allegations.  Give me a comprehensive written account of these disrespectful actions that you elude to."  *Id.*

43.     Williams responded to CO Rizzo on January 4, 9 and 10, 2013 via email, but never furnished the information requested from CO Rizzo about what specific conduct of Insp. Emenecker rose to the level conduct unbecoming a public official.  *Id.*; see also January 9-10 emails, attached hereto as Exhibit "9" and incorporated herein by reference.

44.     After receiving Williams' complaint, CO Rizzo questioned Insp. Emenecker, with Insp. Emenecker stating he had had no problem with Williams.  See Exhibit 5 at 10:9-13.

45.     CO Rizzo characterizes the disagreement between Williams and Insp. Emenecker as a difference of opinion, with the matter being resolved when Insp. Emenecker passed the job. See Exhibit 2 at 127:3-8; see also Exhibit 5 at 10:13-20; see also Exhibit 9.

### 2. <u>931 South 7th Street</u>

46.     Plaintiffs claim ESCO Revaitis rejected their work at 931 South 7th Street without a reasonable basis.  See ECF at ¶24.

47.     Plaintiffs' contact person for the 931 South 7th St. job was the property owner's daughter-in-law, Ayana Jordan.  See Exhibit 2 at 133:15 to 134:23.

48.     Plaintiffs' scope of work for this property was installing new electrical service and interior wiring.  *Id.* at 137:10 to 138:8.

49.     After completing the work, Ms. Jordan scheduled the inspection.  *Id.* at 141:5-13.

50.     During the inspection on January 17, 2012, Ms. Jordan telephoned Williams and notified him that the inspection failed because of a lighting problem on the second floor of the residence, as indicated on the Electrical Subcode Technical Section for this property.  See Exhibit 2 at 141:14-20; see also Electrical Subcode Technical Section for 931 S. 7th St., attached hereto as Exhibit "10" and incorporated herein by reference.

51.     During said phone conversation, Williams stated the 2nd floor lighting problem was not within his scope of work.  The circuit breaker had tripped out because of an overload, and during the inspection a breaker was off in the electric panel.  See Exhibit 2 at 141:21 to 142:5.

52.      In regard to the tripped circuit breaker, Plaintiff claims ESCO Revaitis "didn't look into it in detail to find out whether it was the old existing work or something I did."  *Id.* at 142:6 to 143:8.

53.     After speaking with Ms. Jordan, Williams went to the property and confirmed the tripped breaker had nothing to do with his work.  *Id.* at 143:9-14.

54.     Williams then called ESCO Revaitis and stated the job was failed for something outside of Plaintiffs' scope of work, to which ESCO Revaitis allegedly replied "the only thing I know is there was a breaker off."  Williams says he then told ESCO Revaitis that he [ESCO Revaitis] did not take the panel cover off to determine if the problem was old or new wiring, to which ESCO Revaitis supposedly replied "yeah, you know, you get busy and I just didn't take the cover off." *Id.* at 143:15-22.

55.     ESCO Revaitis has testified that he initially failed Plaintiffs' job without issuing a red failure sticker because the 2nd floor had no lights and the breaker would not reset; and he spoke to Williams at the time of the inspection, to which Plaintiff responded that those issues were outside the scope of his work.  See Exhibit 3 at 17:20 to 18:24.

56.     After thinking about his conversation with Plaintiff, ESCO Revaitis decided the breaker would not reset because of a direct short in it, so he passed Plaintiffs' job on February 1, 2012 and delivered the approval to Ms. Jordan. *Id.*; see also Exhibit 10.

57.     According to Plaintiffs, the week after the initial inspection, ESCO Revaitis went back to the property and did another inspection, and then approved the job with Williams later received a notice from the City of Camden that the job was approved.  See Exhibit 2 at 146:10-15, 150:7-12.

58.     Williams complained about this job to CO Rizzo. *Id.* at 144:21 to 145:23; see also Exhibit 5 at 10:21 to 11:13.

59.     CO Rizzo characterizes the disagreement between Williams and ESCO Revaitis as a difference of opinion, with the end result being the job passed. *Id.* at 11:14-20.

60.     Ms. Jordan provided a statement to the City of Camden that unequivocally states that her property did not pass inspection, "but not due to Marshall [Williams]," and that she hired

another electrician after Williams, with the 2nd electrician fixing the problem which allowed the property to pass inspection.  See October 8, 2013 statement of Ayana Jordan, attached hereto as Exhibit "11" and incorporated herein by reference.

### 3. 1571 South 8th Street

61.     Plaintiffs claim Insp. Emenecker rejected their work at 1571 South 8th Street without a reasonable basis, and that Insp. Emenecker made disparaging remarks to the homeowner regarding Plaintiffs.  See ECF at ¶25.

62.     The owner of 1571 S. 8th St. was Bernice Holland, with Williams' neighbor, Tony Parker (a relative of Ms. Holland), requesting that Williams fix an electric problem at Ms. Holland's residence.  See Exhibit 2 at 209:2 to 210:21.

63.     Thereafter, Williams replaced an electrical panel and upgraded the ground system at the property.  *Id.* at 211:2-11.

64.     Ms. Holland arranged for an inspection, and in his deposition Williams testified ESCO Revaitis was the inspector for this property.  *Id.* at 211:12-14, 212:25 to 213:1.

65.     After the inspection occurred, Williams claims he received a telephone call from Ms. Holland wherein she stated ESCO Revaitis told her during the inspection that Williams should have corrected a cable on the outside and a loose outlet in the basement, and that she should not have paid Williams.  *Id.* at 211:12 to 213:1.

66.     There was also a problem with the service head, with ESCO Revaitis wanting more straps on the service head, which Williams claims "was like that all along" and "it wasn't like the service head couldn't function," and that the service head straps were outside the scope of his work.  *Id.* at 213:2-13.

67.     Williams claims the service head was properly attached when he performed his work, and that it became detached at some point between his work and the inspection as a result of inclement weather.  See January 13, 2013 deposition transcript of Williams, attached hereto as Exhibit "12" and incorporated herein by reference, at 46:16 to 47:18.

68.     Mr. Parker telephoned Williams and asked that Williams fix the problems, which Williams did without compensation for work that he would have charged approximately $250.00.  See Exhibit 2 at 213:17 to 214:9.

69.     About a week after the initial inspection, Williams complained in writing to CO Rizzo about this job wherein Williams averred a statement from Ms. Holland would be provided to validate his complaint.  See Exhibit 12 at 40:15 to 41:2; see also undated letter from Williams to CO Rizzo, attached hereto as Exhibit "13" and incorporated herein by reference.

70.     Williams also went to City Hall and complained to CO Rizzo in-person about this job.  See Exhibit 2 at 215:12 to 217:22.

71.     Williams prepared a statement for Ms. Holland to sign, which states that ESCO Revaitis failed the job due to the fact that the service head was not supported and that Williams should not have been paid for work that was done incorrectly; and that when Mr. Parker called Williams, Williams stated the service head was attached to the property when Williams performed work at the property.  See statement of Bernice Holland, attached hereto as Exhibit "14" and incorporated herein by reference; see also Exhibit 12 at 45:24 to 46:3.

72.     The job was approved approximately three (3) weeks later.  See Exhibit 2 at 217:23 to 218:13.

73.     Plaintiff's deposition testimony that ESCO Revaitis was the inspector for this job is in contradiction to his Complaint (which alleges Insp. Emenecker was the inspector for this

job) and the Electrical Subcode Technical Section which contains Insp. Emenecker's initial's and handwriting in the inspections portion of the document indicating that the initial failure was due to the service head not being attached to the building. See ECF at ¶25; see also Exhibit 2 at 212:25 to 213:1; see also Exhibit 4 at 42:23 to 43:10; see also Electrical Subcode Technical Section for 1571 S. 8th St., attached hereto as Exhibit "15" and incorporated herein by reference.

**4. 1207 Mt. Ephraim Avenue**

74.    Plaintiffs claim ESCO Revaitis, while performing an inspection at 1207 Mt. Ephraim Avenue, advised the owner of the property that the owner should use the services of a contractor other than Plaintiffs. See ECF at ¶26.

75.    A tattoo shop owned by Israel "Tony" Miller entitled "Twisted Tattoos" is located at 1207 Mt. Ephraim Ave. See Exhibit 2 at 195:22 to 196:2.

76.    After Plaintiffs performed electrical work at Twisted Tattoos in October 2011, Mr. Miller scheduled an inspection wherein ESCO Revaitis allegedly stated to Mr. Miller that if he [Mr. Miller] needed additional work, that ESCO Revaitis had a "good old boy" by the name of George Cassidy that is an electrical contractor that ESCO Revaitis would recommend as opposed to calling Plaintiffs. See Exhibit 2 at 200:20 to 202:7; see also Exhibit 7 at 5.

77.    ESCO Revaitis denies making the comments Mr. Miller claims were uttered by ESCO Revaitis. See Exhibit 3 at 15:6-16.

78.    Williams prepared a statement for Mr. Miller that Mr. Miller signed. See September 25, 2013 statement of Mr. Miller, attached hereto as Exhibit "16" and incorporated herein by reference; see also Exhibit 2 at 207:17-23.

79.    George Cassidy has never been a member of IBEW. See Exhibit 12 at 19:3-8.

80.     Plaintiffs concede that being non-union was not an issue for this job; Plaintiffs complaint was that ESCO Revaitis was improperly recommending another electrical contractor. *Id.* at 19:9 to 20:6.

81.     Every single one of Plaintiffs' jobs referenced above was approved by the City of Camden inspectors. *Id.* at 116:14-20.

### C. Plaintiffs' 2013 Complaint to the New Jersey Department of Community Affairs (DCA)

82.     In 2013, Plaintiffs sent a written complaint to Carmine Gangeruso of the DCA, wherein Plaintiffs complained that when an initial inspection would occur in the City of Camden and an inspector would say there was a violation, so specific citation to the electrical code was being provided in support of the inspector's position that a violation was present.  See undated letter from Plaintiffs to DCA, attached hereto as Exhibit "17" and incorporated herein by reference; see also Exhibit 12 at 117:4-14.

83.     Ken Verbos has been an employee of the State of New Jersey, DCA, Department of Regulatory Affairs, since 1993.  See January 16, 2015 deposition of Mr. Verbos, attached hereto as Exhibit "18" and incorporated herein by reference, at 6:19 to 7:1.

84.     Mr. Verbos first became aware of Plaintiffs after Plaintiffs complained to Mr. Verbos' supervisor, Mr. Gangeruso.  *Id.* at 7:21 to 8:7.

85.     Williams complained to Mr. Verbos about City of Camden inspectors not providing code citations when failing a job, improperly requiring Williams to make repairs that were not Williams' responsibility, and making derogatory remarks about Williams to Williams' customers.  *Id.* at 9:3-13.

86.     No formal investigation was ever conducted by Mr. Verbos into the inspectors' respective conduct.  *Id.* at 16:9-16.

87.     As a result of Plaintiffs' complaints, Mr. Verbos spoke to the City of Camden inspectors when he was in Camden on an unrelated issue, and advised the inspectors they had to cite a specific electrical code section if they failed a job.  *Id.* at 17:3-9, 38:9-20.

88.     In situations where an inspector mistakenly believes Plaintiffs performed work that constituted a failure, there is no requirement for inspectors to explain to the property owners that a mistake was made; the inspectors are required to issue an approval sticker in such a situation.  *Id.* at 13:14 to 15:10; 46:13 to 47:1.

89.     The demeanor of the inspectors is not a DCA issue, it is an issue to be handled by the municipality.  *Id.* at 9:14-22, 10:11-14.

90.     Mr. Verbos spoke to Mr. Gangeruso about Plaintiffs' issues with the City of Camden inspectors, and they agreed that the dispute did not rise to a level that required action by the DCA.  *Id.* at 22:10 to 23:7.

**D. Plaintiffs' Complaints to Mr. Rizzo & Director Afanador**

91.     Plaintiffs take issue with situations wherein initially the inspectors stated there was a violation, and then Williams protested and the jobs were ultimately approved by the inspectors; and that CO Rizzo did not send Williams and the property owner something in writing stating that there was nothing wrong with the work Plaintiffs performed.  It is Plaintiffs' contention that an approval notice being sent to Plaintiffs and the property owner is insufficient in such situations.  See Exhibit 2 at 99:17 to 102:20.

92.     On September 20, 2013, Williams submitted a request to meet with Dir. Afanador.  See September 20, 2013 letter of Williams, attached hereto as Exhibit "19" and incorporated herein by reference.

93.    Williams purposefully did not set forth any specific complaint in his September 20th letter because:

> I don't trust them people in the City of Camden, you gotta be very discreet what you say to them.  If I was to tell [Director Afanador] in advance what the contents of what I wanted to speak about, they prepare themselves.  You gotta be very careful when you communicate with them, you can't let them know what your hand is.  Like playing a game of poker, you can't let 'em know what your hand is.  You gotta reveal that at the time.

See Exhibit 2 at 180:5-24.

94.    If Williams had notified Dir. Afanador the specific nature of his complaints, "[t]hey would have turned around and gathered information…and interviewed certain people…" *Id.* at 181:6-21.

95.    Pursuant to Williams' request, a meeting occurred in September 2013 at City Hall with Williams, Dir. Afanador and other City personnel.  *Id.* at 159:3 to 163:5, 185:13-15.

96.    During the meeting, Williams claims he provided statements and telephone numbers of persons for Dir. Afanador to contact, including Ms. Jordan, and information regarding the properties discussed *supra*: 1207 Mt. Ephraim Ave., 1302 Browning St., 931 S. 7th St., and 1571 S. 8th St.  *Id.* at 190:4 to 191:11.

97.    Dir. Afanador confirms that Williams provided information regarding Ms. Jordan and Mr. Miller.  See Exhibit 6 at 14:1-7.

98.    Dir. Afanador requested CO Rizzo to investigate Williams' complaint of his jobs failing inspections, and CO Rizzo advised Dir. Afanador that none of Plaintiffs' jobs had failed as they all received approval.  *Id.* at 14:1 to 15:3.

99.    CO Rizzo spoke to ESCO Revaitis about not citing to the code for Plaintiffs' jobs, to which ESCO Revaitis replied that there was no reason to cite to the code when he has never

failed a job of Plaintiffs' as said jobs all received approval for the work performed by Plaintiffs. See Exhibit 3 at 16:18-25.

100.    Dir. Afanador contacted Mr. Miller and he confirmed that ESCO Revaitis made the comments attributed to him [ESCO Revaitis] in Mr. Miller's statement.  See Exhibit 6 at 16:10 to 17:8.

101.    Dir. Afanador contacted Mr. Miller a second time and asked him if he wrote his statement, and Mr. Miller advised that Williams prepared the statement and he [Mr. Miller] signed the same.  Dir. Afanador advised Mr. Miller that she needed a statement directly from Mr. Miller, but Mr. Miller refused to cooperate.  *Id.* at 17:9 to 19:16.

102.    During Dir. Afanador's and CO Rizzo's investigation of Plaintiffs' complaints, ESCO Revaitis denied, via email, Mr. Miller's accusations.  See October 4, 2013 email from ESCO Revaitis to Dir. Afanador, attached hereto as Exhibit "20" and incorporated herein by reference.

103.    Director Afanador stated to Williams after their meeting that she was going to reach out to Ms. Jordan.  See Exhibit 2 at 187:20 to 188:5.

104.    Dir. Afanador contacted Ms. Jordan via telephone with CO Rizzo and the Director's secretary also parties to the phone conference, with Ms. Jordan having a negative feeling towards Williams as a result of Williams' behavior when Williams called ESCO Revaitis a "cracker"; with Williams' improper behavior rising to such a level that Ms. Jordan had to resort to having her husband speak to Williams on the phone so as to cause Williams to cease harassing her by calling and text messaging her.  See Exhibit 5 at 12:1 to 13:5; see also Exhibit 6 at 20:14 to 22:11.

105. Dir. Afanador requested that Ms. Jordan provide a statement, and Ms. Jordan complied when she provided the statement referenced *supra*. See Exhibit 6 at 20:14 to 22:11

106. Ms. Jordan's aforementioned statement contradicts Williams' version of events regarding the inspection of her property; Ms. Jordan states Williams was present for the inspection and that when ESCO Revaitis initially approached them for the inspection, Williams called ESCO Revaitis a "racist son of a bitch," and that the initial failure of the inspection was not due to work performed by Plaintiffs. See Exhibit 11.

107. Plaintiffs accounts for Ms. Jordan's version of events contradicting his as a result of Dir. Afanador and Ms. Jordan both being Hispanic, and "if you don't know this about the Spanish community, they're very close. No disrespect to anybody, but they're very close. They will support each other, lie, or whatever it is. They will lie. They lie for one another. That's one population, group of people that will lie for each other…" See Exhibit 2 at 157:2-20.

108. The week after the meeting, Dir. Afanador telephoned Williams and allegedly stated that the electrical inspectors had done an excellent job and that Williams was the problem, to which Williams replied "I understand your position, you're the director and it's only fitting that you take that position because it makes it look like you don't have any control over your office." *Id*. at 185:25 to 186:25.

109. In light of the only evidence supporting Plaintiffs' allegations being Mr. Miller's statement prepared by Williams, and ESCO Revaitis' denial of same, Dir. Afanador found no wrongdoing on the part of ESCO Revaitis or Insp. Emenecker at the conclusion of her investigation due to a lack of evidence/merit to Williams' complaints. See Exhibit 6 at 23:3-6; see also Exhibit 20; see also October 3, 2013 email from Dir. Afanador to ESCO Revaitis, attached hereto as Exhibit "21" and incorporated herein by reference.

17

## LEGAL ARGUMENT

**POINT I.      THE SUMMARY JUDGMENT STANDARD**

A Court may grant summary judgment when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). *See* Hersch v. Allan Products Company, 789 F. 2d 230, 232 (3d Cir. 1986). A dispute is "genuine" if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *See* Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" only if might affect the outcome of the suit under the applicable rule of law. *Id.* Disputes over irrelevant or unnecessary facts will not preclude entry of summary judgment. *Id.*

In deciding the motion, the Court must view the evidence in favor of the non-moving party, by extending any reasonably favorable inference to that party. Kowalski v. L & F Products, 82 F. 3d 1286, 1288 (3d Cir. 1996). In the *Celotex Corp. v. Catrett*, the United States Supreme Court stated:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no "genuine issue as to any material fact", since a complete failure of proof concerning an essential element of the non-moving party's case necessary renders other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

In such situations, the "burden on the moving party may be discharged by showing – that is pointing out to the District Court – that there is an absence of evidence to support the non-moving party's case." *Id.* at 325; *see also* Matsushita Electric Industry Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply

show that there is some metaphysical doubt as to the material facts") (additional citations omitted). Thus, if the non-movant's evidence is merely "colorable" or is "not significantly probative", the Court may grant summary judgment. *See* Anderson, *supra* at 249-250.

Applying this standard to the facts of the present case, summary judgment must be granted in favor of Defendants for the reasons discussed *infra*.

**POINT II.   ANY AND ALL OF PLAINTIFFS' CLAIMS AGAINST DEFENDANTS THAT OCCURRED PRIOR TO OCTOBER 24, 2011 ARE BY THE APPLICABLE STATUTE OF LIMITATIONS**

Plaintiffs initiated this action with the filing of the Complaint on October 24, 2013, and for the reasons set forth below, any incidents complained of by Plaintiffs that occurred prior to October 24, 2011 are barred by the applicable two (2) year statute of limitations.

First Amendment rights are protected by suits under 42 U.S.C. §1983, and Federal courts look to state law to determine the limitations period for §1983 actions. *See* Wallace v. Kato, 549 U.S. 384, 388-390, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007). Civil rights or constitutional tort claims are best characterized as personal injury actions and are governed by the applicable state's statute of limitations for personal injury actions. *Id.*; *see also* Wilson v. Garcia, 471 U.S. 261, 280, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985). Accordingly, New Jersey's two-year limitations period on personal injury actions set forth in N.J.S.A. 2A:14–2, governs Plaintiffs' claims. *See* Montgomery v. De Simone, 159 F.3d 120, 126 & n. 4; *see also* Cito v. Bridgewater Township Police Dept., 892 F.2d 23, 25 (3d Cir.1989). Under N.J.S.A. 2A:14–2, an action for an injury to the person caused by a wrongful act must be commenced within two years of accrual of the cause of action. Cito, *supra* at 25; *accord* Brown v. Foley, 810 F.2d 55, 56 (3d Cir.1987). Therefore, any professed wrongful actions for which Plaintiffs are seeking relief this matter prior to October 24, 2011 are barred by the two-year statute of limitations.

**POINT III.   PLAINTIFFS CANNOT PRODUCE ANY EVIDENCE TO SUPPORT THEIR CLAIMS OF A VIOLATION OF THEIR 1ST AMENDMENT RIGHT TO ASSOCIATE**

### A.   Plaintiffs Did Not Engage in Constitutionally Protected Conduct

The First Amendment prevents the government from "wielding its power to interfere" with persons' "freedom to believe and associate, or to not believe and not associate." Rutan v. Republican Party of Illinois, 497 U.S. 62, 76 (1990); *see also* Roberts v. U.S. Jaycees, 468 U.S. 609, 623 (1984).  The First Amendment protection of the right to associate or not associate extends to union-related activity, free from retaliation. Bradshaw v. Twp. of Middletown, 296 F. Supp. 2d 526, 544 (D.N.J. 2003).

"Unlike claims of Due Process deprivation, claims of First Amendment retaliation do not require a plaintiff to allege that she had a protectable property interest in employment." Downey v. Coal. Against Rape & Abuse, Inc., 143 F. Supp. 2d 423, 444 (D.N.J. 2001). In *Downey*, a director of a non-profit organization brought a retaliation claim against the private employer and the county for terminating her based upon her negative statements made against county officials. *Id.* In her complaint, the plaintiff asserted violation of First Amendment rights based on her theory that the public officials acted in concert to interfere with her employment in retaliation for statements criticizing the government's performance. *Id.* at 436.

"The gist of First Amendment retaliation claims under § 1983 is that government officials may not directly take an adverse employment action against an individual in retaliation for exercise of that individual's First Amendment rights." Downey, *supra* at 444 citing Board of County Commissioners v. Umbehr, 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996), and O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (First Amendment protects independent contractors).  The *Downey* Court ultimately held

that there is a well-established right of private citizens to be from official retaliation for exercising their First Amendment rights.

To establish a First Amendment Retaliation Claim, a Plaintiff must allege: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial or motivating factor in the alleged retaliatory action. Phyllis Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005). The first factor is a question of law; the second factor is a question of fact. Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004). The defendant may defeat the plaintiff's claim by demonstrating that the same adverse action would have taken place in the absence of the protected conduct. Phyllis Hill, *supra* at 125; see also Perna v. Twp. of Montclair, 2006 WL 2806276, at *5 (D.N.J. Sept. 28, 2006). The plaintiff may rebut the defendant's rationale by arguing that the discipline imposed was pretextual. *Id.*

In the matter *sub judice*, Plaintiffs did not engage in activity that amounts to constitutionally protected conduct. In *Lee v. The Cnty. Of Passaic*, a union of former employees for a Juvenile Detention Center was in negotiations for a new collective bargaining agreement after payroll miscalculations had been discovered. Lee v. The Cnty. of Passaic, 2011 WL 3159130, at *2 (D.N.J. July 26, 2011). One of the former employees made statements to the media "regarding cost of living increases; salary readjustments; and whether the County overpaid certain officers." *Id.* at *4. Subsequently, the former employees were notified that the negotiated deal was off the table, which caused them to allege relation claims against their right to associate. *Id.* at *2-3. The Court dismissed the claims since Plaintiffs failed to show that they were engaged in a valid union activity that amounted to constitutionally protected conduct. *Id.* at *4. The court noted that Plaintiff's speech fell into the category of a personal grievance since he was not speaking to the County's mismanagement of funds, its discharge of its responsibilities, or any

breaches of the public's trust." *Id.* at *4. Thus, the court found Plaintiff's speech to be outside the scope of protected activity under the First Amendment. *Id.*

Likewise, the conduct of Williams on behalf of Nico and his dispute about the inspection procedures of the City of Camden for his inspections falls into the category of a personal grievance. Plaintiffs' complaint are solely related to their interactions with the City of Camden, and all claims of Plaintiffs must be dismissed as a result thereof.

### B. Plaintiffs Cannot Prove a First Amendment Retaliation Claim Against ESCO Revaitis or Insp. Emenecker

Assuming, *arguendo*, that Plaintiffs' conduct is protected by the First Amendment, Plaintiffs nevertheless cannot prove that they suffered any retaliatory action. Plaintiffs concede every single one of their jobs has been approved by the City of Camden. Thus, Plaintiffs have suffered no retaliatory action. If it is determined Plaintiffs have suffered some adverse impact, they cannot establish that Plaintiffs' non-participation in IBEW was a substantial or motivating factor in any of the conduct complained of against ESCO Revaitis or Insp. Emenecker.

"Generalized assertions lack the necessary factual support" to be a "substantial" or "motivating factor" behind a retaliation claim based on associational rights. Peppers v. Booker, 2012 WL 1806170, at *8 (D.N.J. May 17, 2012). In *Peppers*, police officers asserted that they were transferred and demoted in retaliation for their political affiliation. *Id.* at 8. To support their retaliation theory, they claimed the defendants had knowledge of their political associations based upon plaintiff's supporting a political candidate on his Facebook page; plaintiff's family relationships with a political candidate; and that it was known that plaintiff bought tickets to attend fundraisers for the political candidate. *Id.* The court found these facts were not sufficient to enough to support a claim against the defendants as they were generalized assertions that lacked the necessary factual support to be a substantial or motiving factor. *Id.*

Plaintiff has not been a member of IBEW since 1998, and his complaints regarding the City of Camden did not begin until the 2002 Contract, more than four (4) years after his membership ceased. ESCO Revaitis and Insp. Emenecker have not been members of IBEW since 1996 and 1999, respectively. Plaintiffs have not alleged that they have ever had any problems with IBEW, and specifically acknowledge no problems have occurred since the 2002 Contract was awarded.

The statements attributed to Mr. Norcross by Plaintiff that Plaintiff was not to perform work in the City of Camden to CFO Feliciano are believed to be the consequence of Williams' belief that Mr. Norcross was "pissed off" Williams left IBEW; this is pure speculation by Williams, and it is of note that at no time during the alleged conversation between CFO Feliciano and Mr. Norcross was IBEW, or Williams' non-membership in the same, ever mentioned. Assuming this conversation even occurred, CFO Feliciano obviously did not infer that Mr. Norcross' dissatisfaction with Williams involved IBEW as he would not have inquired what was the problem between Williams and Mr. Norcross. Furthermore, there is zero evidence that ESCO Revaitis or Insp. Emenecker had any involvement in, or knowledge of, anything related to the 2002 Contract; Insp. Emenecker was not even an employee of the City until 2004. Nor is there any evidence establishing any privity between Mr. Norcross and ESCO Revaitis or Insp. Emenecker; neither individual ever mentioned Mr. Norcross to Williams.

Any claim that ESCO Revaitis' alleged comment to Mr. Miller that Mr. Miller should hire a different **non-union** contractor is belied by Plaintiffs' own admission that that this job had nothing to do with Plaintiffs' non-membership in IBEW. Accordingly, any claim by Plaintiffs involving 1207 Mt. Ephraim Ave. should be dismissed.

Plaintiffs' claimed proof of a causal connection between his non-association with IBEW and the alleged retaliatory action by ESCO Revaitis is the following:  ESCO Revaitis made comments about how Williams was going to deal with IBEW on three (3) to four (4) separate occasions, stating "how you making out?", "getting any flak from the union?" and "guys that are local [union] probably look down upon you because you were a union member."  Other than the aforementioned 3-4 occasions when ESCO Revaitis asked Williams how Williams was dealing with the union between 2002 and 2004, ESCO Revaitis has never mentioned the union to Williams.

Plaintiffs allege that the evidence that Insp. Emenecker treated him disparately because of their non-union membership occurred on two (2) occasions: (1) During an inspection at 420 Chambers Street, Insp. Emenecker asked why Williams was not wearing a rubber suit when Williams was taking a panel cover off, and when Williams said he did not need a suit, Insp. Emenecker allegedly stated "see? Since you've been working nonunion you got away from all the good habits that we use out of the local"; and (2) During an inspection at 1302 Browning St., Insp. Emenecker stated to Williams "you know how you supposed to do it, y'all working out of the local before, you know that."

As in *Peppers*, the claimed proofs of Plaintiffs are insufficient as they are mere generalized assertions lack the necessary factual support to be a substantial or motivating factor behind their retaliation claim based on associational rights.  Without more, Plaintiffs' claims that the problems they had with City inspectors are nothing more than conjecture.  The comments themselves are benign, and cannot be characterized as establishing that any of the acts complained of by Plaintiffs are the result of Plaintiffs' non-membership in IBEW.

### C. **Plaintiffs Cannot Prove a First Amendment Retaliation Claim Against CO Rizzo or Dir. Afanador**

Plaintiffs claim the disparate treatment they received from ESCO Revaitis and Insp. Emenecker was reported by Plaintiffs to CO Rizzo and Dir. Afanador, and that CO Rizzo and Dir. Afanador "failed to take action, have ratified the aforesaid actions of their subordinates, and have continued the long existing policy of the City of Camden to discourage non-union contractors from working in the city."

A plaintiff must allege with appropriate particularity that a defendant had some personal involvement in the alleged constitutional deprivation, as liability cannot be predicated solely on the operation of *respondeat superior*. Colburn v. Upper Darby Twp., 838 F.2d 663, 673 (3d Cir. 1988), *cert. denied*, 489 U.S. 1065 (1989); *see also* Rode v. Dellarciprete, 845 F.2nd 1195, 1207 (3rd Cir. 1988). This rule was recently affirmed in *Ashcroft v. Iqbal*, where the United States Supreme Court held that "a plaintiff must plead that <u>each</u> Government-official defendant, through the official's own individual actions, has violated the Constitution." Aschroft v. Iqbal, 129 S.Ct. 1937, 1948 (2009) (emphasis added). The Court of Appeals for the Third Circuit has stated:

> It is clear from the statue's express language that, like federal habeas corpus in this respect, a civil rights complaint must portray <u>specific conduct</u> by state officials which violates some constitutional right of the complainant in order to state a claim for relief.

Gittlemacker v. Prasse, 428 F.2d 1, 3 (3d Cir. 1970) (emphasis added). Liability against a supervisor requires that the supervisor have been personally involved in a subordinate's alleged wrongful conduct. *See* Rode v. Dellarciprete, 845 F.2d 1195, 1207-09 (3d Cir. 1988); *see also* Colburn, *supra* at 673 (absent allegation of personal involvement in alleged constitutional violation, no liability could lie against police commissioner or mayor).

In regard to CO Rizzo, Plaintiffs claim is essentially that CO Rizzo failed to take any action against his employees as a result of their interactions with Williams.  First and foremost, there is no action that CO Rizzo could have undertaken against either ESCO Revaitis or Insp. Emenecker as every single one of Plaintiffs' jobs in the City of Camden was approved by the inspectors.  CO Rizzo requested of Williams specific information that constituted conduct unbecoming of Insp. Emenecker for the 1302 Browning inspection, but Williams never provided more than generalities.  Each of the complained instances by Williams to CO Rizzo were disagreements between the inspectors and Williams, which resulted in every job being approved. It is of significance that Plaintiffs are not claiming they ever notified CO Rizzo that the reason they were experienced what they perceived to be problems with the inspectors was due to Plaintiff disassociating himself with IBEW in the 1990s. None of CO Rizzo's actions can be characterized as violating Plaintiffs' constitutional rights.

In regard to Dir. Afanador, from the outset Williams was not forthright, by his own admission, in providing her information regarding his problems with her employees.  Oddly, Williams thought providing information to Dir. Afanador prior to meeting with her would allow her to investigate Plaintiffs' complaints, which is exactly what was being requested; this simply makes no sense.  After conducting her investigation, Ms. Jordan inculpated Williams, not the inspectors; and Mr. Miller refused to participate and his involvement has no relevance to Plaintiffs' claims as they are not related to Plaintiffs' non-membership in IBEW for the reasons discussed above.  There was no evidence for Dir. Afanador to determine that Plaintiffs' First Amendment rights were being violated, and all claims against the Director should be dismissed.

**POINT IV.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY**

Qualified immunity entitles a defendant to avoid trial and the other burdens of litigation. Bornstad v. Honey Brook Township, 2005 WL 2212359 at *13 (E.D.Pa. September 9, 2005), citing Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S.Ct. 2806 (1985).  Under the qualified immunity doctrine, public officials "performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known". Bornstad, *supra* at *13, citing Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2000).

In analyzing the merits of a claim of qualified immunity, the court must engage in a multi-step inquiry.  First, the court must first determine whether the Plaintiff has alleged a deprivation of a constitutional right.  Donahue v. Gavin, 280 F.3d 371, 378 (3d Cir. 2000).  If a court determines that there is sufficient evidence to conclude that the public official did commit a constitutional violation, it must determine that the right was clearly established at the time of the action.  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2002).

Next, analyzing whether an public official's conduct violated a clearly established right, a court must determine whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.  *Id*.  The Supreme Court has determined that in evaluating a claim of qualified immunity by a police officer, the court must engage in an additional level of analysis to determine whether a public official's conduct is subject to qualified immunity.  *Id*.

If it is determined that the public official did violate a clearly established constitutional right, the court must then decide whether the official made a reasonable mistake as to what the law required. Carswell v. Borough of Homestead, 381 F.3d 235, 242 (3d Cir. 2004).  The

determinations of whether the right was clearly established and whether the official's conduct was reasonable are questions of law. <u>Sterling v. Borough of Minersville</u>, 232 F.3d 190, 193 (3d Cir. 2000).

Defendants acknowledge Plaintiffs have alleged a deprivation of a constitutional right. Applying the above standards to the facts of the instant case, it cannot be disputed that Defendants are entitled to qualified immunity.  The facts of this case unequivocally establish that Plaintiffs and the inspectors had disagreements over whether Plaintiffs work was in accordance with the law.  CO Rizzo and Dir. Afanador investigated Plaintiffs' complaints and found no wrongdoing as there was insufficient evidence to establish the inspectors were violating Plaintiffs' constitutional rights.  As a matter of law, the individual Defendants acted in good faith and are entitled to qualified immunity, and Plaintiffs' claims set forth in the Complaint must be dismissed.


**POINT V.   ALL CLAIMS BROUGHT BY PLAINTIFF AGAINST THE CITY OF CAMDEN MUST BE DISMISSED**

Plaintiffs lone allegation against the City of Camden is that it had a "long existing policy [ ] to discourage non-union contractors from working in the city," which can only be characterized as a *Monell* claim wherein a municipality may be held liable under §1983 only where the municipality itself causes the Constitutional violation at issue. <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 681 (1978). Thus, respondeat superior or vicarious liability will not attach against a municipal defendant. *Id.* "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983.   Aware that governmental bodies can act only through natural persons, the Supreme Court determined that governmental bodies should be responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights.   Monell, *supra* at 691.

The City of Camden cannot be held liable under §1983 unless the plaintiff proves the existence of an unconstitutional municipal policy.   City of St. Louis v. Praprotnik, 485 U.S. 112, 128, 108 S.Ct. 915 (1988).   The United States Supreme Court has explained that "the touchstone of 'official policy' is designed to distinguish acts of the municipality from acts of employees of the municipality, and thereby making clear that municipal liability is limited to action for which the municipality is actually responsible." Pembaur v. City of Cincinnati, 475 U.S. 469, 479-480, 106 S.Ct. at 1298 (1986). (internal quotations omitted)(emphasis in original).

The Supreme Court has provided several principles for evaluating municipal liability under 42 U.S.C. §1983: (1) municipalities may be held liable under §1983 only for acts which the municipality has officially sanctioned or ordered; (2) only officials who have "final policy making authority" may, by their actions, subject the government to §1983 liability; (3) determining whether a particular official has final policy making authority is a question of state law; and (4) the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business. Praprotnik, *supra* at 123, 108 S.Ct. at 924 (1988) citing Pembaur, *supra* at 480-483.

A §1983 suit against a municipal employee in his official capacity is simply another way of pleading an action against a municipal entity of which the official is an agent. Monell, *supra* at 691 n. 55.   Therefore, a plaintiff suing an official in his official capacity must prove the

elements of a §1983 suit against the municipality; (1) that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional depravation. Myers v. Oklahoma Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998), citing Monell, *supra* at 694.

A municipality can be liable only "when the alleged constitutional transgression implements or executes a policy, regulation, or decision officially adopted by the governing body or informally adopted by custom." McTernan v. City of York, 564 F.3d 636, 657 (3d Cir. 2009) (quoting Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (citing Monell, *supra*). Thus, *Monell* created a "two-track path" for a plaintiff to establish municipal liability under § 1983, depending on whether the allegation is premised on municipal policy or custom. McTernan, *supra* at 657 (citing Beck, *supra* at 971).

A government "policy" is established "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." McTernan, *supra* at 658 (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (quotation and citations omitted). On the other hand, a "custom" can be proven when a course of conduct, though not authorized by law, is "'so permanent[] and well-settled' as to virtually constitute law." *Id.*; see also Watson v. Abington Twp., 478 F.3d 144, 155-156 (3d Cir. 2007) (holding that "custom may be established by proving knowledge of, and acquiescence to, a practice," citing Fletcher v. O'Donnell, 867 F.3d 791, 793- 94 (3d Cir. 1989)). It is clear that under either route, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Watson, *supra* at 156 (citing Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990); see also Praprotnik, *supra* at 123 (1988) (holding that "an unconstitutional

governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy . . . .")

Plaintiffs' proofs in this matter that there exists a long existing policy in the City of Camden to discourage non-union contractors from working in the City is predicated upon Plaintiffs' own complaints, and nothing more.  There is no evidence of any other non-union contractors being discouraged from working in the City, and there is not a scintilla of evidence that any such policy or custom of discouraging non-union contractors ever existed in the City of Camden.  Plaintiffs' claims against the City of Camden must therefore be dismissed.


## CONCLUSION

For all of these reasons, it is respectfully submitted that the Motion for Summary Judgment of Defendants should be granted and Plaintiff's claims be dismissed in their entirety.


                                        WEIR & PARTNERS LLP

                                        /s Daniel E. Rybeck
                                        DANIEL E. RYBECK, ESQUIRE

Dated: March 13, 2015

## CERTIFICATION OF FILING AND SERVICE

On March 13, 2015, I filed the herein Motion for Summary Judgment with the Court via ECF, and a copy served upon Plaintiff's counsel by ECF.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**WEIR & PARTNERS LLP**

/s Daniel E. Rybeck
DANIEL E. RYBECK, ESQUIRE

Dated: March 13, 2015