

CODE  #6-02-161

**This Contract and Agreement,** made and entered into this 8th day of July , in the year of Our Lord, Two Thousand Two (2002).

**The City of Camden,** a Municipal Corporation of the State of New Jersey of the first part, hereinafter referred to as the party of the first part and **Nico Electrical Contractor, 5328 Browning Road, Pennsauken, New Jersey 08109** of the second part, hereinafter referred to as the party of the second part.

**Witnesseth:**

In Consideration of the mutual promises and covenants of the parties hereto it is agreed as follows:

The party of the second part shall provide the goods and/or services, more particularly described in the specifications and proposal attached hereto and made a part hereof within the time limits stated therein: Provide electrical installation and repairs for various departments of the City on an "as needed" basis for a period of two (2) years, per attached bid dated May 14, 2002 and Resolution R-11 adopted June 13, 2002.

The party of the second part does hereby agree and covenant that it, he or she will comply with the Labor Laws of the State of New Jersey and of the United States of America as it may pertain to the manufacture, assembly or performance of the goods or services to be supplied hereunder and to further pay to its employees a sum no less than the prevailing daily rate for wages in the locality where the work is to be performed or services rendered pursuant to law.

**AND** the party of the second part further agrees to comply with the provisions of N.J.S.A. 10:5-12 regarding unlawful employment practices and discrimination; and all other applicable federal, state laws and municipal ordinances regarding employment practices and discrimination. The violation of any of the aforesaid statutes or ordinances by the party of the second part shall be a breach of the entire contract and the party of the first part shall have the option of canceling the remaining portion of the contract, rescinding the contract in its entirety or continuing the contract subject to the remedies, penalties or other mandatory action available to the party of the first part under the law. (See Addendum #1 and Execute).

1

**(01-12-15)**                                      **Williams 36**

AND the party of the second part hereby certifies that no bonus, or other consideration has or will be given, received or promised to the servants, agents or employees of the party of the first part of the awarding of this contract.

AND the party of the second part shall furnish a Performance Bond in the amount of WAIVED BY THE PURCHASING AGENT.

The party of the first part does covenant, promise and agree, to and with the said party of the second part, to pay or cause to be paid unto the said party of the second part the sum of ONE HUNDRED FIFTY THOUSAND DOLLARS ($150,000.00), lawful money of the United States of America, as per attached bid dated May 14, 2002 and Resolution R-11 adopted June 13, 2002. The parties acknowledge that the City is subject to the Local Public Contracts Law, N.J.S.A. 40A:11-15, which states that this contract shall be subject to the availability and appropriation annually of sufficient funds.

The payment of said price, or consideration money, shall be paid to the said party of the second part, upon certification of the Department of Administration that the work was done or articles furnished and delivered in a satisfactory manner; then upon presentation by the said party of the second part, to the Department of Finance of said City, a Certificate in Lieu of Affidavit that the work done or articles furnished are according to law and not upon any secret promises to pay any bonus in money or property as detailed on the invoice.

AND, it is further agreed by the parties hereto in the event of a default by the party of the second part in any of the terms and/or conditions hereof then in such an event, of the second part as liquidated damages and not as a penalty; the party of the second part shall be liable for the payment of any costs or expenses incurred by the party of the first part in excess of the contract price required to complete this contract.

It Is Further Understood and Agreed that in the event of the default as aforesaid, the party of the second part, it successors, heirs or personal representatives shall pay such excess costs and expenses upon the presentation of an invoice by the party of the first part.

2

**In Witness Whereof**, the party of the second part has caused these presents to be signed and sealed and the said CITY OF CAMDEN has caused these presents to be signed by its proper officers and sealed with its common or corporate seal, the day and year first aforesaid.

CITY OF CAMDEN

Signed, Sealed and Delivered:

BY: _____
GWENDOLYN A. FAISON
Mayor

in the presence of:

(SEAL)

ATTEST: _____
LUIS PASTORIZA
Municipal Clerk

Approved as to form:

NICO ELECTRICAL CONTRACTOR

_____
DENNIS G. KILLE
City Attorney

_____
Witness

3

2

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:13-cv-06353(JHR-AMD)

NICO ELECTRICAL CONTRACTOR, INC., and
MARSHALL B. WILLIAMS,

                              Plaintiffs,

          vs.

CITY OF CAMDEN, EUGENE EMENECKER,
WILLIAM REVAITIS, JAMES RIZZO and IRAIDA
AFANADOR,

                              Defendants.

          -------------------
          October 21, 2014
          -------------------

               Oral sworn deposition of
MARSHALL B. WILLIAMS, 5328 Browning Road,
Pennsauken, New Jersey, was taken at the law office
of F. MICHAEL DAILEY, JR., LLC, 216 Haddon Avenue,
Westmont, New Jersey, before Linda S. Scholz,
Registered Professional Reporter and Certified Court
Reporter of the State of New Jersey, on the above
date, commencing at 10:05 a.m., there being present:

          F. MICHAEL DAILEY, JR., LLC
          BY: F. MICHAEL DAILEY, JR., ESQUIRE
               216 Haddon Avenue
               Westmont, NJ 08108          REC'D NOV 0 5 2014
               (856) 833-0006
               Attorney for Plaintiffs

                    APPEARANCES CONT.,

Page 22

1  trying to make sure -- maybe two thousand -- I think
2  it was 2005.  I believe it was 2005.
3        Q     Okay.  And why did you not incorporate
4  until 2005?
5        A     I just -- I decided to incorporate
6  because I spoke to several attorneys, and I even had
7  a judge mention to me it would be in our best
8  interest to incorporate to protect myself.
9        Q     Is that as -- protect yourself as for
10 personal liability?
11       A     Personal liability.
12       Q     Okay.  You said you had a judge --
13       A     I even had a judge recommend to me that
14 it might be in my best interest.
15       Q     Which judge?
16       A     He was -- Judge Wingate.  Judge
17 Wingate.  He's been retired some time.  My father
18 used to worked for --
19       Q     Okay.
20       A     -- Wingate.
21       Q     Okay.
22             MR. DAILEY:  He's dead, isn't he?
23             MR. RYBECK:  I've heard the name.  I
24 never appeared before him, so --
25             MR. DAILEY:  He was -- as long as I

D E G N A N & B A T E M A N , I N C .

Page 23

1  knew he never left the criminal division.
2             THE WITNESS:  He spoke at my dad's
3  funeral.  That's the last time I seen him.  I didn't
4  see him since then.
5  BY MR. RYBECK:
6        Q     In paragraph 15 of your complaint you
7  allege that in 2002 you were the low bidder on the
8  contract to provide electrical maintenance services
9  to the City of Camden for a period of three years.
10             Explain to me how that bidding process works.
11       A     What happens, it's an open bid process
12 to the public, it's put out and all -- anyone that's
13 a -- that meets the qualifications can apply.
14             And I applied and I was informed that I was
15 the lowest bidder and was awarded the contract.
16       Q     Okay.  And do you have any of those bid
17 documents in your possession?
18       A     I don't have them on me, but I may have
19 to -- you should be able to research and have those
20 documents, they should be available.
21       Q     Sure.  Anything in your possession
22 regarding that 2002 bid I ask you provide to your
23 attorney and he provide to me.  Okay?
24       A     Uh-huh.
25       Q     And it was for electrical maintenance

D E G N A N & B A T E M A N , I N C .

Page 24

1  services.  Explain to me what that means.
2        A     Electrical maintenance service means
3  like say for instance if -- something as simple as
4  like say for instance if you have lighting out that
5  may be out at a building that's owned or monitored
6  by the City of Camden, they would reach out to you
7  and say, well, look, we have a problem here.  If the
8  maintenance guys -- if it's something the
9  maintenance guys won't do, they'll reach out to you.
10             Some of the guys that they have on maintenance
11 they won't do because they're not knowledgeable as
12 far as construction and they'll reach out to someone
13 who's more advanced.
14       Q     Okay.  And it was a period of three
15 years.  Was that what the bid specs said?
16       A     I believe it was a period of three
17 years.  Back then I think it was three years.  I
18 think they changed it to two years now.
19       Q     Were you the sole person that was
20 awarded that bid?
21       A     Yes.
22       Q     In paragraph 16 you allege that not
23 long after being awarded the contract you had a
24 telephone conversation with a Richard Feliciano, --
25       A     Yes.

D E G N A N & B A T E M A N , I N C .

Page 25

1        Q     -- who was a CFO for Camden.  Who
2  initiated that -- the telephone call?
3        A     He called me.
4        Q     Okay.  And please tell me what
5  transpired in that conversation.
6        A     Well, Rich called me and he says, I
7  just got a phone call, he says, do you know Donald
8  Norcross?  I said, yes, me and Donald, we served an
9  apprenticeship together, I know Donald very well.
10 And he said, he called me, he -- and also he turned
11 around and marched -- he said he marched into the
12 purchasing agent's office, Rich Feliciano was the
13 purchasing agent, and he said that he wanted the bid
14 to go back out for bids, he said he didn't want me
15 doing any work and that he didn't want me performing
16 any work.
17             So he was upset because I was awarded the bid,
18 he wanted to go back out for bid.  And he said,
19 we're going to have a problem with him.  And that's
20 where it was pretty much left.
21       Q     Okay.  And this is -- when you say, he
22 didn't want you to have the bid, he being Donald
23 Norcross?
24       A     Right, Donald Norcross placed the phone
25 call and he also came into his office also.  And he

D E G N A N & B A T E M A N , I N C .

Page 34

1 Sometimes I'll be over near Cooper River Park I'll
2 run into him.
3     Q     I just ask you if you recall, or if
4 there's any kind of research you can do to find out
5 his last name, --
6     A     Sure.
7     Q     -- just provide it to your attorney.
8     A     Sure.
9     Q     Any other interaction with Mr. Norcross
10 since '94?
11     A     Not that I can think of, no.
12     Q     Going back to 2002 after you were
13 awarded the bid, at that time what was Mr.
14 Norcross's position?  Business wise.
15     A     He was the -- classified as assistant
16 business agent.  Then he held a position
17 politically, too.  I'm not sure what he was.  He was
18 linked in some way politically in Camden County.
19 But with the electrician's union he was an assistant
20 business agent.
21     Q     To your knowledge has Mr. Norcross ever
22 held any kind of position, either political
23 appointment wise or just regular employment wise,
24 with the City of Camden?
25     A     I'm not sure where he's seated, I don't

D E G N A N & B A T E M A N, I N C.

Page 35

1 know where -- what seats he holds or what he has
2 with regard to the City of Camden.
3     Q     Do you know if he ever has had any kind
4 of political appointment with the City of Camden?
5     A     I can't totally speak on that.
6     Q     You don't know?
7     A     I'm not sure.
8     Q     Okay.  And how about any kind of
9 employment with the City of Camden?
10     A     I don't know whether he's employed by
11 the City of Camden, no.
12     Q     At any time?
13     A     Not to my knowledge.
14     Q     Okay.  If you don't know, I understand
15 that, you know, you're qualifying your answer, so
16 that's fine.
17     A     Yeah.
18     Q     As a result of having -- well, strike
19 that.  Going back to your conversation with Mr.
20 Feliciano, what did you say in response?
21     A     He -- Rich said to me, he says, what's
22 going on?  With the two guys.  Says, well, -- I
23 explained to him, I made it real brief, I said to
24 him, he wanted me to sign the book as a union
25 contractor, Rich, I said, I just don't have the

D E G N A N & B A T E M A N, I N C.

Page 36

1 financial resources to pay the wages week by week,
2 I'm just starting off, I just don't have the money.
3     And I said, he's pissed off me at me because
4 we were all called brothers out of the local and I
5 told him I just didn't have the money.  And I
6 explained to him when I was out of work when we
7 merged all the locals I couldn't take care of the
8 family, so I had to do something to take care of the
9 family.  That's why I became a contractor.  And that
10 basically summarized the reason why he was pissed
11 off at me.
12     Then when he found out that I was awarded the
13 bid and he had so many guys out of the -- work out
14 of the local, he wanted guys out of the local to be
15 doing that work, because previously the contractor
16 that did the work for the City of Camden, from my
17 understanding, was a union contractor.
18     So when they have it, they want to maintain
19 it, they don't want to lose any form of employment
20 where they could send the guys out to work.
21     Q     Did Mr. Feliciano tell you this is what
22 Mr. Norcross said, or are you inferring that from
23 Mr. --
24     A     We had a conversation about that.  We
25 spoke in detail.  He said that he was really pissed

D E G N A N & B A T E M A N, I N C.

Page 37

1 off, he said he wanted the job to go back out for
2 bid.
3     Q     Mr. Feliciano told you that?
4     A     Yes.
5     Q     Okay.  That Mr. Norcross was pissed
6 off?
7     A     Right.
8     Q     Okay.  And what was your response?
9     A     I just told him, doesn't surprise me,
10 that's Donald, that's what he does.  I says -- I
11 told him that he also comes out and he hassles me
12 too.  But that's what he does.
13     Q     Okay.  Did anything else transpire in
14 that conversation?
15     A     That's pretty much summarizing the gist
16 of our conversation.
17     Q     Anything else you can recall?
18     A     No.
19     Q     In paragraph 18 you also allege that
20 during this period -- well, strike that.  When was
21 the conversation with Mr. Feliciano?
22     A     I don't recall the exact date.
23     Q     Was it within a year of being awarded
24 the bid?
25     A     Yes.

D E G N A N & B A T E M A N, I N C.

Page 38

1    Q    Was it within a month?
2    A    It was within a month, yeah, it was
3 within a month.
4    Q    Yeah?
5    A    Yeah, because they guys -- guys at the
6 local, they monitor what's going out.  Like if
7 there's work going out in Camden County they fine
8 tooth comb, they watch for anything that's going
9 to -- they can send the guys to work or they can
10 obtain those jobs.  They get pissed off when they
11 lose them.
12    Q    And you talked about these interactions
13 with Mr. Norcross in '91 or '92 on Pine Street and
14 then also '93 or '94.  I thought it was -- I thought
15 you you testified that you were a member of IBEW up
16 until '98.
17    A    I left the local, I'm going to
18 approximate and say -- I worked out of the local for
19 roughly about maybe 14, 15 years.  And the time
20 period I could base it when they merged all the
21 locals I was out of work on a regular basis, and
22 then I started studying to take the test in New
23 Jersey and Delaware.
24    Q    I understand.  But your complaint, if
25 you go to paragraph 11, you say prior to 1998 you

D E G N A N & B A T E M A N, I N C.

Page 39

1 were a member of IBEW.
2    A    Paragraph 11?  Yes, I was a member
3 prior to 1998.
4    Q    So why would Mr. Norcross be coming to
5 you in 1994 asking you to sign up to become a member
6 if you were already a member?
7    A    Getting back to the question, paragraph
8 11?
9    Q    Yeah.  You were just discussing
10 instances in '91 or '92 and '93 or '94 where Mr.
11 Norcross was talking about having to sign you up to
12 become a member of the union, but I thought you
13 testified you were a member of the union prior to
14 1998.
15    A    I left the local -- let me see.  --
16 real close to that time period.  I worked for the
17 local out of -- let me see.  I finished my
18 apprenticeship in '83, '84 and I worked for 14, 15
19 years.  That's pretty close to that time.
20       Prior to the year of 1998 Marshall William was
21 a member of IBEW.  Yeah, that's true.
22    Q    So how could Mr. Norcross be coming to
23 you prior to 1998 asking you to sign up for the
24 union if you were already a member?
25    A    It was after that time period.

D E G N A N & B A T E M A N, I N C.

Page 40

1    Q    Okay.
2    A    Yeah.  It's real close, but it was
3 after.  As soon as I wind up getting my license,
4 that's when he -- he aggressively started coming at
5 me.  Like I said, I worked at the local for 14, 15
6 years.  And that's real close to that time period.
7    Q    So these conversations you were
8 discussing about Mr. Norcross trying to sign you up,
9 such as waiting at your driveway, that was after
10 1998?
11    A    Right, after he found out I had my
12 license, that's when he --
13    Q    Okay.
14    A    Yep.
15    Q    Why did you think that that incident on
16 Route 70 at Fox Electric happen at '93 or '94?  Was
17 that just a mistake in time?
18    A    I would say that was a mistake on my
19 part.
20    Q    Okay.
21    A    Yeah.
22    Q    Any time after the bid was awarded in
23 2002 did you have any interaction with Mr. Norcross,
24 any conversations?
25    A    No.

D E G N A N & B A T E M A N, I N C.

Page 41

1    Q    In paragraph 18 of your complaint you
2 allege that in addition during this period of time
3 you had a conversation with the defendant, Mr.
4 Revaitis, asking how you were going to deal with the
5 union when attempting to perform work in the City of
6 Camden.
7       When did this conversation occur?
8    A    This conversation occurred after it was
9 publicly known that I was awarded the maintenance
10 contract for the City of Camden.
11    Q    Was that within a month of you being
12 awarded the bid?
13    A    I would say within a month, because I
14 had to go to the building inspection department to
15 pick up a permit for a job I was doing in the city
16 and he seen me at counter and walked over and
17 inquired about that.
18    Q    What was Mr. Revaitis' position at this
19 time?
20    A    He was the inspector for the City of
21 Camden, electrical inspector for the City of Camden.
22    Q    Do you remember where the job was that
23 you were getting the permit for?
24    A    I believe it was for Mr. Rowland, I
25 believe it was Nate Rowland.  He lived on Newton

D E G N A N & B A T E M A N, I N C.

## Page 42

1 Avenue.

2 Q How do you spell Mr. Rowland's last
3 name?

4 A R-O-W-L-A-N-D.

5 Q He lives on Newton Avenue?

6 A He used to live on Newton Avenue. He's
7 deceased now.

8 Q So you come in to get a permit for
9 Mr. Rowland's property on Newton Avenue and
10 Mr. Revaitis asked you this question?

11 A Correct.

12 Q Okay. What was your response?

13 A I just shrugged it off. I says, well,
14 I'll just deal with it as it comes, you know, just
15 like every other day, I just take it day as it
16 comes.

17 Q Okay.

18 A I said, I know there's going to be
19 opposition, I said, Donald's not happy, but I'm just
20 trying to survive. That's what I would always say,
21 I'm just trying to survive, just like everybody.

22 Q Did Mr. Revaitis mention Mr. Norcross's
23 name at any point in that conversation?

24 A He said, how you going to deal with the
25 local? And I said, I just deal with it as it comes.

D E G N A N & B A T E M A N , I N C .

## Page 43

1 Q I understand that. But did he mention
2 Mr. Norcross specifically by name?

3 A No, he didn't mention his name.

4 Q Okay. What was your understanding of,
5 how are you going to deal with the local? What that
6 meant?

7 A The opposition that would come with it.
8 Because we all know how the rules are played. He
9 was a union member, I was a union member, and we
10 know the opposition that comes when you don't, you
11 know, go according to what they want you to do.

12 Q And is the opposition meaning the
13 things you were referencing earlier about people
14 flatting your tires, things of that nature?

15 A Those things could take place.

16 Q Okay. Have you ever had any problems
17 with the union since being awarded this bid?

18 A Not with the local in New Jersey, no.

19 Q Okay. In paragraph 19 you state that
20 during the entire three-year period of the contract
21 you did not receive one job to perform. Is that
22 correct?

23 A That's correct.

24 Q Okay. I believe you testified earlier
25 that maintenance workers could perform some work in

D E G N A N & B A T E M A N , I N C .

## Page 44

1 the City of Camden, but you would be called in for
2 jobs that were essentially above their
3 qualifications, for lack of a better word. Correct?

4 A Normally that's the procedure.

5 Q Okay. And who had that contract prior
6 to you?

7 A I'm not sure. I remember the name
8 being mentioned, but I forget. So much time has
9 passed I don't remember the actual name.

10 Q Okay. So from 2002 to 2005 the City of
11 Camden never hired you for one maintenance job?

12 A I went out and looked at a lot of work
13 and I would -- never got any of those jobs.

14 Q Okay. Do you have any knowledge if
15 anyone else performed maintenance work for the City
16 of Camden during that time period?

17 A I was informed by the property manager
18 that those jobs were performed that I was scheduled
19 to do work on.

20 Q Who was the property manager?

21 A His name was John Carnegie.

22 Q And who -- what was he the property
23 manager of?

24 A I believe he was the property manager
25 for all the rec centers, all the facilities.

D E G N A N & B A T E M A N , I N C .

## Page 45

1 Q And was Mr. Carnegie an employee of the
2 City of Camden?

3 A Yes.

4 Q Do you know what his position was?

5 A I believe it was property manager.

6 Q Just property --

7 A I believe that's what his
8 classification was, property manager.

9 Because what would happen was Mr. Feliciano
10 would call me up and he says, call John, John wants
11 you to meet with him and look at some, you know,
12 jobs that were going to start up.

13 And that would be basically what would happen,
14 I would meet with him because he knew the buildings
15 and he had access to all the buildings and I would
16 meet with him and we'd walk the walk-throughs.

17 Q So this was -- the walk-throughs you
18 did were pursuant to the contract?

19 A This is what they had planned on doing,
20 these were the jobs that they had planned on doing.

21 Q And that was after you were awarded the
22 bid?

23 A That's correct.

24 Q So where were the jobs at that you
25 walked through with Mr. Carnegie?

D E G N A N & B A T E M A N , I N C .

Page 86

1    terrible contractor, he should have done that for
2    you. Don't call him no more.
3           Things like that. They would make comments to
4    the customers, not knowing who the customers were.
5    Some of them were good enough to share some of their
6    experiences with me.
7           Q       Any other disparate treatment other
8    than stating words to the customers that you were a
9    bad contractor?
10          A       Billy Revaitis would make comments
11   about, you know, how you going to deal with doing
12   work in -- when I had the maintenance contract --
13   with the City of Camden? How you going to deal with
14   the union? Things like that, you know. Because I
15   know they're not too thrilled with people doing work
16   for the City of Camden, and that was previously a
17   contractor was -- by a union contractor.
18          Q       How many times did Mr. Revaitis say
19   that to you?
20          A       Maybe three or four times.
21          Q       When was the first time?
22          A       When I was awarded the contract, maybe
23   a month after that, because I was dropping off a
24   permit. He seen me at the counter and it gave him
25   an opportunity to speak to me about it.

D E G N A N  &  B A T E M A N,  I N C.

Page 87

1           Q       We talked about that earlier, correct?
2           A       That's correct.
3           Q       When was the last time?
4           A       Maybe a couple years later. But he
5    periodically would make side comments.
6           Q       Such as?
7           A       How you making out? Getting any flack
8    from the union? Stuff like that.
9           Q       Now, what was your understanding of
10   what those comments were? Were they in jest or was
11   he actually concerned?
12          A       I would tell him sometimes, Donald --
13   I'd see Donald, run into Donald Norcross and Donald
14   would make certain comments and say, you know, he's
15   not happy. I said, Billy, I just don't have the
16   financial resources to be a union contractor.
17   That's how I would leave it.
18          Then he would make his little side comments,
19   you know, being sarcastic, and I would just -- I'd
20   just walk away from him, I'd try to like shut him
21   down. I'd hear him, but I don't hear him.
22          Q       What were his side comments?
23          A       Like comments like, you know, guys that
24   are local probably look down upon you because you
25   were a union member. I says, I understand all that,

D E G N A N  &  B A T E M A N,  I N C.

Page 88

1    but I'm trying to take cake of my family. My focus
2    was just trying to support the family.
3           Q       Any other comments?
4           A       No.
5           Q       Okay. I believe you testified that you
6    had not seen Mr. Norcross since you were awarded the
7    bid in 2002. Correct?
8           A       I seen Donald -- last time we actually
9    talked was that time he came by the house, he came
10   outside my house. He would come out there in the
11   morning and try to irritate me in the morning.
12          Q       But that was prior to you receiving the
13   bid in 2002, correct?
14          A       After I received -- no. After I
15   received the bid I was the contractor and he would
16   come through and he would periodically try to
17   encourage me to sign the book as a union contractor.
18          Time period now? I know we jockeying around
19   from year to year, I'm just trying to remember. I
20   can only reflect upon the timeframe when I was
21   awarded the contract.
22          When I was awarded the contract, that's when I
23   started seeing him more frequently and the
24   communication -- he would call me and then he would
25   actually stop over in the morning. Like I'd back

D E G N A N  &  B A T E M A N,  I N C.

Page 89

1    the truck up at 7:00 o'clock in the morning and he'd
2    be outside sitting outside the house.
3           Q       And that was after you were awarded the
4    contract in 2002?
5           A       Yes.
6           Q       When was the last time you saw Mr.
7    Norcross?
8           A       When me and Donald actually had words?
9    I seen him I'm going to say maybe -- that time at
10   the supply house, that might have been -- come on
11   Marshall. I'm trying to think. I'm trying to be as
12   accurate as possible. Maybe 2006 at the supply
13   house that day. Whenever that was. I mentioned it
14   previously.
15          That's the last time we actually had verbal
16   contact with each other at the supply house that
17   time.
18          Q       So when you say the supply house,
19   that's Fox Electric?
20          A       That's correct.
21          Q       And you previously testified that was
22   1993 or 1994, and now you're saying it was around
23   2006?
24          A       Last time -- if I did say -- no, '96
25   or -- that's when I got my license then.

D E G N A N  &  B A T E M A N,  I N C.

Page 94

1  member and I kind of like went through the same
2  thing that you're going through.
3       He says, I'm going to visit those guys but I'm
4  going to visit them unannounced, he said, they don't
5  know I'm coming, but between me and you I'm going to
6  visit them.
7       And he went there, I didn't know what day he
8  was going there, but he went there and he called me
9  and he told me, he says, I visited them, and he
10 says, you're absolutely right, he says, they're
11 failing your jobs and they're not documenting the
12 reason why.  He says, you've got a valid complaint.
13      He says, they're supposed to document.  He
14 says, when those guys are given a license they're
15 supposed to document when they fail a job the reason
16 why and he says, they're failing jobs for work
17 unrelated to your scope of work on the permit
18 application.  He says, I spoke to Jim Rizzo about
19 it.
20      And I told him also I've had multiple meetings
21 with Jim Rizzo, but he's very protective of those
22 inspectors there.  And he says, you're right, he
23 says, everything that you said is right.  He says --
24 he said that everything that you told me was -- he
25 says, I got much respect for you because what you

**D E G N A N & B A T E M A N , I N C .**

Page 95

1  said was accurate.
2       Q       Did you make a formal complaint to the
3  DCA?
4       A       Yes, I did.
5       Q       When was that?
6       A       That might have been like months prior
7  to 2013.
8       Q       So sometime in 2012 or 2013?
9       A       I'm going to say between the beginning
10 of two thousand -- between January and maybe prior
11 to his visit of nine -- I think he went there on
12 9-13, I think that's the date he visited the City of
13 Camden.  I know it was on a Monday he went, because
14 he called me that day.
15      Q       So your complaint was submitted
16 sometime in 2013, Mr. Verbos went to the city of
17 Camden and confirmed that your complaint was valid
18 in September of 2013.  Correct?
19      A       He called me and he told me it was
20 valid and we spoke on the phone.
21      Q       And what was the result of your
22 complaint?  Was there any kind of censure or
23 anything against the city?
24      A       He explained to me that he spoke to
25 Mr. Rizzo, who's the code official, and he said that

**D E G N A N & B A T E M A N , I N C .**

Page 96

1  you guys are not -- went through the proper
2  procedure in regards to permit applications.  He
3  said, what happens is if you fail a job you're
4  supposed to cite the reason why you're failing the
5  job and you're not doing that.
6       And he says, and what he's saying is correct,
7  speaking of myself, he says that -- he informed me
8  about this here and he says -- because he said he
9  went in and he asked them for applications for the
10 permits that I had put in previously.  And he said
11 that I noted that nothing was documented, the reason
12 why they failed the jobs.  And the reason why they
13 failed the jobs, it didn't have nothing to do with
14 the scope of work.
15      Q       So you're saying that you were doing a
16 discreet action regarding electrical work and they
17 would fail you for some other kind of electrical
18 problems unrelated to your work?
19      A       When you say discreet, what do you
20 mean?
21      Q       Well, you were performing a certain
22 task regarding an electrical box, I think you gave
23 the example, and they would fail you for something
24 unrelated to that electrical box.  Correct?
25      A       Right, they would fail the job for

**D E G N A N & B A T E M A N , I N C .**

Page 97

1  something not related to the permit application,
2  which is called a scope of work.
3       Q       Okay.  So it was outside the scope of
4  work?
5       A       That's correct.
6       Q       And for work that you never performed?
7       A       That's correct.
8       Q       Okay.  Other than failing you for jobs
9  for work you didn't perform and telling customers
10 you were essentially a bad contractor, anything else
11 that Mr. Emenecker or Mr. Revaitis did to you?
12      A       I remember one time that sticks in my
13 mind very clearly, Gene Emenecker, he got nasty and
14 cursed me out on the phone.
15      Q       Over what?
16      A       What happened was, there's an issue on
17 the job, it was on Browning -- Browning Road.
18 Browning Street, rather, Browning Street in Camden.
19      And it was an issue -- the codes state that
20 you have to -- any existing service, you can cut it
21 out.  What happened was the service cable was
22 embedded in the mortar facial, so by code, as
23 opposed to defacing the lady's property, I cut
24 the cable out where it couldn't be re-energized.
25      And Gene Emenecker, his name is Eugene, Gene

**D E G N A N & B A T E M A N , I N C .**

Page 98

1 called me up. And we never really had a real good
2 relationship, even when I was an apprentice. He
3 always mistreated me when I was an apprentice.
4      But he called me up off -- the customer calls
5 me up, and says, Marshall, we got a problem here.
6 And he says, you're gonna -- no disrespect, he says,
7 you're going to do the job according to the F'ing
8 way I want it done or you're not going to get it
9 passed. I says, Gene, I says, who's going to be
10 responsible for defacing the lady's property? I
11 says, long as I cut the cable off where it can't be
12 re-energized, it's legal.
13      And I turned around and I called Ken Verbos
14 about it, I spoke to Jim Rizzo about it and the
15 lady -- the customer, her name was Vynne, her name
16 is Vynne, V-Y-N-N-E, she says to me, she says, I
17 have never in my life seen anything -- she says, I'm
18 standing here, he's cursing at you, you guys are
19 going back and forth. But, she said, he's a public
20 official, he should never act like that.
21      Q      Was Vynne her first name or last name?
22      A      I believe that's her first name.
23      Q      Do you recall her last name?
24      A      No, but if I look at my records I could
25 get it for you. But her -- I think the address was

D E G N A N & B A T E M A N , I N C .

Page 99

1 1302 Browning Street. I think it was 1302 Browning
2 Street.
3      Q      Okay. So you have three complaints now
4 against Mr. Emenecker and Mr. Revaitis: One being
5 they tell your customers you're a bad contractor;
6 two, they failed you for work outside the scope of
7 your work; and three, they were failing you for work
8 that was legal.
9      A      They failed me for work that's legal?
10 That's -- I'm misunderstanding that last one.
11      Q      What you just described at Browning
12 Street, you said the manner in which you were
13 performing the work was legal, but they still failed
14 you for the job.
15      A      That's correct, that's a true
16 statement.
17      Q      Okay. And anything else either
18 Mr. Emenecker or Mr. Revaitis did?
19      A      Well, that was very hurtful because
20 what it does, it leaves a bad taste. Because what
21 would happen, as soon as this would happen the
22 customers -- when they hire you they put faith in
23 you that you're going to perform the job correctly.
24 But once this here takes place, the customer's going
25 to question your ability to perform work properly.

D E G N A N & B A T E M A N , I N C .

Page 100

1      All I could do is turn around and go to the
2 code and validate what I did was correct. And I
3 would go to Mr. Rizzo, their supervisor or their
4 boss, and explain to him what was going on. And I
5 would always try to huddle with Mr. Rizzo and
6 explain to him what was going on, I would always
7 send him an email and update what was going on.
8      And I asked him, could he send me something in
9 writing or provide the customer something in writing
10 to state that there's nothing wrong with the work I
11 did? But he never would do that.
12      And Ken Verbos even said that you're not
13 asking for anything but to validate the fact that
14 you did the job correctly and what they did was
15 incorrect. But Dr. Rizzo would not support me with
16 regard to that.
17      Q      Well, were you ultimately approved for
18 the work?
19      A      Yes.
20      Q      So wouldn't that approval evidence that
21 the work was done properly?
22      A      After they were informed that what they
23 did was wrong, they had no other choice. But Mr.
24 Rizzo, he just wanted to suppress it, he just wanted
25 to put a blanket over it and that's what --

D E G N A N & B A T E M A N , I N C .

Page 101

1 Mr. Verbos said the same -- he said, it's still not
2 addressing -- they're supposed to provide you
3 something in writing that, hey, look, we made a
4 mistake based on this here code statute. And as of
5 today they still have not addressed anything in
6 writing, it's always verbal.
7      It's always like -- I received a call from
8 James Rizzo, the code official, he says, look, we
9 decided to just let you go. I said, can you provide
10 me that in writing and state the reason why in
11 writing and why we had the mistake? But nothing was
12 ever committed in writing, it was always verbal
13 stuff.
14      Q      But if the work was ultimately
15 approved, isn't that evidence that the work was done
16 properly?
17      A      Yes, it's evidence that the work's done
18 properly, but my concern was, just like I shared
19 with the investigator from the state, was that I
20 needed validation from -- to the customer, because
21 those customers will never call me back.
22      Q      Couldn't -- sorry. Keep going.
23      A      The harm that it does to you as a
24 contractor, words can't even say.
25      Q      Couldn't you show the customer the

D E G N A N & B A T E M A N , I N C .

## Page 102

```
1   approval?
2       A       Me saying it means nothing, as opposed
3   to an official -- public official saying it.  A
4   public official saying it means much more.
5       Q       Well, the approval is granted by the
6   public official, correct?
7       A       Yes.
8       Q       So couldn't you show the customer the
9   approval from the public official and say, this work
10  was done properly, they approved it?
11      A       I have talked to customers about that.
12  I could do that, but they wanted more than for to
13  say, I didn't do anything wrong, they said -- the
14  customer's position, all I want is for my job to get
15  passed so I can move on and sell the property.
16      But the damage is already done because they --
17  it raises a question mark in the customer's mind;
18  well, if he's having problems with these inspectors,
19  I don't want to deal with him, I'm call another
20  contractor.  And that's what happened.
21      Q       So it wasn't so much that -- strike
22  that.  It was more that the customer saw a problem
23  with you and the inspectors, that's -- and you
24  wanted the inspector to say there is no problem?
25      A       I wanted the inspector to distinguish
```

D E G N A N & B A T E M A N , I N C.

## Page 103

```
1   the fact that he made a mistake in regard to saying,
2   I made a mistake, I should have just addressed the
3   scope of work on the permit, I should have never
4   addressed anything non-related to the scope of work.
5       That was the biggest thing -- that's the thing
6   that the inspector -- investigator from DCA was
7   saying, he said, Marshall, I fully understand what
8   you're saying, they're bringing up issues that don't
9   relate to your work and what it does in the mindset
10  of the customers is damaging to you as a contractor,
11  that that's where the problem lie.
12      Q       So you want a letter, essentially, from
13  someone from the City of Camden, saying you didn't
14  do anything wrong?
15      A       That was requested back in 2012.
16      Q       That's the relief you were requesting,
17  correct?
18      A       That was part of it.
19      Q       What other relief?
20      A       Any form of harm.
21      Q       I mean regarding the that specific
22  instance.
23      A       I haven't even put a dollar value on
24  the relief dollar wise what I asked for in regard to
25  that, but I know I can't even measure the damage
```

D E G N A N & B A T E M A N , I N C.

## Page 104

```
1   that has been done by the inspector, what they have
2   done, because I don't even -- like the one customer
3   Vynne, if I called her, she treats me like I'm
4   cancer, she afraid and intimidated.
5       When they see the inspector coming and he has
6   a badge on -- you have to understand the mindset of
7   a person that's just trying to go through life and
8   not have any problems, they say, I gotta live in
9   this city, I don't want any problems.
10      So if I call her or call someone, they shy
11  away from me because -- he's a good electrician, but
12  he has a problem with the inspectors in Camden.  But
13  they don't understand the history of it, the reason
14  why.
15      Q       Is her name Ayana Jordan?
16      A       Oh, she's extremely terrible, she's
17  not --
18      Q       That's not Vynne?
19      A       No, that's another one that's
20  unbelievable what happened on that particular job.
21      Q       We'll get to that later.  Anything else
22  that either Mr. Emenecker or Mr. Revaitis did
23  regarding this disparate treatment you allege in
24  your complaint?
25      A       Primary thing is like misdirecting the
```

D E G N A N & B A T E M A N , I N C.

## Page 105

```
1   customers regarding me as an individual and as a
2   contractor.
3       Q       I understand.  But other than those
4   three things that we talked about, anything else?
5       A       Presently I can't think of anything
6   else.
7       Q       Okay.  And it's your claim that those
8   instances where they were engaging in disparate
9   treatment of you was because you were performing
10  nonunion work?
11      A       Your question is a little misleading
12  when you say I was performing nonunion work.  It's
13  just work, I don't look at it as nonunion work.
14      Q       Let's go to your complaint.  In
15  paragraph 20 you state, quote: over the following
16  years, Marshall Williams and Nico continued to
17  receive disparate treatment from the defendants,
18  Eugene Emenecker and William Revaitis, aimed at
19  discouraging them from performing nonunion work
20  within the City of Camden.
21      A       Okay.  I can answer that question.  The
22  reason why it's looked upon like that is because I
23  was an ex-union member.  We were all union members,
24  so they looked at me as a trader.  Because we were
25  all union members.  If you're a union member, you're
```

D E G N A N & B A T E M A N , I N C.

## Page 106

1  a union member 'til the day you die.  That's the
2  way -- that's how the union guys look at it.
3      Q      Mr. Emenecker and Mr. Revaitis are not
4  union members any more, correct?
5      A      No, previous union members, but they're
6  pro union.
7      Q      Okay.  They were not members at the
8  time that they were employed by the City of Camden,
9  correct?
10     A      That's correct.
11     Q      Okay.  What evidence do you have --
12     A      No, I'm sorry, let me take that back.
13  For me to say they're not union members, that's not
14  true, because they still pay union dues and they
15  still attend union meeting.  So technically they're
16  still union -- they're still affiliated with the
17  union.
18     Q      To this day?
19     A      Oh, yeah.
20     Q      Okay.  What evidence do you have that
21  the disparate treatment you received at the hands of
22  Mr. Emenecker and Mr. Revaitis was because they
23  wanted to prevent you from performing nonunion work?
24     A      What?
25     Q      You're claiming they're pro union and

D E G N A N & B A T E M A N ,  I N C .

## Page 107

1  they were doing these things because they're pro
2  union.
3      A      Right.
4      Q      What do you base that upon?
5      A      Oh.  Because of my direct contact with
6  them, I've been to jobs where they came out and did
7  their inspections and I was physically there to meet
8  them at the job sites.
9      And things that I observed, the customers
10  would observe, sometimes I was too busy, I was at
11  another job site, a customer would call me up and
12  tell me, hey, they failed the job for this reason.
13  They made personal comments about you as an
14  individual.
15     So compositely from me being there when they
16  would come out and do inspections, and not only
17  that, I would received phone calls from customers
18  that would say, some of the comments that were made,
19  it's just -- something's wrong here.  And they
20  voiced their opinion previously about me not signing
21  the book as a union contractor that is like going
22  against the grain.
23     Q      When did Mr. Emenecker make a comment
24  about you not signing the book to be a union
25  contractor?

D E G N A N & B A T E M A N ,  I N C .

## Page 108

1      A      I remember one time it came out some
2  time ago, I did a job on Chambers, I remember the
3  address even, it was 420 Chambers in Camden.  That's
4  another job I did.
5      He came out and there was a carpenter present
6  on the job and as soon as he came down the basement
7  where I was at I said to him, Gene, would you like
8  me to take the panel cover off?  And he said, you
9  know what the F to do.  I looked at him, the guy
10  looked at me.  What the hell's going on here?
11  That's what he said to me.
12     Q      He said what?
13     A      He said, you know what the F to do.
14     Q      Okay.
15     A      To take the -- because he got to see
16  the grounding and all, with ground wires.  A lot of
17  times inspectors, if they know you, they don't --
18  they just say, fine, I know the guy's work, it's
19  apparent that the ground wire and everything is in
20  place where it's at.
21     I had to take the panel cover off and, you
22  know, he had -- he had nasty -- he got nasty -- that
23  guy's got a very nasty attitude.  And the people
24  working for him, everybody says the same thing, he's
25  a very negative guy.

D E G N A N & B A T E M A N ,  I N C .

## Page 109

1      Q      I understand your comment, but my
2  question was:  How is it disparate treatment?  What
3  evidence do you have that that was a result of
4  Mr. Emenecker not wanting you to perform nonunion
5  work in Camden?
6      A      What evidence do I have?
7      Q      You stated that you had a conversation
8  with Mr. Emenecker about you not signing the book,
9  and and then you gave --
10     A      They weren't --
11     Q      Hold on one second.  And then you gave
12  an instance of 420 Chambers --
13     A      Um-hmm.
14     Q      -- as when he made a comment about not
15  signing the book, but you didn't just say anything
16  about that.  So that's my question.
17     A      Oh, okay.  When I was taking the cover
18  off, the panel cover off, he said to me, where is
19  your suit?  I said, a suit?  And he's like, a rubber
20  suit you put on.  I says, I don't really need a
21  suit, all I'm doing is taking the cover off.  He
22  says, see?  Since you've been working nonunion you
23  got away from all the good habits that we use out of
24  the local.  Comments like that, stuff like that.
25     Q      Any other comments other than that?

D E G N A N & B A T E M A N ,  I N C .

Page 110

1    A    No.
2    Q    So that one lone comment makes you
3  believe that the disparate treatment you were
4  receiving from Mr. Emenecker was a result of him not
5  wanting you to perform nonunion work in Camden?
6    A    And Browning Road also, the job at the
7  location -- I believe it was 1302 Browning Street in
8  Camden.  That's the other time we had verbal
9  confrontation.
10    Q    Was any union work mentioned --
11  anything about the union mentioned in the Browning
12  Street?
13    A    He made comments, like side comments;
14  well, you know how you supposed to do it, y'all
15  worked out of the local before, you know that.
16  Stuff like that he would say.  He made comments like
17  that.
18    He'd always say something in a little comment
19  about the union, something like that, that would --
20  say, okay, fine, I remember y'all worked out of the
21  local.  Little comment.  He would say something real
22  brief, wouldn't be like he would go on, he would
23  make a little comment, like a brief comment.
24    Q    So the comment, you knew how to do
25  something because you worked in the union, other

Page 111

1  than that, did he say anything else?
2    A    No.
3    Q    So we have two comments; one on
4  Chambers, one on Browning Street.  Any other
5  comments by Mr. Emenecker about the union?
6    A    No.
7    Q    Okay.  How about Mr. Revaitis, other
8  than his initial question to you when you came in to
9  get the permit where he said, how are you going to
10  deal with the union, being a nonunion member,
11  pursuant to the 2002 contract, has he ever mentioned
12  the union to you?
13    A    He's mentioned that particular comment
14  four or five times; how you making out dealing with
15  the union?  And I told him, the only problem I have
16  every now and then I'd run into Donald and Donald
17  pulled out after a while.  That was it.
18    Q    So from 2002 to 2004 I believe you said
19  there was three to four times Mr. Revaitis made that
20  comment about --
21    A    That's correct.
22    Q    Okay.  Any other time since 2004 has
23  Mr. Revaitis ever mentioned the union to you?
24    A    No.  I try to avoid him.  I try to
25  avoid them guys.

Page 112

1    Q    That's a no?
2    A    No.
3    Q    Okay.  And those questions were solely;
4  how are you going to deal with being a nonunion
5  member working in Camden?
6    A    Yes.
7    Q    Let's go to paragraph 23.  We're going
8  to talk about the incident at Browning Street which
9  you briefly mentioned before.  Who was the property
10  owner?
11    A    Vynne.  I can't think of her last name.
12  Vynne.  I can't think of her last name.
13    Q    That was Vynne, correct?
14    A    Yeah.  Might be in my phone.
15    Q    You can check.
16    MR. RYBECK:  Off the record.
17    (discussion off the record.)
18    THE WITNESS:  I have her name, the
19  correct spelling is V-Y-N-E.
20  BY MR. RYBECK:
21    Q    Okay.  So Vyne is the property owner?
22    A    She sold the property, she's not
23  presently the property owner.  I know she was trying
24  to prepare that property for sale.  That's what her
25  objective was.  Presently she's not -- may not be

Page 113

1  the property owner now.
2    Q    Was she a resident or was she just an
3  owner?
4    A    From my understanding she was the owner
5  and I think she was renting the property, but I
6  think her place of residency is in Delaware,
7  because -- I know it's in Delaware because she said
8  she always would go back and forth to Delaware every
9  day.
10    Q    How did you first meet Vyne?
11    A    Referrals.  I forget even who it was.
12  Someone referred -- said they were looking for an
13  electrician and they directed her to me and she
14  called me.
15    Q    You don't recall who referred Vyne to
16  you?
17    A    I forget.
18    Q    Okay.  Was this the first work you had
19  ever performed for Vyne?
20    A    Yes.
21    Q    So have you performed work for Vyne
22  since then?
23    A    No.
24    Q    So what was the exact nature of the
25  work you were performing for Vyne?

Page 114

1    A    Replacement of the service cable.
2    Q·   And what does that --
3    A    That's the --
4    Q    -- entail?
5    A    -- cable that feeds the electrical
6  panel, that's -- the power comes -- attaches to the
7  utility company's line that's on the pole and it
8  links into your meter and the panel in your basement
9  or exterior, wherever it may be.
10   Q    And what was the amount of the
11 contract?
12   A    Dollar value?
13   Q    Yes.
14   A    I think it might have been 1300.
15   Q    And how long does that job take?
16   A    It was completed that same day.
17   Q    And explain to me the procedure for
18 getting an approval.  You -- before you did the work
19 you went and applied for a permit, correct?
20   A    That's correct.
21   Q    And the permit lists the work
22 performed, correct?
23   A    Yes, scope of work.
24   Q    And who fills that out?
25   A    I do.

D E G N A N & B A T E M A N, I N C.

Page 115

1    Q    Okay.  And then someone from the code
2  office initials it saying, you know, the work is
3  approved to be done, correct?
4    A    Right.  But under those circumstances
5  that was -- from what I remember, it was an
6  emergency because of the condition of the service
7  cable.  I listed it as an emergency.  Under state
8  law I have 72 hours I can perform the work and --
9  within 72 hours and just put the application in in
10 that timeframe.
11   Q    So you submitted the application to do
12 the work after you did the work?
13   A    I believe I did the job prior to doing
14 it.  It was an emergency job.
15   Q    My question is:  You didn't file any
16 paperwork with the city until after you completed
17 the work?
18   A    No, always put my paperwork in first,
19 always do that first.
20   Q    Okay.
21   A    Then I'll -- if it's an emergency I can
22 do it afterwards.  Like if somebody called me for an
23 emergency today I would put the paperwork in and
24 then I'd go ahead and do it.
25   But that particular job I know I put the

D E G N A N & B A T E M A N, I N C.

Page 116

1  paperwork in, then I did it.
2    Q    Okay.  So right before doing the work
3  you submitted the work -- or the paperwork to
4  Camden, then you did the work?
5    A    That's correct.
6    Q    Okay.  But as of the time you were
7  doing the work they hadn't approved your request to
8  do the work yet, had they?
9    A    You don't have to, if it's an
10 emergency.
11   Q    But they hadn't approved it.
12   A    That's correct.
13   Q    Okay.  And then who arranges for the
14 inspector to come out?  Is that you on the owner?
15   A    Normally you recommend the owner to
16 request, because they know their schedule when
17 somebody can be there to allow the inspector in.  So
18 you tell them, hey, look, the job's completed, you
19 can call for the inspection whenever's convenient
20 for you.
21   Q    Okay.  Do you recall when you received
22 the call from Vyne?  Was it the day before the work
23 was done or the day of?
24   A    No, it was following that time.  After
25 I did the job for her, maybe two days later she

D E G N A N & B A T E M A N, I N C.

Page 117

1  called for an inspection, or might have been after
2  she actually received a permit, but that particular
3  day when the inspector came out I received that
4  phone call from Vyne and she put Gene Emenecker on
5  the phone.
6    Q    When did you first come in contact with
7  Vyne?
8    A    I don't remember the exact date.  I'd
9  have to look at the permit.
10   Q    Because it was an emergency, correct?
11   A    That's correct.
12   Q    So do you recall if it was the same
13 day?
14   A    Same day as of?
15   Q    When you began the work.
16   A    No, I didn't do it the same day.  I
17 looked at the job first and I schedule it and I told
18 her I would try to get out there -- I think I did it
19 the following day, said I would try to take care --
20 address that the following day.
21   Q    Okay.  So you do the work, you tell
22 Vyne to contact the city, they'll have an inspector
23 come out to inspect the work.  Correct?
24   A    Once it's completed.
25   Q    Yes.  Well, you complete it that day.

D E G N A N & B A T E M A N, I N C.

Page 118

1    A    The day I started, the day I completed,
2  yes.
3    Q    So once you were done the work that day
4  you spoke to Vyne, told her to get an inspection
5  done, --
6    A    I'm sorry. Whatever's convenient for
7  her. I'm sorry, I cut you off.
8    Q    Okay. And did she do that, to your
9  knowledge?
10   A    I think she did it maybe the following
11 day. It was somewhere close to that timeframe.
12   Q    And what's your understanding of what
13 transpired during that inspection?
14   A    Well, I received a phone call from her
15 and she said, I'm going to put the inspector on the
16 phone. And that's when me and Gene was on the phone
17 and there was like a lot of screaming back and
18 forth, he got nasty and I hollered back at him.
19 That's pretty much what happened.
20   Q    What did Gene say to you?
21   A    You want this job inspected? You know
22 what the F to do. That's it. And I said, what did
23 you say? And then I got nasty back with him.
24   Q    what did you say?
25   A    I said, do you talk -- I said, that's

D E G N A N & B A T E M A N, I N C.

Page 119

1  the way you talk to people? I said, you got a
2  problem, I said, you're a public official. I said,
3  you know what, Gene? I'll deal with you. I said,
4  when I tell somebody -- I said, I don't -- I just
5  turn around and my mindset, I'll just report you to
6  your superiors.
7    Q    Did you --
8    A    That's what I normally would do.
9    Q    Did you use any profanity?
10   A    I said maybe, the hell with you, man, I
11 ain't got no time to mess with you. I said
12 something like that. But F? Nothing like that, I
13 didn't say nothing like he said, no, I didn't say
14 nothing like F you, nothing like that.
15   Q    What was his response?
16   A    He hung up the phone on me, that's
17 what -- he hung up the phone on me. I called him
18 back. And she was like almost like in tears. She
19 said, I don't believe what I just witnessed, she
20 said, this is crazy. She said, this is crazy, she
21 said she never seen -- she never thought she'd see
22 like that from a public official, somebody works for
23 the city.
24       And she -- all she said, Marshall, all I want
25 to do is just get this here correct so I can sell my

D E G N A N & B A T E M A N, I N C.

Page 120

1  property, I just want to sell this property, she
2  said, I never thought -- she said, I wish that -- I
3  didn't know she had problems with the inspector,
4  like, she said, your work's good, nothing against
5  you, your work is good, she said, but I didn't know
6  that these guys have a problem with you like this
7  here.
8    Q    And that was -- that conversation was
9  the same day as the inspection that took place?
10   A    Yeah, same day of the inspection, yeah.
11   Q    And what did you tell her was going to
12 be done?
13   A    I told her I was going to report him.
14 And I said to her, would you be willing to validate
15 what just happened? And she said yes. And I turned
16 around and tried reaching out to her and she's
17 afraid. Her thing is she don't want no problems,
18 she works in the city and she don't want -- she's
19 intimidated, she's intimidated by the inspectors or
20 anybody holding a badge or something.
21   Q    Well, you asked her to validate,
22 meaning some kind of written statement from her
23 saying what happened?
24   A    Yeah, just to validate what happened.
25 All I asked her for, I said, Vyne, all I'm asking

D E G N A N & B A T E M A N, I N C.

Page 121

1  you to do is just tell the truth. I'm not going to
2  ask you to add or subtract, could you just validate
3  the truth?
4    Q    And what was her response?
5    A    She said yes at the time.
6    Q    Okay.
7    A    And I called, she reached out to me,
8  but after a time period she like avoided my phone
9  calls. Like if I call her right now, she ain't
10 going to pick up the phone once she see my name on
11 the phone.
12   Q    Okay. Did she ever state any words to
13 you that she was intimidated or afraid to give a
14 statement?
15   A    She said, I gotta live here, she said,
16 I don't want no problems with these people. That's
17 how she would say; I don't want no problems.
18   Q    I thought she lived in Delaware.
19   A    Yeah, but she comes in Camden all the
20 time. She was living in Camden, too. She lives in
21 Delaware but she has a property in Camden, so she --
22 you know, she worked at the hospital. She works at
23 Lourdes Hospital.
24       So in turn, like say for instance if she has
25 to stay locally, because she says sometimes she'll

D E G N A N & B A T E M A N, I N C.

## Page 122

1  stay a little late, she'll stay in Camden, sometimes
2  go to Delaware.
3      Q      Do you know where she stays in Camden?
4      A      I know she's got a daughter in Camden
5  right near that house, somewhere near that house,
6  'cause she would say my daughter lives around the
7  corner.
8      Q      You don't know where?
9      A      No.
10     Q      And did she say anything else about a
11 fear to give a statement?
12     A      I'm sorry?  Say it again.
13     Q      Did she say anything else about being
14 fearful to give a statement?
15     A      No.
16     Q      Okay.  What was your response to her?
17     A      I said -- I told her what I was going
18 to do, I was going to report what he did to his
19 superior, Mr. Rizzo.  And I asked her to -- you
20 know, would she support basically what happened?
21 That's all I'm asking you is to just tell the truth.
22 But you could tell she didn't want to be bothered.
23 She don't want to be involved in nothing.
24     Q      And once she didn't want to be
25 involved, did you tell her anything in response?

D E G N A N & B A T E M A N, I N C.

## Page 123

1      A      I just stopped trying to reach out to
2  her, 'cause she wouldn't answer my phone calls no
3  more.
4      Q      Does she own other properties in
5  Camden?
6      A      I don't know a lot of personal
7  information, I don't know that much.  Only thing I
8  know is that I was just trying to perform a job for
9  her.
10     Q      Were you paid for the job?
11     A      Yes.
12     Q      Was there any other prospective work
13 you had set up with Vyne?
14     A      She would say to me, I'm going to use
15 you in the future.  She said, I just don't need
16 these problems with these inspectors.
17     Q      Did she say what properties she was
18 going to use you for?
19     A      Uh-uh.  No.  But she said she had
20 family members who had work, too, but our
21 communication's gone, I don't talk to her any more.
22     Q      Did you make a complaint about
23 Mr. Emenecker's conduct?
24     A      Yes, I did.
25     Q      To who?

D E G N A N & B A T E M A N, I N C.

## Page 124

1      A      Dr. Rizzo.
2      Q      When was that?
3      A      Probably within a couple weeks,
4  maybe -- knowing me, within a couple days, because I
5  move on things pretty quick.
6      Q      And how did you make that complaint?
7      A      I sent a notice to Mr. Rizzo, and it
8  might have been on my emails.  I think -- I believe
9  I sent it to him by email.  I might have physically
10 handed him a letter.
11     That particular one I think I sent him a
12 certified letter, I think I sent maybe also, but I
13 know I sent him notice on that too.
14     Q      Some kind of written notice?
15     A      Some kind of written notice, yes.
16     Q      And did you explain to him what
17 happened in that notice?
18     A      Yes, I did.
19     Q      Okay.  And did you request any kind of
20 relief in that notice?
21     A      Same thing, I just asked -- he needs to
22 get control of his inspectors, they're out of
23 control.
24     Q      Okay.  Anything else?
25     A      No.  We actually had meetings too, sat

D E G N A N & B A T E M A N, I N C.

## Page 125

1  in his office and discussed it.
2      Q      Did Mr. Rizzo respond to your
3  complaint?
4      A      He would say, oh, I'll talk to him
5  about it and I'll deal with the situation.  But then
6  I didn't hear nothing back.  And I said, could you
7  put me something -- never put nothing in writing.  I
8  said, could you provide me something in writing?
9  Nothing never comes back in writing, it was always
10 like sitting here having a little conference
11 meeting, and after that you never get nothing in
12 writing.
13     I said, could you -- and I sent an email,
14 could you not verbally send me anything or talk to
15 me, I would prefer for something in writing so I can
16 document it.  Never -- they never provided nothing
17 in writing.
18     Q      What did you want back from him in
19 writing?
20     A      That it was addressed and that -- to
21 contact the customer that his inspector made a
22 mistake.
23     Q      So you also requested that the customer
24 be contacted?
25     A      Yeah, that I did nothing wrong and that

D E G N A N & B A T E M A N, I N C.

## Page 126

1 the inspector was wrong in his analysis.
2      Q      And did he ever state he was going to
3 do that?
4      A      He told me verbally he will do it, but
5 that's verbal.  He never did it.
6      Q      He told you verbally he would contact
7 the customer?
8      A      No, he would speak to Gene Emenecker
9 about his conduct and that he would get back to me.
10 And I would say, fine, could you put -- I would
11 always follow up and say, could you provide me it in
12 writing as opposed to verbal?  Because I know he
13 never wanted a paper trail.
14      Q      Did he ever say he was going to contact
15 the customer?
16      A      No, he said that he would have his
17 office -- I'll have my office send a notice out to
18 her.
19      Q      A notice saying what?
20      A      That the electrician did nothing wrong,
21 his work was up to code, and that I would receive a
22 copy of it.
23      Q      Okay.
24      A      Because that would keep me in good
25 grace with the customer.  That's all I was asking

D E G N A N  &  B A T E M A N ,  I N C.

## Page 127

1 for, I wanted to be kept in good grace.  I don't
2 want to have a bad relationship.
3      Q      But the work was ultimately approved,
4 correct?
5      A      Yes.
6      Q      And when was the work approved?  Prior
7 to your conversation with Mr. Rizzo or afterwards?
8      A      It was after.
9      Q      Okay.  And did you ever receive some
10 kind of written notification that it was approved?
11      A      I believe he called me on the phone and
12 he said to me -- eventually they do send you out a
13 notice in the mail, but he said to me, he said,
14 well, look, we're just going to let this here go.
15      I said, that does not address the issues,
16 you're not documenting anything.  See, that's what I
17 would always say, address the issues and do what
18 you're supposed to do by state law.
19      But they never addressed the issue, they
20 always try to like, you know, put a blanket over it,
21 sugar coat things.
22      Q      What is the state law?
23      A      State law says that if an inspector
24 fails a job he's supposed to cite the code section
25 that he fails the job for.  He can't turn around and

D E G N A N  &  B A T E M A N ,  I N C.

## Page 128

1 say, because you do it my way or I'm going to fail
2 the job.  That's illegal.  You have to cite the code
3 section.
4      Q      But the job was approved, correct?
5      A      Yes.
6      Q      So it wasn't failed?
7      A      Yes, but they still didn't follow the
8 state law.
9      Q      If the job wasn't failed how would they
10 cite a statute saying why it failed?
11      A      It has to be documented, because it was
12 never documented in the code, the statute was never
13 documented.
14      Q      I think you're missing my question
15 here.  If the job was approved, what code statute
16 would they cite saying it failed?
17      A      I'm not sure, but my understanding was,
18 speaking to Ken Verbos, he said that's a violation.
19 He said, even though they doing that, it's still a
20 violation.  In regard to the rules that inspectors
21 is supposed to abide by.  And he said, I spoke to
22 Mr. Rizzo about that.  And they act they like they
23 on deaf ears.
24      He said, even they're approving the job --
25 they're approving the job so that you'll -- they

D E G N A N  &  B A T E M A N ,  I N C.

## Page 129

1 just want you to go away so you'll stop complaining.
2 But they're still not addressing what you're saying.
3 They're supposed to -- like if I -- he said, if I
4 walk in that office, just like I did, he said, that
5 day I walked in the office and I seen when they
6 failed your job, he said, I asked Mr. Rizzo, where's
7 the code section on this here notice, the reason why
8 you failed the job?  Oh, we didn't put it on there.
9 He said, that's not acceptable.  That's what he's
10 saying.
11      Q      I'm still confused here.  The job
12 wasn't failed, it was approved.
13      A      Right.
14      Q      So what would you want in writing about
15 a failure if no failure occurred?
16      A      Okay.  I'll try to answer your
17 question.  What I was asking for was for it to be
18 done according to the rules laid out by the State of
19 New Jersey that the code section is noted and that
20 also that a notice be sent out to the customer that
21 the work that I performed meets the code
22 requirements and that the inspector made a mistake.
23 This would actually put me in good standing with the
24 customer.
25      Q      What state law requires them to do

D E G N A N  &  B A T E M A N ,  I N C.

## Page 130

1    that?

2          A       You would have the speak to Ken Verbos.

3    If I spoke to Ken I would be able to furnish you

4    that information.

5          Q       I'm going to ask you provide that

6    information to your attorney; he can, in turn,

7    provide it to me, any law that requires them to

8    contact the customer.

9          A       No, the state law -- I'm stating that

10   the requirement that they're supposed to code the

11   statute, the statute's supposed to be cited on that

12   violation notice.

13         Q       But there was no violation.  Correct?

14         A       They failed the job initially.  The job

15   failed for that reason.  So if they failed the job

16   they have to have a reason to fail it.  So why did

17   they fail the job?

18         Q       But --

19         A       That's what I'm saying.

20         Q       -- that job was ultimately approved,

21   correct?

22         A       Yeah, but they never said that we

23   changed our mind because we wanted -- that's what --

24   Mr. Rizzo said, well, we just decided to let it go.

25   That's how he would say it, we just decided to let

D E G N A N  &  B A T E M A N ,  I N C.

## Page 131

1    it go.  That don't fly.  Ken Verbos said -- he said,

2    that don't fly, we just going to let it go.

3          Q       So you want something in writing

4    saying, this was the code we violated for, but we're

5    not violating it?

6          A       That's what Ken Verbos asked for also.

7    But they never acknowledged him.

8          Q       How do you know Mr. Verbos asked for

9    that?

10         A       Me and Ken talk all the time.  Ken

11   said, Marshall, they have -- still have not

12   responded back to me also.

13         Q       Okay.  Now, does Mr. Verbos have any

14   kind of supervisory role over the code office in

15   Camden?

16         A       They respond to the whole entire State

17   of New Jersey.

18         Q       Could he cite them for any kind of

19   violation?

20         A       He could.  He was trying to avoid it.

21   He said, I'm trying to get these guys to do right

22   by, you know, taking another step.

23         Q       Okay.  Did he ever take it another

24   step?

25         A       I don't know.  Me and Ken have been out

D E G N A N  &  B A T E M A N ,  I N C.

## Page 132

1    of contact with each other.

2          Q       Why is that?

3          A       I get -- I'm busy trying to survive and

4    I sent him an email last night, I asked him could he

5    update me on -- we were supposed to have a meeting

6    and he was supposed to update me in regard to

7    following up -- the one job, the young lady's name

8    that you mentioned, Ayana, Spanish girl, and that

9    was one of the biggest problems, he said that I'm

10   going to contact her.  He was going to contact her.

11   And he said, I'll clear this up that you did nothing

12   wrong, it was the inspectors in Camden that were

13   wrong.

14         Q       I want to stick to the Browning Street

15   job.  Did Mr. Verbos ever find any kind of violation

16   and create any kind of discipline against the City

17   of Camden for that job?

18         A       Now, what he's documented, I have no

19   knowledge of, I only know what he's told me.

20         Q       Did he ever tell you he found any kind

21   of violation --

22         A       Yes, he did.

23         Q       -- and discipline them?

24         A       He did tell me they were in violation.

25   Now, whether he took actions to discipline them,

D E G N A N  &  B A T E M A N ,  I N C.

## Page 133

1    that's another story.  I can't speak on behalf of

2    what actions he's taken, but I know that he did tell

3    me that, you're absolutely right in regard to your

4    findings.

5          Q       Okay.

6                  MR. RYBECK:  Good time to break.

7                  (Luncheon recess.)

8    BY MR. RYBECK:

9          Q       Back on the record now.  Mr. Marshall,

10   I'll reference you back to your complaint.  Go to

11   paragraph 24 where you discuss a rejection of your

12   work performed at 931 South Seventh Street by

13   Mr. Revaitis.  When was that work done?

14         A       I believe that was in 2013.

15         Q       And who was the owner of the property?

16         A       I forgot the lady's name, but her -- I

17   was communicating with her -- I think that's her

18   daughter-in-law.

19         Q       Was the female you can't remember her

20   name, was she the owner of the property?

21         A       No.  I look at it like she was a

22   liaison for the owner.

23         Q       The daughter-in-law was the liaison?

24         A       Daughter-in-law, yes.

25         Q       Okay.  And who was the owner?

D E G N A N  &  B A T E M A N ,  I N C.

## Page 134

1        A        Unfortunately I can't think of her name
2  right now.
3        Q        Was it her mother?
4        A        Her mother-in-law.
5        Q        Okay.
6        A        I guess it's the mother-in-law.
7        Q        Yes.
8        A        Um-hmm.
9        Q        So the mother-in-law owned the property
10  but you dealt with the daughter-in-law?
11        A        Yes.
12        Q        Okay.  Do you remember the
13  daughter-in-law's name?
14        A        Ayana.  I think her name was Ayana.
15        Q        How do you spell that?
16        A        I'm going to try this here one.  I
17  think it's A-Y-A-N-I-A.  Pretty good.
18        Q        Yes.  I believe we reference this
19  earlier.
20        A        Okay.
21              MR. RYBECK:  Let me just mark this.
22              (P-2   Handwritten statement from Ayana
23        Jordan marked for identification.)
24  BY MR. RYBECK:
25        Q        Mr. Marshall, I'm showing you what's

## Page 135

1  been marked as P-2, which is a handwritten letter by
2  Ayana, A-Y-A-N-A, and maybe you can help with the
3  last name there, because I can't read that.
4        A        Oh, boy.  Looks like letters.  D-A-N?
5        Q        Is it Jordan?
6        A        That may be Jordan, maybe.
7        Q        All right.  Actually it states in the
8  first line that I, Ayana Vania Jordan.  So I believe
9  that's her name.  Does that refresh your
10  recollection?
11        A        I never remember her last name, but I
12  remember Ayana, I used to always --
13        Q        Okay.  You can put that down for a
14  second.
15        A        Okay.
16        Q        So how did you get in touch with Ayana
17  originally?
18        A        Ayana contacted me through the
19  internet, she seen my company name on the internet.
20        Q        Where do you advertise on the internet?
21        A        Through Google.
22        Q        How does that work?
23        A        I'm not sure exactly how that does --
24  works, but I've had people call me and say, you
25  know, I got your name off the internet through

## Page 136

1  Google out of contractors of South Jersey and you
2  popped up and you're rating's, you know, pretty
3  high.  So that's what prompts people to call me.
4  That's the only --
5        Q        Okay.
6        A        I'm just going by what people --
7  because I always ask them, I say, how did you get my
8  name or who referred you to me?  Sometimes I get
9  customers in that manner.
10        Q        And do you have a website for your
11  company?
12        A        No.  Not presently, no.
13        Q        So someone searches your company's name
14  on Google or searches for contractors and your name
15  pops up on some website, essentially?
16        A        That's correct.
17        Q        Okay.  You don't know what website it
18  is, though?
19        A        From what I remember she said Google.
20  I'm not exactly what -- sure what website, but
21  that's what I remember.
22        Q        Okay.  So Ayana contacts you by phone?
23        A        Correct.
24        Q        And what did she say?
25        A        She says that we're having electrical

## Page 137

1  problems over at a property in Camden, she said, I'm
2  having problems getting contractors to come out to
3  Camden and do work and we would like to have you
4  come out and give us a quote in regards to work we
5  need done.
6        Q        And what did you say?
7        A        I made arrangements to accommodate.
8        Q        Okay.  And you went to the property?
9        A        That's correct.
10        Q        Okay.  And what was the work that
11  needed to be done?
12        A        She needed a new electrical service,
13  and then there was interior wiring that needed to be
14  done.
15        Q        When you say new electrical service,
16  what do you mean by that?
17        A        The services -- the incoming power that
18  comes from the outside of the property, that's
19  your -- your primary cable or main cable on the
20  outside, the meter enclosure and the panel box.
21        Q        So you were replacing all of those
22  things?
23        A        That's correct.
24        Q        Okay.  And what else were you doing?
25  I'm sorry.

Page 138

1      A      There was a need for interior wiring.
2  Speaking of the power, which is receptacle circuitry
3  and lighting circuitry.
4      Q      Was that throughout the house?
5      A      Not the entire house, but a percentage
6  of the house.
7      Q      It's a private residence?
8      A      Correct.
9      Q      Okay.  And what was your quoted price?
10     A      The quoted price I believe might have
11 been -- I'm going to approximate, I think it
12 probably was like maybe 44 or 4900, something in
13 that ball park.
14     Q      Anywhere from four to $5,000?
15     A      Yeah, I would say so.
16     Q      And did you go to the property to
17 perform the work?
18     A      Initially did I go to the property to
19 perform the work, did you say?
20     Q      Yes.
21     A      I went over to review the work
22 initially.
23     Q      Okay.  And once you did the review and
24 gave the quote, did you then thereafter go to the
25 property and perform the work?

D E G N A N & B A T E M A N, I N C.

Page 139

1      A      Once we agreed to a price I scheduled
2  and that's when the work commenced.
3      Q      And how long would this job typically
4  take?
5      A      Circumstances always vary.  I would
6  say, considering what we did there, we were looking
7  at maybe ten days.  But I think I brought that in in
8  like seven days.
9      Q      And you did the work yourself?
10     A      Yes.
11     Q      Is it fair to say that for the past
12 five years you always worked by yourself?
13     A      No, not all the time.
14     Q      Do you hire subcontractors?
15     A      Sometimes I might turn around and ask
16 another contractor to offer me a hand that's
17 licensed.
18     Q      Okay.  I believe I forgot to ask you
19 before; for the 1302 Browning Street job, was
20 that --
21     A      Um-hmm.
22     Q      -- work that was only performed by you?
23     A      Yes.
24     Q      Okay.  And the same for 931 South
25 Seventh Street, you were the only contractor that

D E G N A N & B A T E M A N, I N C.

Page 140

1  worked on that property?
2      A      That's correct.
3      Q      Okay.  Did you file a permit
4  application with the City of Camden prior to
5  commencing work?
6      A      Yes, I did.
7      Q      Okay.  And that work was approved to be
8  done?
9      A      It was approved once it was completed.
10     Q      Okay.  Once you file the request for a
11 permit, do they have to sign off saying yes, you can
12 do the work?
13     A      Yes.  The only other time that -- when
14 it's not necessary is if it's an emergency, if it's
15 something I deem to be an emergency I can use my own
16 discretion in starting it if I feel as though it's a
17 potential fire hazard.
18     Q      And you filled out the permit
19 application outlining all the work that was to be
20 performed, correct?
21     A      That's correct.
22     Q      Okay.  And you finished the job in
23 seven days?
24     A      I'm going to say approximately that
25 timeframe.

D E G N A N & B A T E M A N, I N C.

Page 141

1      Q      Okay.  At any point up until the time
2  you finished the work did you have any contact with
3  any inspectors from the City of Camden?
4      A      No.
5      Q      So after the work was done who
6  scheduled the inspection?
7      A      The -- the liaison for the owner, I
8  believe her name is Ayana.
9      Q      And did you advise Ayana that she
10 needed to schedule an inspection?
11     A      Yes, she -- you always mention to the
12 customer to schedule an inspection when it's at your
13 convenience when someone will be available.
14     Q      And what's your understanding of what
15 transpired during the inspection?
16     A      Okay.  During the inspection Ayana
17 called me and she said that my inspection failed.
18 And I said, for what reason?  She said, because we
19 have a problem with the lighting up on the second
20 floor.
21     And I had mentioned to her that what she was
22 referring to did not reflect my scope of work.  The
23 problem that she had during the inspection was an
24 old knob and tube circuit and the circuit breaker
25 tripped out.  And that's pretty common.  She could

D E G N A N & B A T E M A N, I N C.

Page 142

1  have been using something, but it was tripped out
2  because of an overload.
3        But it had nothing to do with the new work
4  that I performed.  But the inspector failed the job
5  because there was a breaker that was off in the
6  panel, but he didn't look into it in detail to find
7  out whether it was the old, existing work or
8  something I did.
9        If it was something that I did, then he would
10 have had cause to fail the job.  But he failed it
11 for non-related work in respect to my work.
12      Q      Now, is there some kind of test that
13 the inspector could have performed to determine
14 where the problem was?
15      A      He could have very simply removed the
16 panel, and he would have identified the old wiring
17 from the new wiring, if he had removed the panel.
18      Q      And how would the inspector be able to
19 tell what was old wiring as opposed to new wiring?
20      A      Because when you pull the panel off
21 you'll be able to distinguish a new wire from an old
22 wire.  Once you remove the panel cover off you'll
23 see what's old and new.
24      Q      Just from a visual observation you can
25 tell the old wire is worn and used, is that what --

D E G N A N & B A T E M A N, I N C.

Page 143

1      A      Yeah.
2      Q      -- you're saying?
3      A      You can see the age differential.
4      Q      It's your understanding that the
5  inspector -- who was Mr. Revaitis, correct?
6      A      Correct.
7      Q      -- did not perform that test?
8      A      No, he didn't.
9      Q      All right.  So once Ayana calls you and
10 tells you you failed, what did you do?
11     A      I went out to the job, you know, out of
12 respect and turned around and, you know, verified
13 that it has nothing to do with the work I did.  So I
14 did that.
15     And when I found out what it was, I called
16 Billy Revaitis and I said, Billy, you failed it for
17 something that's not related to what I did.  And he
18 said, the only thing I know is there was a breaker
19 off.  I says, but you didn't take the cover off to
20 identify what was old and new.  And he said, yeah,
21 he says, you know, you get busy and I just didn't
22 take the cover off.
23     But she was -- she was pissed off, the girl
24 was pissed off at me.
25     Q      How -- why do you believe she was

D E G N A N & B A T E M A N, I N C.

Page 144

1  pissed off at you?
2      A      If you get a chance to meet her, she's
3  very temperamental.  She's a very nasty person.
4      Q      What did she say to you that led you to
5  that belief?
6      A      You want me to tell you what she said?
7      Q      You can.
8            MR. DAILEY:  He's asking you the
9  question.
10           THE WITNESS:  She said, you fucker, you
11 fucked up.  And I said, hold on, before you draw
12 conclusions, let me come over and see what you got
13 going on there.
14 BY MR. RYBECK:
15     Q      And after --
16     A      When you meet up with her, she's a little
17 vicious little thing.
18     Q      How old is Ayana approximately?
19     A      She gotta be about 20 years younger
20 than me.  She young little Spanish girl.
21     Q      So once you talked to Mr. Revaitis and
22 he essentially admits that he didn't check to see if
23 the work was old wiring or new wiring that caused
24 the failure, what happened after that?
25     A      Well, I met with Mr. Rizzo, as always I

D E G N A N & B A T E M A N, I N C.

Page 145

1  was trying to create a paper trail, document things.
2  And I explained to what was going on.  And Billy
3  Revaitis sat in on the meeting too, he called Billy
4  in.  Billy happened to be in that afternoon, we all
5  sat in there.
6      And I said to Billy, I said, you gotta see
7  this girl's very temperamental, she came at me with
8  some aggression.  And the problem is she doesn't
9  understand that the reason why the circuit breaker
10 was off was because it was an old circuit.  And I
11 was supposed to do another project for her
12 mother-in-law, which is a daycare center, and she's
13 not going to use me now, she's pissed off.
14     He said, don't worry about it, you know, some
15 you win, some you lose.  I says, I'm asking you
16 could you go back there and explain to her that
17 there was a mistake made?  And me, Billy and
18 Mr. Rizzo, we talked about it.  And nothing became
19 of it.
20     I followed up and asked him, could you respond
21 back to me?  And it's really nonchalant, like it was
22 no big thing.  But that girl, she's something
23 different, she's very temperamental.
24     Q      Who said the words to you, some you
25 win, some you lose?

D E G N A N & B A T E M A N, I N C.

Page 146

```
 1        A        Billy Revaitis.  William Revaitis.
 2        Q        What did Mr. Rizzo say during this
 3   meeting?
 4        A        He said, we'll talk to her and see if
 5   we can get this here cleared up.  I said, it's real
 6   simple, just send her something in writing.  Like I
 7   always ask; could you send them something in
 8   writing?  Get me a copy, carbon copy me?  But they
 9   wouldn't do it.
10        Q        Was the job approved ultimately?
11        A        Yes.
12        Q        Did you receive the notification from
13   the city that the job was approved?
14        A        Yes.  Standard, they always send out
15   the notice.
16        Q        Did you provide that to Ayana?
17        A        No, she wouldn't -- no, she don't want
18   me near her.  I was at the TD Bank one day, I
19   thought she wanted to fight me in the bank.  I
20   walked into the bank and she was pissed off because
21   she -- like I said, she's like whatever the
22   inspector says, it's like holy, like the Bible.
23        Q        Well, when did you see her at TD Bank?
24        A        Maybe a month after that job.
25        Q        What TD Bank did you see her at?
```

D E G N A N & B A T E M A N , I N C .

Page 147

```
 1        A        On Browning Road.  I live right near
 2   Browning Road in Pennsauken.
 3        Q        And explain to me what happened.
 4        A        Like if I'm -- like say for instance if
 5   you're standing in the bank like and you looking
 6   straight ahead.  She walked on the side of me like
 7   this here and says, you fucker.  Like that.
 8            What the hell's this all about?  And I said,
 9   oh, my goodness, that's her.  I was just like, I
10   ain't going to get in no verbal thing with her.  She
11   got pissed off and walked out.
12        Q        Now, just for the record, you had your
13   arms crossed at --
14        A        She walked up to me.  Like say for
15   instance -- like I can --
16        Q        Hold on a second.
17        A        I can show --
18        Q        Just for the record I'm saying you were
19   demonstrating what Ayana was doing, you had your
20   arms crossed, --
21        A        She was -- like I look at you like, I
22   said, you F'er, like that, and I look at you like
23   that.  And standing -- and people in line's, what
24   the hell's this all about?
25        Q        Because the court reporter can't
```

D E G N A N & B A T E M A N , I N C .

Page 148

```
 1   transcribe what you're doing --
 2        A        Okay.
 3        Q        -- so I'm just describing it for the
 4   record.
 5        A        Okay.
 6        Q        Did you say anything to her?
 7        A        No, I don't get in no argument with a
 8   woman in public, that's a no-win situation.  I'm
 9   cool about that.  I looked over at her -- I looked
10   at her and says to myself, she's just a crazy woman
11   there.  I couldn't believe it.
12        Q        Other than, you fucker, did she say
13   anything else to you?
14        A        No.  She said -- that girl's a loose
15   cannon, man.  The guys looked, I said, the girl's a
16   loose cannon, man, that's some crazy situation, man.
17   The guy looked, I said, that's a crazy situation.
18        Q        Now, was this encounter with Ayana at
19   TD Bank before or after your meeting with
20   Mr. Revaitis and Mr. --
21        A        It was after.
22        Q        -- Rizzo?  So the job had already been
23   approved at this point when you saw her at TD Bank?
24        A        No, I don't think -- I don't think --
25   let me get my timing right.  Was the job approved?
```

D E G N A N & B A T E M A N , I N C .

Page 149

```
 1   Yeah, Billy went back out there the following week
 2   and he approved the job.
 3            But in her mind she feels as though I did her
 4   wrong, because she called me up about something
 5   else, too after the job was approved, but didn't
 6   relate to nothing else.  It was some crazy theory
 7   that she came up with.
 8        Q        What was the crazy theory?
 9        A        The crazy theory was they had a
10   property that was next door and there was no
11   electricity there.  And she said her breaker's
12   tripping out in the house because the electricity is
13   leaking through one wall coming into the house and
14   it's causing the breaker to trip.
15            So I said, there's no power in the property
16   next door, there's no connection between the
17   vacant -- and the reason whey she was speaking about
18   that was because they own the property.  And I said,
19   you don't even have service coming to that property,
20   there's no link in that property.
21            But she came up with some crazy theory and
22   then she said, you messed my house up.  She just
23   angry.  And I kept telling her, I says, no, that has
24   nothing to do with it.
25            I even called the utility company and they
```

D E G N A N & B A T E M A N , I N C .

## Page 150

1  says, no, everything's fine there. But she has a
2  short -- it's old knob and tube wiring and I tried
3  to explain to her, I says, you plug something into
4  that circuit and it overloads it and it trips out.
5         But she cannot get in her mind what an
6  overload is. So she's just angry.
7         Q       And when did this phone conversation
8  occur? How long after you saw her at TD Bank?
9         A       No, this was before then. Like Billy
10 Revaitis did the inspection, then the following week
11 he came out and did another inspection and got the
12 job approved.
13        And then like before that month time span,
14 then she had me come back out. And I said, okay,
15 I'll come back out. I says, Ayana, I can't keep
16 coming out here, I completed my contractual
17 obligation and I can't keep coming back out here, I
18 said -- with your theory.
19        Then she thought I was insulting her. And I
20 said, the theory that you come up with just doesn't
21 make sense, there's no -- there's no power next door
22 and there's nothing next door that's causing the
23 breaker to trip out. I said, here you got an
24 internal problem with the branch circuit wiring in
25 the house and you have to address it.

D E G N A N & B A T E M A N, I N C.

## Page 151

1         And she thought I was trying to promote more
2  work. And all I -- I didn't want to do more work, I
3  wanted to just get away from her, because she
4  temperamental.
5         Q       So this phone conversation with her
6  about the -- her crazy theory, your words, that
7  occurred --
8         A       That was not a phone conversation. I
9  physically went over to the house and met with her.
10        Q       Okay. But when she notified you about
11 the problem she called you originally, correct?
12        A       Correct.
13        Q       Okay. And that occurred before you saw
14 her at TD Bank?
15        A       Yes, that was like maybe a week before.
16 Week before.
17        Q       So the last time you saw Ayana was at
18 TD Bank?
19        A       That's correct, that's a true
20 statement.
21        Q       Going back to the daycare center, where
22 was that at?
23        A       I have no idea where the daycare
24 center. She says, my mother-in-law has a daycare
25 center, we're looking at rewiring the place and

D E G N A N & B A T E M A N, I N C.

## Page 152

1  we're going to have you do it once we finish this
2  project.
3         Q       And you didn't know where that was,
4  though?
5         A       No.
6         Q       And obviously that worked did not come
7  to fruition?
8         A       That's correct.
9         Q       Okay. Other than Mr. Revaitis
10 essentially wrongfully failing you for the job, was
11 there any other conduct on his part relating to the
12 931 South Seventh Street property that you're
13 claiming was wrongful?
14        A       There was -- there was several
15 properties, there's several -- I'm sorry. You asked
16 me a question.
17        Q       Just relating to this property.
18        A       Oh, no, that's the only thing with that
19 property, that's the issue with that property.
20        Q       Are you claiming that he recommended or
21 badmouthed you -- strike that. Are you claiming
22 that Mr. Revaitis badmouthed you to Ayana or
23 recommended another contractor?
24        A       No. What he said to her was he should
25 have corrected this here problem before he finished

D E G N A N & B A T E M A N, I N C.

## Page 153

1  your job. And that's what the issue became, that's
2  why I needed him or Mr. Rizzo to clarify that.
3         And I also asked the guy from the state, Mr.
4  Verbos, he said he was going to call her, but we
5  lost contact. He said, I'll clear this up,
6  Marshall. But he -- I don't think he ever followed
7  up and called her.
8         Q       Okay. Going back to P-2, the letter
9  from Ayana that's in front of you --
10        A       P -- okay. Um-hmm.
11        Q       It states: I, Ayana Vania Jordan, did
12 not get any -- I believe the word is
13 recommendations -- from the inspectors at all at no
14 time. The second electrician I found was on Craig's
15 List or Angie's list. I heard Marshall the
16 electrician say, oh, his a racist son of a bitch
17 when the gentleman got out of the car.
18        Do you have any knowledge as to why Ayana
19 wrote a letter saying that no one recommended the
20 second electrician?
21        A       I'm trying to think who the second
22 electrician was. I have no idea what she's talking
23 about.
24        Q       Okay. But you didn't make any claim to
25 the City of Camden that they had recommended another

D E G N A N & B A T E M A N, I N C.

## Page 154

1  electrician?
2      A    There was a different issue, but it
3  didn't involve Ayana.
4      Q    Okay.  I'm saying for this property you
5  didn't make that claim, correct?
6      A    No.
7      Q    Okay.  And her saying that you said,
8  oh, his a racist son of a bitch, do you have any
9  idea what she's referencing there?
10     A    No.
11     Q    Have you ever claimed that any of the
12  defendants in this lawsuit were racist?
13     A    The only one I know who's a racist,
14  because I worked with him and I know the comments he
15  would make, is Gene Emenecker.  I know for a fact
16  Gene's got issues.
17     Q    Okay.  Are you claiming that
18  Mr. Revaitis is racist?
19     A    Well, this is what I understand
20  about -- he's got -- I heard he's got issues because
21  his daughter married a black guy and I heard the
22  guys at the local, the guys at the local say that
23  he's got psychological issues behind that.
24     Q    But that's --
25     A    He never came off to me like that, but

D E G N A N & B A T E M A N , I N C .

## Page 155

1  I know that Gene Emenecker came directly with me
2  making racial comments.
3      Q    We'll get back to that.  So you,
4  yourself have never experienced any racism on behalf
5  of Mr. Revaitis?
6      A    He make little joking comments, but we
7  ignore that guy, the more comments he be making.
8      Q    What comments?
9      A    Like he'll say, you're -- like black
10  guys be making in the hood, they be saying like pots
11  and pans.  My man pots and pans.  What's up brother?
12  He be saying little comments.  People say, where the
13  hell he come from?
14      Then he said, you know -- you know, it's like
15  a code, like if you know something and, you know, if
16  you really been in the trenches you know how to like
17  talk the lingo.  He try to talk like he's all that
18  and that.  He got some bullshit with him.
19          MR. DAILEY:  Getting all this?
20  BY MR. RYBECK:
21      Q    So Mr. Revaitis is saying to you, my
22  man pots and pans, --
23      A    Yeah.
24      Q    -- are you claiming that's racist?
25      A    No.  He comes off like he's like

D E G N A N & B A T E M A N , I N C .

## Page 156

1  down -- down low, like cool, you know, but then he
2  do shit to you.  This is where he coming from.  He
3  plays a two sided coin.
4      Q    So you're not claiming Mr. Revaitis is
5  racist to you?
6      A    Billy ain't bad, but Gene, Gene's just
7  racist, Gene makes it obvious.
8      Q    I just want to make clear that you're
9  not claiming Mr. Revaitis is racist?
10     A    No, I never looked at -- like with him
11  being racist, just the way he handled me over the
12  years is wrong because I wasn't a union contractor.
13     Q    We'll get back to that.  Mr. Rizzo, are
14  you claiming he has any racism against you?
15     A    I can't say that about Mr. Rizzo
16  neither, no.
17     Q    How about Miss Afanador?
18     A    She's a very deceitful person, very
19  conniving.
20     Q    I want you to concentrate on my
21  question.  Are you claiming she's racist?
22     A    Oh, racist?  She may be.  Possibility.
23     Q    What do you base that on?
24     A    Because -- I'll tell you what happened.
25  As a matter of fact, the guy from the state kind of

D E G N A N & B A T E M A N , I N C .

## Page 157

1  like he said, you're right on point.
2      When this girl named Ayana, I remember
3  Afanador contacted her, right?  And she turned
4  around and said that Ayana said that you were the
5  problem, you cursed the inspector out and all this.
6  I said, I never did nothing like that.  I says,
7  that's -- I never, ever cursed any inspector out on
8  the job.  Why would I do something like that?
9      And her and Ayana, they're both Spanish,
10  right?  And if you don't know this about the Spanish
11  community, they're very close.  No disrespect to
12  anybody, but they're very close.  They will -- they
13  will support each other, lie, or whatever it is.
14  They will lie.  They lie for one another.
15      That's one population, group of people that
16  will lie for each other.  They will turn -- you can
17  be wrong as wrong and they will turn around and
18  say -- there's a code of loyalty in the Spanish
19  community, they will support each other to the very
20  last breath.
21     Q    And is that --
22     A    Rarely will they turn on one another.
23     Q    Is that what you're claiming occurred
24  with Miss Afanador and Miss Jordan?
25     A    Well, what happened was, when Miss

D E G N A N & B A T E M A N , I N C .

## Page 158

1  Afanador got ahold of Ayana I called her back,
2  because she deceitfully -- she said to me, let's
3  have a meeting.
4      She brought me and a bunch of Spanish people
5  in the meeting and they sat there and listened to me
6  divulge all my information to the city of Camden.
7      And then she betrayed me, she turned around
8  and did a flip -- she did a 180, she flipped the
9  script on me.
10     And then the guy from the state says, I
11 thought that's what she's going to do, because she
12 turned around a week later and says, oh, you're the
13 problem, all my inspectors are good people, and this
14 and that.
15     And then the girl Ayana, she said that Ayana
16 said that I cursed the inspector.  I said, I never
17 did anything like that.  So that doesn't surprise
18 me, that Miss Afanador, being Spanish, she talked to
19 her and she did a total flip on me.
20     Because I spoke to Ken Verbos, I said, Ken, I
21 spoke to Miss Afanador and her whole personality,
22 her view toward me changed.  First she was going to
23 support me in regard to trying to clear up this
24 problem I've been having with the inspectors, and
25 now she totally flipped the script.  Ken said to me,

D E G N A N & B A T E M A N, I N C.

## Page 159

1  I thought she was going to do that.  He said, does
2  not surprise me.
3      Q     Let's go back to this meeting you were
4  talking about.  How did that come about?
5      A     The meeting?
6      Q     Yes.
7      A     The meeting with Miss Afanador and all?
8      Q     Yes.  Who was at the meeting?
9      A     Let me see.  I know her secretary was
10 there, and then there was a girl from Weights and
11 Management that was there.  These are people that
12 run the departments.
13     Then there was this other girl that's in
14 charge of code violations, but they -- but after
15 they had the meeting I found out none of them were
16 supposed to have been there.  But these are all
17 Spanish people.
18     Q     They're all --
19     A     The one girl from code enforcement,
20 she's not Spanish, she's a Caucasian girl, but
21 she -- but the other girls was Spanish.
22     Q     Let's just go one person at a time
23 here.
24     A     Um-hmm.
25     Q     The Weights and Management female, --

D E G N A N & B A T E M A N, I N C.

## Page 160

1      A     Um-hmm.
2      Q     -- she's a Hispanic woman?
3      A     Little, short Spanish girl.
4      Q     Okay.  Approximate age?
5      A     I'm going to say -- I think her name
6  was Judy, too.  I think she might have been maybe
7  late 20s.
8      Q     You think her name is Judy?
9      A     I think her name was Judy.
10     Q     Any other distinguishing
11 characteristics you can recall?
12     A     She's a little, small girl.  That's the
13 greatest thing that stands out, she's a little,
14 small girl.
15     Q     What about her hair color?
16     A     Dark color.  Might be black, but dark
17 color.
18     Q     Okay.  Anything else you can remember
19 about the way she looks?
20     A     She's kinda -- not the way she looks.
21 She kind of shy, kind of shy and she only speaks
22 when asked to speak.
23     Q     How about Miss Afanador's secretary,
24 she's also Hispanic?
25     A     She an older lady.

D E G N A N & B A T E M A N, I N C.

## Page 161

1      Q     Hispanic?
2      A     Yeah.  I remember her, she worked in
3  the City of Camden for a long time, I remember her.
4  I don't remember her last name or nothing, but I
5  remember that face.  I'll never forgot her.  She
6  stills works up there.
7      Q     What's her approximate age?
8      A     She's gotta be late 50s, near 60.
9      Q     Any others -- like any other
10 distinguishing characteristics you can remember
11 about her?
12     A     Just an older lady, wears glasses.
13     Q     Christine Tucker?
14     A     I don't think her name was Christine.
15     Q     Okay.  And you said someone from code
16 violations was there?
17     A     Yeah, this girl, this lady here,
18 she's -- she's a lesbian, I know that everybody,
19 they all just talk about her down there, I know
20 she's a lesbian, but I don't think you want to say
21 that.  That's what she is.
22     Q     She's Caucasian?
23     A     Yes.
24     Q     Approximate age?
25     A     She -- maybe 50.

D E G N A N & B A T E M A N, I N C.

Page 162

```
1       Q        Anything else you can remember about
2  the way she looks?
3       A        She look boy-ish.
4       Q        what color hair does she have?
5       A        Sandy color hair.
6       Q        How long is her hair?
7       A        Short.  She wears her hair short.
8       Q        Like a buzz cut?
9       A        Yeah, something like that, yeah.
10      Q        Was anyone else at the meeting?
11      A        No.  She just brought me in and they
12 all sat there and gathered as much information as
13 they could from me.
14      Q        what information did they gather from
15 you?
16      A        They wanted to hear everything.  Like
17 Miss Afanador, she was angry because she says, I
18 didn't know that the department of DCA came in to do
19 an investigation.
20      And what happened was Mr. Rizzo never told her
21 that and she was angry behind it.  So when they -- I
22 said, you sure you want me to march in there if you
23 guys have a meeting?
24      So all of them sitting in there in the
25 morning, I had to march past all of them to go back
```

D E G N A N & B A T E M A N, I N C.

Page 163

```
1  in Miss Afanador's office.  And I says, there's a
2  lot of tension.  And she shut the door and we had a
3  meeting back there.
4       Q        Now was this City Hall?
5       A        City Hall on the fourth floor.
6       Q        Four floor?
7       A        Yep.  And the mayor didn't know
8  neither, the mayor was supposed to know.  They never
9  told the mayor.  And she wanted to suppress
10 everything.
11      Q        That's mayor Dana Redd?
12      A        Yes.
13      Q        And why was the mayor supposed to know?
14      A        Because I talked to a few people, they
15 said the protocol is you first bring it to the --
16 what's that?  The finance manager or something.
17      Because what happened was I got a phone call
18 from the mayor's secretary and she says, did you --
19 did -- it's my understanding that DCA came in.  I
20 said, who gave you my number?  She never told me.
21 So I listened to her.  I said, let me hear her out.
22      And then when she told me who her mother was,
23 I said, I need to hear even more, because I know her
24 mother, right?
25      So I said, yeah, DCA came in and they did an
```

D E G N A N & B A T E M A N, I N C.

Page 164

```
1  investigation.  And she says, our office knew
2  nothing about that.  And they were a little angry
3  that they didn't communicate that with them.
4       Q        And who was the mayor's secretary?
5       A        A young girl.  I can't think of her
6  name.  I can't think of the girl's name.
7       Q        You know her mother, though?
8       A        Yeah.  Her mother's name's Phyllis.
9  what was Phyllis' last name?  She married now.
10 Phyllis Byrd.  Might have been Byrd.  I think her
11 mother's maiden name was Byrd.
12      Q        B-Y-R-D?
13      A        Right, that's right, yeah.
14      Q        And the mayor's secretary, is she
15 Hispanic?
16      A        No, black girl.
17      Q        Approximate age?
18      A        I'm going to say she might be in her
19 30s or something, because sometimes I go up on the
20 fourth floor to get permits, I look over there and
21 it looks like her mother, the girl looks just
22 like -- the one, Phyllis, but I think that's the
23 daughter.
24      But I never walked up to her and said, hi, my
25 name is Marshall, and talk, I don't do that, I just
```

D E G N A N & B A T E M A N, I N C.

Page 165

```
1  keep moving.
2       Q        So the mayor's secretary called you,
3  you don't know how or why she called you?
4       A        She said, I heard that DCA came in.
5  And I said, yes.  And I says, I'm supposed to have a
6  meeting with Miss Afanador the following week.  And
7  I -- so I said to her, I says, isn't protocol that
8  you suppose to tell the mayor's office?  And she got
9  like quiet on the phone.  I said, can you hear me?
10 And she wouldn't say anything.  And I kept pursuing
11 it.  She said, yeah, we should have known about it
12 first.
13      She says, when somebody like DCA comes in you
14 supposed to contact business -- oh, business
15 administration, you're supposed to contact the
16 business administrator and then you supposed to
17 contact -- the business administrator tells the
18 mayor.  That's how it's supposed to go, how it go.
19 That's what I meant.  That's what she told me.
20 Because it goes down -- you're supposed to share
21 information.
22      Q        Let's talk about the DCA investigation.
23 when did that begin?
24      A        Oh, we been talking about the City of
25 Camden for years.  This guy came on in September,
```

D E G N A N & B A T E M A N, I N C.

## Page 178

1    And I thought that we had achieved that, but
2  once we walked out of the meeting I had an idea what
3  might turn opposite, because she had -- my opinion,
4  just my opinion, she had to take the position to
5  protect her office, because she was the director
6  there.  So it makes sense that she would turn around
7  and then call rounding the troops up or circling the
8  wagons, say, look, we gotta make Marshall look like
9  he's a problem.  And that's my opinion.
10    So when I talked to her a week later she did a
11  total flip-flop on me, and one of the key factors
12  that girl Ayana, I told her that she was
13  temperamental, I told her she's not going to talk to
14  you.
15    But they're Spanish, they're going to -- they
16  work together.  It's easy for one Spanish person to
17  say, look, we gotta work together, gotta make it
18  look like he's an asshole, whatever.  That don't --
19  that's pretty common.
20    Q    So is that just what you believe
21  happened with Miss --
22    A    I experienced it.
23    Q    Hold on one second.  -- with Miss Ayana
24  Jordan, that Miss Afanador said to her, we're both
25  Spanish, we have to make --

D E G N A N & B A T E M A N,  I N C.

## Page 179

1    A    I can't say that.
2    Q    Hold on.  -- we have to make Marshall
3  look like an asshole?
4    A    No, I can't say that.
5    Q    Okay.
6    A    I'm just basing it upon when I talked
7  to Miss Afanador the next time, she said that Miss
8  Ayana said that no, you cursed the inspectors out.
9  I've never done it in my entire life.  That's easy
10  to tell the truth, there are certain thing I just
11  don't do.
12    Q    So the comment in P-2 that you stated,
13  oh, his a racist son of a bitch, that never
14  occurred?
15    A    No.  No.
16    Q    Did you ever once complain to
17  Miss Afanador that the problems you were having were
18  racially based?
19    A    I just said to her, Gene Emenecker
20  could be racially based.  And she said that she
21  wouldn't put it past him.
22    Q    When did she say that?
23    A    During that meeting we had.
24    Q    Okay.  And was there anyone else
25  present for that?

D E G N A N & B A T E M A N,  I N C.

## Page 180

1    A    All them other girls was there.  All of
2  us -- there was four of us in the meeting, including
3  myself.  Yes, four females, including Miss Afanador,
4  and myself.
5    Q    At any time did you ever submit a
6  complaint in writing that the problems you were
7  having with the City of Camden were racially based?
8    A    No.  I was very discreet.  I sent
9  Miss Afanador a letter stating that I would -- I was
10  requesting to meet with her because of the internal
11  problems.  But I never detailed what it was about, I
12  didn't want to reveal that until I met with her.
13  And during the meeting I disclosed that.
14    Q    Why did you not want to reveal that?
15    A    Because I don't trust them people.  I
16  don't trust them people in the City of Camden, you
17  gotta be very discreet what you say to them.  If I
18  was to tell her in advance what the contents of what
19  I wanted to speak about, they prepare themselves.
20  You gotta be very careful when you communicate with
21  them, you can't let them know what your hand is.
22  Like playing a game of poker, you can't let 'em know
23  what your hand is.  You gotta reveal that at the
24  time.
25    Just like the guy from the state.  He said, I

D E G N A N & B A T E M A N,  I N C.

## Page 181

1  came in there and caught them with their pants down.
2  He said, I'm not going to let them know what day I'm
3  coming to see them.  He said, I caught them with
4  their pants down, Marshall, he said, they didn't
5  know then I was coming.
6    Q    What do you mean, they would prepare
7  themselves if you had written your complaints in
8  writing to Miss Afanador prior to the meeting?  What
9  could they have done, in your opinion that --
10    A    I'll give you --
11    Q    Hold on.  -- that would have prepared
12  them for the meeting?
13    A    What do I believe they would have done?
14    Q    Yes.
15    A    They would have turned around and
16  gathered information.  Like say, for instance, I
17  want to speak about this or speak about that.  I
18  believe they would have turned around and
19  interviewed certain people, they would have
20  postponed the meeting, delayed to prepare
21  themselves.
22    Just like, an example the guy from the state,
23  he says, I came here, but if I told them they were
24  coming, they would have been prepared.  He said, by
25  state law we can walk in to any municipality and

D E G N A N & B A T E M A N,  I N C.

Page 182

1  demand the records right there.  And if they don't
2  give us the records, we have the authority to shut
3  the office down.  He says, so when I went in and
4  asked for it, they had to give it to me.
5      Q      Let's get away from Investigator Verbos
6  here.  I want to concentrate on Miss Afanador.
7  You're claiming they would have interviewed
8  witnesses had you notified them of specific
9  instances.  Correct?
10     A      I believe that.
11     Q      And what's the problem with that?
12     A      Because I don't trust them.  I don't
13  trust the politics in the city.  Because I've seen
14  what they've done over the years.  I wanted to walk
15  into a meeting and have an open forum and share with
16  her that -- the only thing I said to her was, I'm
17  having certain problems with doing business in the
18  city of Camden, would you be so good to meet with
19  me?
20         And I remember years ago I told her that one
21  day at the front desk and she said, if you ever
22  continue to have problems, feel free to come to my
23  office and talk to me.  So she remembered me from
24  years and years ago.  This is like ten years ago we
25  had a conversation one day.

D E G N A N & B A T E M A N, I N C.

Page 183

1          And so when I walked up to her she said, yeah,
2  I remember you, your brother works up at the print
3  shop.  I said, yes.  I said, I'd like to meet with
4  you.  So she was receptive to meeting with me.
5          And then when she found out that DCA came in,
6  she wanted to meet with me even more, because she
7  should have been informed that DCA came in.  Her
8  right-hand man in the office never said to her, hey,
9  we've got a problem, DCA came in.  He never shared
10 that with her.
11         So she was more than welcome -- see, I had her
12 at a point that she was willing to meet with me.
13 She said, well, this guy -- she said, I'm willing to
14 meet with him.  That's what I'm saying.
15         So I had her eager to meet with me.  As long
16 as I had her interest, then I knew she was willing
17 to meet with me.
18     Q      But you take issue with -- if you had
19 given them names of persons, of property owners, if
20 they would have interviewed them you would have had
21 a problem with that?
22     A      Not necessarily.  Not necessarily.  But
23 I didn't want her to know exactly the details of
24 what I wanted to talk about, because after I met
25 with her she said, I'll get back to you tomorrow.

D E G N A N & B A T E M A N, I N C.

Page 184

1  And tomorrow wind up being maybe four or five days,
2  because I knew she was trying to come back at me
3  differently.
4          See, when you tell somebody something it gives
5  them a chance to put their -- you know, put their
6  apples in line and -- you know, figure of speech,
7  and that's what happened.  She said, I'll get back
8  to you tomorrow, after we had that meeting, and I
9  called her and she was evasive.  She was evasive.
10         And then when we finally did talk a week later
11 she took a defense, like she was like opposed to me
12 then.  All of a sudden you embrace me, then the
13 following week you're opposed to me.  See, that's
14 what I anticipated.
15     Q      Why did you anticipate that?
16     A      Because for her to turn around and go
17 along with me, it would be totally -- it would sort
18 of -- I have a problem and she's going against her
19 office.  She's gotta protect the rest of the office
20 because it shows that she doesn't have control of
21 her office.  See, I was using basic common sense.
22     Q      So you anticipated prior to the meeting
23 that Miss Afanador was going to go against you?
24     A      Not necessary, but I knew that if I
25 shared everything with her, then in turn she

D E G N A N & B A T E M A N, I N C.

Page 185

1  wouldn't be so receptive.  I had to maintain her
2  interest.  I didn't let her know all the details
3  what I wanted to talk about.
4      Q      Did you anticipate that she would
5  investigate your complaints after --
6      A      of course.
7      Q      -- the meeting?
8      A      Yes, of course.
9      Q      And to your knowledge, did she?
10     A      I don't know the extent of what she
11 did, but all I did was try to be receptive and, you
12 know, make myself available.
13     Q      And this meeting occurred when?
14     A      I am going to say -- had to be in
15 September of 2013.
16     Q      So was it after Investigator Verbos
17 came to the code office, correct?
18     A      I met with Miss Afanador?
19     Q      Yes.
20     A      Yes.
21         MR. RYBECK:  Let's take a five minute
22 break.
23         (Brief recess.)
24 BY MR. RYBECK:
25     Q      We were talking about the meeting you

D E G N A N & B A T E M A N, I N C.

## Page 186

1 had with Miss Afanador and approximately -- she told
2 you that she was going to call you the next day and
3 she called you approximately four to five days
4 later.
5      A      The following week.
6      Q      Okay.  And was that in September or
7 October, that phone call?
8      A      If it was September it had to be maybe
9 the last week in September or the first week in
10 October.  For some reason it might have been the
11 first week in October, because -- yeah, I remember
12 it was right during that time period.  I don't
13 forget much, but pretty close to that time period.
14      Q      And what took place in that
15 conversation?
16      A      I says -- I asked her, I says, what's
17 the status?  Have we made any progress?  And she
18 went on the attack on me, she says, oh, my
19 inspectors have done an excellent job, you're the
20 problem.  That's how she came off.
21      And so I turned around and said to her -- she
22 didn't like what I said -- I said, I understand your
23 position, you're the director and it's only fitting
24 that you take that position because it makes it look
25 like you don't have any control over of your office.

D E G N A N & B A T E M A N ,  I N C.

## Page 187

1      She got pissed off.  She hung the phone up.
2      Q      Did she say anything else?
3      A      She said, I ain't gotta put up with
4 this shit.  I ain't gotta put up with this shit.
5 And hung up the phone.
6      Q      Anything else transpire in that
7 conversation?
8      A      No, that's it.
9      Q      Okay.  Have you ever spoken to her
10 again?
11      A      No.  She did that, she hung up on me.
12 Somebody hang up on me, we're done.  Yeah.
13      Q      She called you that day, though?
14      A      I called her and then she called me
15 back.  I initiated the call maybe about 9:15 in the
16 morning and then she turned around and called me
17 back.
18      Q      Have you ever seen this letter in P-2?
19      A      No.
20      Q      Did Miss Afanador ever tell you that
21 she had spoken to Miss Jordan?
22      A      Yes, she did, she said she did.  She
23 said she was going to reach out to her and she said
24 she did speak to her.
25      Q      When did she say that?

D E G N A N & B A T E M A N ,  I N C.

## Page 188

1      A      After we met -- that same day we met at
2 the office she said, I'm going to reach out to her.
3 And I told her, I said, I don't think that you're
4 going to have a productive meeting with her because
5 she's angry with me.
6      Q      What was your understanding of why she
7 was contacting Miss Jordan?
8      A      Why was Miss Afanador's reason for
9 contacting her?
10      Q      Yes.
11      A      Because she wanted to speak to her.
12 She said she wanted to speak to the individuals that
13 witnessed or have knowledge of what's been taking
14 place with the inspectors.
15      Q      And what knowledge did Miss Jordan have
16 about what took place with Mr. Revaitis?
17      A      She was there, she -- when Mr. Billy
18 Revaitis went out to do the inspection she met him
19 there at the property to do the inspection.  She
20 basically was available to let him in the property
21 to review.
22      Q      But no one was disputing that the
23 property was violated, correct?
24      A      Was it violated?  I'm sorry.
25      Q      Well, denied.

D E G N A N & B A T E M A N ,  I N C.

## Page 189

1      A      I'm sorry, I misunderstood.
2      Q      Your application was denied.
3      A      It was denied initially, it was -- the
4 job failed inspection --
5      Q      Okay.
6      A      -- initially.
7      Q      But this meeting that occurred with
8 Miss Afanador, the job had been approved at that
9 point, correct?
10      A      At that point in time when we had the
11 meeting it was closed out, they had approved it.
12 But she understood, she says, yes, our inspectors
13 are supposed to note the records.
14      Q      Miss Afanador said that?
15      A      Yes.
16      Q      Did Miss Afanador state what she was
17 going to ask Miss Jordan?
18      A      No, she didn't go into detail what she
19 was going to explain to her, she said she was going
20 to talk to her.  And I told her, I said, you may
21 have more luck than me, because she's Spanish.  I
22 said, no disrespect, because, you know, she may be
23 receptive to you, but she's a very angry woman
24 because she think I did her wrong.
25      Q      And did Miss Afanador say she was going

D E G N A N & B A T E M A N ,  I N C.

Page 190

1  to reach out to any other individuals?
2      A    She said she was going to speak to Jim
3  Rizzo.
4      Q    How about any property owners?
5      A    I gave her the list of everything, I
6  gave her the statements, I gave her everything, you
7  know, and I said, you can -- I even gave her phone
8  numbers of people that she could contact.  I even
9  gave her this girl's phone number.
10     Q    Miss Jordan?
11     A    Yeah.  Ayana, yeah, Jordan.  I'm just
12 now remembering her last name Miss Jordan, Jordan.
13     Q    Who else -- what other names did you
14 give Miss Afanador of private citizens?
15     A    There was a guy at the tattoo shop, I
16 can't think of his name right now.  Tony?  It's
17 called Twisted Tattoos.  I gave her the property of
18 Browning Street, the -- the property we spoke about
19 earlier.
20          There was one on Seventh Street, there was an
21 older lady by the name of Miss Bernice, that was
22 another inspection.  That's one we did speak about.
23          But I gave her -- you know, I spoke and I gave
24 her some verbal information about other properties I
25 encountered problems with inspections.  I told her

D E G N A N & B A T E M A N , I N C .

Page 191

1  about -- there was a property, Nate Rowland on
2  Newton Avenue that I had to do a commercial service
3  when it should have been just a residential service
4  because the inspector misinterpreted the code and it
5  cost the homeowner another $3,000 to do the job the
6  way he wanted me to do it.
7          But the guy Nate Rowland had money so he says,
8  look, we're going to do what we gotta do.  He says,
9  Mr. Marshall, let's just get the job done, he said,
10 I got money, that doesn't mother me.  So we went
11 ahead and did it.
12     Q    What other properties or property
13 owners did you notify Miss Afanador about?
14     A    I just told her about some other ones
15 that weren't written, but they were all documented
16 in the records, because I always pulled permits on
17 those jobs.  I'm trying to think of some.  I can't
18 really think of them at the moment.
19          But we just had a general conversation.  She
20 said, what's some of the other problems you've had
21 on this job?  And I told her the times, concerns,
22 what I had problems with Gene and Mr. Revaitis.  We
23 had just an open forum.
24          At one time when we was just talking I said,
25 this has been going on for years, I said, I've been

D E G N A N & B A T E M A N , I N C .

Page 192

1  putting up with this here for over ten years.  And I
2  told her, I said, I've been talking to the state
3  about this for a long time, too.
4      Q    Well, you notified them about the DCA
5  investigation at this meeting, correct?  Or prior to
6  this meeting, correct?
7      A    You mean Miss Afanador?
8      Q    Yes.
9      A    I told her how long I had been in
10 communication with them.
11     Q    Well, you had notified the mayor's
12 office prior to the meeting with Miss Afanador about
13 the DCA investigation, correct?
14     A    No, the mayor's office called me, the
15 secretary called me.  The secretary called me and
16 asked me, you know, it's my understanding that DCA
17 came out.  And I said, yes, they did come out.  I
18 actually even asked her, who gave you my phone
19 number?  She never -- the girl never answered.
20     Q    So the properties we have that you
21 talked about with Miss Afanador at this meeting were
22 1302 Browning, 931 South Seventh Street, 1571 South
23 Eighth Street.  Is that correct?
24     A    That sounds familiar.
25     Q    Okay.  And 1207 Mount Ephraim.  That's

D E G N A N & B A T E M A N , I N C .

Page 193

1  the tattoo shop?
2      A    I believe that is it, yes.
3      Q    Seventh Street was Miss Bernice?
4      A    I believe Miss Bernice is one of the
5  same streets, I think it's Seventh Street.  I think
6  it's the same related address and name.
7      Q    Was that the 931 South Seventh Street?
8      A    I think that's Miss Bernice's address,
9  I believe.
10     Q    I thought you said 931 South Seventh
11 was Miss Ayana Jordan.
12     A    I'm not sure, but I know I could very
13 easily -- I could call her son-in-law and he could
14 tell me his mother-in-law's address.
15     Q    Do you have a recollection of what the
16 property of Miss Jordan, what street that was on?
17     A    Yeah, that's that street where all the
18 winos hang out in Camden, that's that street -- it's
19 a wide street.  I think that's -- that's the street
20 just before you go onto 676.  I think that is --
21 bear with me for a second.  Ninth?  I think that's
22 Seventh Street.
23     Q    So --
24     A    I think Ayana lives on Seventh, I think
25 that property is Seventh Street.

D E G N A N & B A T E M A N , I N C .

Page 194

1    Q      So there were two properties on Seventh
2  Street, Miss Ayana Jordan and Miss Bernice?
3    A      Miss Bernice lives on Ninth Street.
4    Q      Ninth Street?
5    A      Yeah, there you go.  Ninth Street, yes.
6    Q      All right.  So we have 1302 Browning,
7  931 South Seventh, 1571 South Eighth, 1207 Mount
8  Ephraim, Ninth Street with Miss Bernice and Newton
9  Avenue with Nate Rowland.
10   A      Yes.
11   Q      Any other properties you complained
12 about in the meeting with Miss Afanador?
13   A      Oh, there were a lot.  I mean, problems
14 that I've had with the inspectors?
15   Q      Um-hmm.
16   A      There's a whole lot of them we spoke
17 about, but the ones that recent at that time.
18   Q      What other properties?
19   A      I would need time to look back on my
20 old records.  I could look up addresses and notes
21 and all, but I'd have to go over records.
22   Q      I ask that you do that.  We're going to
23 come back for a second day of deposition, so when
24 you come back the next day, just have the -- all the
25 properties you spoke about with Miss Afanador at

D E G N A N  &  B A T E M A N ,  I N C.

Page 195

1  that meeting.  Okay?
2    A      Okay.
3    Q      Thanks.  So after you hung up with
4  Miss Afanador, did anyone else contact you that was
5  in that meeting, any of the females in the meeting
6  with Miss Afanador thereafter?
7    A      No, none of the other females reached
8  out to me.
9    Q      Let's go on to the 1571 South Eighth
10 Street.  Do you know who the owner of that property
11 is?
12   A      1571 South Eighth Street?
13   Q      It's referenced in your complaint in
14 paragraph 25.
15   A      1571 South Eight Street.  Is that
16 Miss Bernice's address?  'Cause I don't know.  I
17 need names.  I need names with regard to address and
18 I'll remember the story.
19   Q      We'll get back to that one at the next
20 time of your deposition.
21   A      Okay.
22   Q      How about 1207 Mount Ephraim?
23   A      That's the tattoo shop.
24   Q      Okay.  Who is the owner -- the owner's
25 name of that?

D E G N A N  &  B A T E M A N ,  I N C.

Page 196

1    A      I don't know Tony's last name, but his
2  first name is Tony.  Antonio or Tony.  Spanish guy.
3    Q      What it is Tony's age, approximately?
4    A      I think Tony might be in his mid 30s.
5  And his last name might be Miller.  I think his last
6  name is Miller, too.
7    Q      And what color is his hair?
8    A      I know it's a dark color, I'm not sure
9  exactly.
10   Q      I'm taking a guess here, but does Tony
11 have tattoos?
12   A      He's got some tattoos, yeah.
13   Q      Do you remember what kind of tattoos he
14 has?
15   A      I know he got some pretty big ones on
16 his arm.
17   Q      Anything specifically you can remember?
18   A      He lifts weights.  He kind of a big
19 guy.
20   Q      Do you remember what any of the tattoos
21 were?
22   A      The most distinguishing thing I
23 remember is his arms.
24   Q      I'm saying, do you remember what any of
25 the pictures were or words on his arms, the tattoos?

D E G N A N  &  B A T E M A N ,  I N C.

Page 197

1    A      There might be some type of religious
2  symbol or something.  Might be a religious symbol or
3  something.
4    Q      How did you first get in touch with
5  Tony?
6    A      Tony reached out to me.  I did work for
7  his family for years.
8    Q      Who in his family?
9    A      There's Carl Miller's Funeral Home.
10   Q      And where is Carl Miller's Funeral Home
11 located?
12   A      On Carl Miller Boulevard in Camden.
13   Q      That was my guess.  Is the family
14 actually named Carl Miller?
15   A      They last name's Miller, I know that.
16   Q      Okay.  And who were you in touch with
17 at the funeral home?
18   A      Are we speaking about the job I did?
19   Q      You said you had done work at Carl
20 Miller's Funeral Home.
21   A      Yes.
22   Q      Who was the contact person there?
23   A      Oh, the contact person there would be
24 Miss Miller or her daughter Pam.
25   But I did the job for Tony.  Tony has his own

D E G N A N  &  B A T E M A N ,  I N C.

Page 198

1  tattoo shop, it's two different --
2       Q     I understand that.  I just want to --
3       A     Okay.
4       Q     I'm going to move on to the -- we're
5  going to come back to the tattoo shop, I just want
6  to talk about the funeral home for a little bit.
7       A     Okay.
8       Q     So it was Pamela or Pam's mom?
9       A     Pam runs the operation for her mother
10  now.
11       Q     Do you know the mother's name?
12       A     I'm not sure Miss Miller's first name,
13  I just know -- I always call her Miss Miller.
14       Q     And when did you work at the funeral
15  home?
16       A     I did a job for them about maybe
17  five -- five, six years ago I put a new service in
18  for them.
19       Q     So 2008, 2009?
20       A     Yeah, I think that was the year, I
21  think it was 2008.
22       Q     And when you say new service, what do
23  you mean?
24       A     They have split service coming -- new
25  power coming into the building.  That's the service,

D E G N A N & B A T E M A N , I N C .

Page 199

1  incoming lines coming in.
2       Q     What does that entail?
3       A     Service cable on the outside, changing
4  the meter setup, changing all the panel boxes out
5  throughout the place and a little bit of interior
6  wiring.
7       Q     And how much money did that cost the
8  Millers?
9       A     I think that was probably like an
10  $18,000 job.
11       Q     And you were paid that?
12       A     Yes.
13       Q     One question I forgot to ask you about
14  Miss Jordan's property.  Were you paid for that job
15  in full?
16       A     Yes.
17       Q     Okay.  So for Tony's tattoo shop on
18  Mount Ephraim, Tony gave you a call?
19       A     Yes.
20       Q     And that call came about because of the
21  prior work did you at his family's funeral home?
22       A     Yes.
23       Q     Okay.  Is that what he said?
24       A     Yes.
25       Q     Okay.  What else transpired during that

D E G N A N & B A T E M A N , I N C .

Page 200

1  conversation?
2       A     Well, he was telling me that I need
3  some work done on my tattoo shop and can you come
4  out and give me a price?
5       I came out and gave him a price and I told him
6  that we would have to take the permit, and I applied
7  for a permit and we went through the process of the
8  paperwork and we scheduled a date and I did the job
9  for him.
10       Q     How much was the job?
11       A     Very small amount.  I think that job
12  was maybe 400 some odd dollars.
13       Q     And what did it entail?
14       A     He needed some receptacles placed at
15  his work stations.
16       Q     And that requires a permit?
17       A     Yes.  Any new work requires permits.
18       Q     Okay.  And you obtained the permit?
19       A     Yes.
20       Q     And I take it that -- is that a one-day
21  job?
22       A     When I went there and did the job it
23  was a one-day job.
24       Q     And when did you do this work?
25       A     Oh, boy.  I'm not sure the exact date.

D E G N A N & B A T E M A N , I N C .

Page 201

1  I know it was during the winter time I did that job.
2  Might have been like in the month of November.
3       Q     What year?
4       A     Maybe a couple years ago, approximately
5  a couple years, may two or three years ago.
6       Q     2012 approximately?
7       A     Yeah, around that time.  I think it was
8  around that time.  I know it was during the cold
9  months, I think it was like in November when I did
10  that job for him.
11       Q     And did Tony schedule the inspection?
12       A     Yes, he would have to be there.  I just
13  told him, use the permit number and just call in,
14  re-inspection whenever you're ready.
15       Q     Are you ever present for inspections?
16       A     Sometimes.  Like if it's a lot of
17  detailed wiring an inspector might have questions,
18  I'll make myself available.  But if it's pretty
19  basic, I'll just -- the inspectors know what to look
20  for.
21       Q     So Tony schedules the inspection.
22  What's your understanding of what transpired during
23  that inspection?
24       A     Well, after the inspector left --
25  William Revaitis did the inspection.  And Tony calls

D E G N A N & B A T E M A N , I N C .

Page 202

1   me up and he says, what's up with you and the
2   inspector? I said, what do you mean? He said -- he
3   turned around and said, I see you called Nico
4   Electric up. He said, man, you should call my man.
5   He says, I got a good-old-boy. That's what he
6   called -- this guy name George Cassidy. Don't call
7   Nico Electric, call him. He gave him his card.
8        And then he says, Tony says, man, no, he said,
9   I would call Marshall, he said, he's been doing work
10  for our family for a long time. We don't have a
11  problem with him.
12       But Tony was surprised that he discredited me
13  and recommended somebody else. Inspectors aren't
14  supposed to do that. When they give them their
15  license they tell them not to do that, you're not
16  supposed to discredit anybody. And that's what --
17  then Tony called me and informed me that he had did
18  that.
19       Q       Other than telling Tony not to use you,
20  did he discredit you in any other way?
21       A       He said, oh, he'll give you a better
22  price, his work is much better. The guy's name is
23  George Cassidy. George Cassidy's no longer around,
24  everybody know George is a butcher, he does butcher
25  work. And Tony seen my work and he was satisfied

D E G N A N & B A T E M A N ,  I N C .

Page 203

1   and -- but that's what transpired.
2        Q       Do you know the specific statute, rule
3   or regulation that prevents Mr. -- or any code
4   inspector from commenting on workers?
5        A       I forget -- I've heard it mentioned to
6   me by several inspectors. I'll find out because
7   I'll make a phone call to an inspector and he'll be
8   able to tell me. But I know they're not supposed to
9   do that. That's one of the -- they got like bylaws
10  they're supposed to comply with. They're not
11  supposed to do that.
12       Q       I'm going to ask that before the next
13  deposition any kind of actual statutes or rules or
14  regulations that you're claiming were violated by
15  the defendants in this lawsuit, you have those ready
16  for the next deposition. Okay?
17       A       (Witness indicating).
18       Q       Is that yes?
19       A       Yes, I'll reach out to --
20       Q       Okay.
21       A       -- an appropriate sources and gather
22  what I can.
23       Q       Who would you reach out to to obtain
24  that information?
25       A       I could go to the state, the inspection

D E G N A N & B A T E M A N ,  I N C .

Page 204

1   department, Ken Verbos would be able to tell me.
2   Then there's -- there's some guy named Robbins.
3   There's a lot of people at the state that are
4   familiar with the rules that the inspectors supposed
5   to comply with.
6        Q       Is there a specific code book?
7        A       They have some -- like I said, they
8   have a bylaw book they supposed to comply with, from
9   my understanding. I don't have that because I'm not
10  an inspector, but I know inspectors first hand, I
11  got a bunch of them in my phone book, I'll call them
12  up and ask them. I'll know that information within
13  the next couple of hours.
14       Q       So the work at 1207, once Tony calls
15  you, what do you do in response to that?
16       A       So I told Tony, I said, you know what?
17  Same thing I did -- say, I'll log the information,
18  I'll record it and I'm going to report it. And he
19  kept doing this -- things were happening so
20  frequently in the close time proximity, I said, I'm
21  going to turn around and keep a record of it,
22  because it was happening too frequently.
23       And I said, would you provide me a statement
24  on that? And he said, sure, he said, I'll sign it.
25  That's what he did. He said, I'll provide you a

D E G N A N & B A T E M A N ,  I N C .

Page 205

1   statement. He said, just truthful, that's what the
2   guy did, he said, I was insulted with the fact he
3   was going to tell me who to hire. That's what he
4   said.
5        Q       And you submitted that to whom?
6        A       Miss Afanador had a copy of that.
7        Q       Did you bring that to you -- did you
8   bring that with you to the meeting with
9   Miss Afanador?
10       A       Yes, I did. I provided her a lot of
11  information, which was foolish on my part. But I
12  did it trying to be cooperative.
13       Q       Why was it foolish?
14       A       Because I felt as though I was talking
15  to my adversary.
16       Q       Who should you have provided it to?
17       A       Someone that would have protected my
18  interest.
19       Q       Who was that?
20       A       Like an attorney.
21       Q       Any government agent?
22       A       I worked with a government agency, I
23  spoke with Ken and his -- Ken Verbos and his boss, I
24  communicated with them.
25       But me and Ken have talked about this

D E G N A N & B A T E M A N ,  I N C .

Page 206

1   situation for over ten years.  But I wish I had --
2   but the biggest problem I had was finding an
3   attorney that would have listened here that wasn't
4   linked to the politics in Camden.
5        Q      I just want to instruct you that any
6   conversations you had with your attorney I'm not
7   allowed to know about.  Okay?  So anything you
8   talked about --
9        A      I understand.
10       Q      -- with Mr. Dailey, that's
11  confidential.  Okay?
12       A      Yes.
13       Q      And what did Miss Afanador say about
14  the statement, if anything?
15       A      She just looked at it and she was
16  surprised about the documentation I presented to
17  her.  And she -- my opinion, she like -- she was
18  pissed off that the office kept everything away from
19  her.  Like, you know, right hand -- she said, but
20  Jim is my right hand man and all this is going on
21  and he didn't share this with me.  She like this,
22  she was disappointed and pissed off.  But she was
23  out on disability leave during that time period,
24  too.
25       Q      Who was?

D E G N A N & B A T E M A N,  I N C.

Page 207

1        A      Miss Afanador.
2        Q      Explain that to me.
3        A      She was out on disability, she had some
4   kind of physical ailment.  I think she had a problem
5   with her back or something.  I think she told me she
6   was in traction or something.
7        Q      When?
8        A      The latter part of the year or
9   something like -- when I met with her the week
10  before I think she told me, or a week or two weeks
11  before, that she had just got out of the hospital or
12  something.  Said she was in an accident or
13  something.
14       Q      Okay.
15       A      Some kind of auto accident, she said.
16       Q      Well, the meeting with Miss Afanador
17  occurred sometime in September 2013, correct?
18       A      Yes, that's right.
19       Q      But the incident with Tony occurred in
20  November of 2012.  Correct?
21       A      Approximately during that time.
22       Q      Okay.  So prior to September of 2013
23  had you provided Tony's statement to anyone at the
24  City of Camden?
25       A      No, I just kept a record of what was

D E G N A N & B A T E M A N,  I N C.

Page 208

1   going on.  I just started logging information.
2   Whenever something would happen I would just keep
3   records of it, records of it.
4        So when it escalated to a point, then I turned
5   around and said, you know, could you guys provide me
6   statements of what was happening?  And surprisingly
7   some of the customers were willing to not be
8   intimidated and they offered statements.
9        Q      When did you request a statement from
10  Tony?
11       A      I think I got that statement -- it was
12  close to that time he shared that with me, I
13  believe.
14       Q      Is his name Israel Miller?
15       A      Israel, that's right, Israel, yeah.  We
16  all call him Tony.  Israel.
17       Q      And that's I-S-R-A-E-L.  Who typed up
18  the statements for Mr. Israel?
19       A      He wrote it down and I typed it up and
20  I showed it to him.  I said, this is what you said?
21  And he said, yup.  And he signed it.
22       Q      Who actually typed it up?
23       A      I prepared it for him.
24       Q      Okay.
25       A      He said, this is exactly how it went

D E G N A N & B A T E M A N,  I N C.

Page 209

1   down.
2        Q      Let's talk about the Miss Bernice job.
3   Was her name Bernice Holland?
4        A      Yes.
5        Q      Actually -- and you don't recall the
6   exact address of her property?
7        A      That's on Ninth Street.
8        Q      My records indicate that the inspection
9   occurred on or about August 26, 2013.  Does that
10  sound correct?
11       A      That's right, it was one of the warmer
12  months, it was a real hot day when I did that job
13  for her.
14       Q      Okay.  How did you first get in touch
15  with Bernice?
16       A      She contacted me -- her son-in-law
17  lives diagonally across the street from me and he
18  says, my mother-in-law got problems with her
19  electricity, can you go over there and see if you
20  can find out what the problem is?
21       Q      Who is the son-in-law?
22       A      His name is Tony.
23       Q      Do you know Tony's last name?
24       A      I can tell you in a second if I can get
25  my phone.

D E G N A N & B A T E M A N,  I N C.

## Page 210

1     Q     Sure, go ahead.
2     A     Parker, Tony Parker.
3     Q     Not the basketball player, right?
4     A     No, no, no.  I didn't think that Tony
5 got that same name.
6     Q     So Tony contacted you in person or via
7 phone?
8     A     He called me at work.  He was at work
9 and called me.  He happened to catch me at home that
10 morning.
11     Q     And he asked you to take a look at his
12 mother-in-law, Bernice Holland's property?
13     A     Yes.
14     Q     Okay.  And did Tony impart what the
15 problem was?
16     A     He said the electricity keeps going off
17 and on.
18     Q     And did he give you Bernice's number?
19     A     Yes.  I called her to confirm that she
20 would be home and made arrangements, told her I
21 would be over shortly.
22     Q     And did you go to the property?
23     A     I went to the property, yes.
24     Q     And what was the quote?
25     A     The quote?  The quote was -- I think I

D E G N A N & B A T E M A N, I N C.

## Page 211

1 quoted her, I think it might have been 12 or $1,300.
2     Q     And what did the work entail?
3     A     I believe it entailed replacement of
4 electrical panel and upgrading of the grounding.  I
5 believe I upgraded the grounding system.
6     Q     And you obtained a permit?
7     A     Yes.
8     Q     And you did the work?
9     A     Yes.
10     Q     How long did the work take?
11     A     It was completed that same day.
12     Q     And then did Bernice coordinate the
13 inspection?
14     A     Yes.
15     Q     Were you present?
16     A     No.
17     Q     And what transpired during the
18 inspection, as far as you know?
19     A     She called me up and said that the
20 inspector said that I should have corrected the
21 cable on the outside.
22     And the cable on the outside was not in my
23 scope of work on the permit application.  And he
24 turned around and he said, you should have never
25 paid him.  And he turned around and said there was

D E G N A N & B A T E M A N, I N C.

## Page 212

1 something that he knows in the basement that I
2 should have taken care of that was not on the scope
3 of work also.
4     Q     What was the problem with the basement?
5     A     There was an outlet or something that
6 was sitting loose at a wall point or something, a
7 loose outlet.  But how was I to see that?  That not
8 my scope of work.
9     Q     Did you do an inspection of the
10 property in total?
11     A     No, I'm not supposed to do an
12 inspection of the property, I'm just there for what
13 the person tells me the problem is.
14     Q     I understand that, they told you what
15 the problem was, but do you look at the entire
16 property?
17     A     No.
18     Q     How did you know what the problem was?
19     A     From experience you know when --
20 initially when Tony called me?  From experience.
21 Normally somebody calls, I pretty much know what's
22 going on before I get there, just from experience.
23 Once I got there and looked at it, I could
24 determine what -- how to resolve the problem.
25     Q     And who was the inspector?

D E G N A N & B A T E M A N, I N C.

## Page 213

1     A     William Revaitis.
2     Q     And there was a problem with the
3 service head?
4     A     There was -- the service head, it was a
5 service head and I think he wanted a couple more
6 straps in it.  And it was like that all along.  But
7 it wasn't like the service could not function, but
8 that wasn't in the scope of work.
9     Because if somebody says, this is what I want
10 you to correct, I'm only going to bill them for what
11 I'm doing.  But if something can continue to
12 function, I'm not going to work on that if I'm not
13 being compensated for it.
14     Q     So the service head was not related in
15 any way to the work you were doing?
16     A     No.
17     Q     Okay.  And what did you do as a result
18 of that phone call with Bernice?
19     A     Well, when she called me back, Tony
20 called me also, and he said, Marshall, can you help
21 my mother-in-law?  She's a nice old lady.
22     So me, what do I do?  Went over late in the
23 evening, threw the -- threw the extension ladder up
24 on the truck and corrected the problem and say, okay
25 now, Miss Bernice?  Have a good day.  That's what I

D E G N A N & B A T E M A N, I N C.

## Page 214

1  did. Didn't charge her nothing.
2       Q     And how much would that normally cost?
3       A     In the evening?  At least about $250.
4       Q     So you did the work for free just
5  because you were doing your friend's mother-in-law a
6  favor?
7       A     Yep.  Just to show good faith and to
8  let her know I'm not as bad as inspectors are
9  saying.
10      Q     And you obtained a statement from Miss
11  Holland?
12      A     Yes.
13      Q     And you typed that statement up?
14      A     She said to me, Marshall -- this is
15  exactly what she said, she said, you type it, she
16  said, I'll sign it.  I looked at it and said, this
17  is sure, I'm not -- don't want to add or subtract no
18  word, this is sure.
19      And Tony looked at it too and Tony said --
20  Tony even said, do you want me to give a statement,
21  too?  He said, because I talked to the guy, too.
22      Q     Tony talked to Mr. Revaitis?
23      A     Yeah, he said he called him too.
24      Q     And what did Tony say took place in
25  that conversation?

D E G N A N & B A T E M A N,  I N C.

## Page 215

1       A     He said, he should have tooken care of
2  that, he should have tooken care of that service
3  cable.  He says, well, Marshall's a
4  straight-shooting guy, he did what we hired him to
5  do.
6       Q     And did Mr. Revaitis say anything in
7  response?
8       A     I don't know what he said back to Tony,
9  but I told Tony that I would go over there and take
10  care of it for his mother-in-law.  And that was the
11  end of it, I went over and did it.
12      Q     Did you ever contact anyone from the
13  City of Camden regarding this property?
14      A     I spoke to Jim Rizzo about this
15  situation also.
16      Q     When?
17      A     Right during that time period, I think
18  it was like maybe the following week or a couple
19  days later I spoke to him about it.  I physically
20  went up there and I talked to him about it.
21      Q     And what happened?
22      A     Same thing.  He turns around, listens
23  to me, pulls me in the room, and Billy Revaitis
24  happened to be in there that afternoon, we sat there
25  and they want to make jokes, talk about other stuff

D E G N A N & B A T E M A N,  I N C.

## Page 216

1  going on not related, like it's no big thing.  And
2  that was it.
3       I said, can you guys send her a notice that I
4  didn't do anything wrong?  You know, but -- then
5  Tony said, don't worry about it, he says, man, you
6  good with us, he said, we ain't worried about what
7  they say about you.  So I didn't push that.
8       But they don't never say they're wrong, when
9  they do things they never say they're wrong.
10      Q     What do you mean, you didn't really
11  push that?
12      A     I didn't turn around and keep saying,
13  Jim, you know, when are you going send me a letter
14  regarding the mistake that you guys made?  It was
15  wrong for you guys to turn around and tell the
16  customer not to pay me.  And also once again the
17  scope of work that you guys failed the job for
18  didn't relate to nothing I did.
19      He failed the job once again for something
20  that was not related.  That's what continued to
21  happen.
22      That cable -- the hookup top there, that
23  service would continue to work, it was not the scope
24  of work.  What I put on that permit -- you always
25  put on -- there's a section you always fill out with

D E G N A N & B A T E M A N,  I N C.

## Page 217

1  the scope of work, what you're doing, and the
2  inspector's supposed to look at that sheet and say,
3  I'm only going out to inspect what's on the scope of
4  work.  That's it.
5       Q     And did Mr. Revaitis concede that he
6  made a mistake in the meeting?
7       A     He turned around and said, it's no big
8  thing.  It's no big thing, that's what he said, it's
9  no big thing.  I said, but you didn't understand,
10  the customer looks at me negatively like I did them
11  wrong.  And I said, I got the utmost respect for
12  this guy and his family and I don't need that.
13      Because when -- I said, I gotta see these
14  people sometime.  Sometime I might be at the market
15  and they look at me just like that girl Ayana, she
16  comes in at the bank and, you know, the way she
17  look.  That's the kind of stuff I'm subjected to
18  when they do that.
19      I told him straight up, I said, you gotta stop
20  doing that to me, you're hurting me.  No big thing,
21  don't worry about it.  That's the attitude; don't
22  worry about it.
23      Q     And was the job ultimately approved?
24      A     Yes.
25      Q     When did you receive the approval

D E G N A N & B A T E M A N,  I N C.

Page 218

1  notice?
2      A    Maybe about three weeks later I get it
3  in my P.O. box, I get a notice that the job was
4  approved.
5      So I called Jim when I get the notice, I said,
6  Jim, you guys have a great way of like smoothing
7  things out, you send me these little approval
8  notices but you never address anything in writing to
9  me pertaining to the mistake or the reason why you
10  failed the job.
11      That's what I would always say to him, I says,
12  you send these little approval notices but you're
13  still not addressing the problem.
14      Q    So if the approval notice -- strike
15  that.  If they had sent something in writing to the
16  property owner saying you didn't perform anything
17  wrong, you would have no complaint about this job?
18      A    The problem I have is that I want the
19  inspectors to quote the statute, the reason for
20  disapproval of the job if the job is disapproved.
21  Do your job as an inspector and quote the statute.
22      Q    I'm a little confused.  I thought you
23  just said you wanted them to contact the property
24  owner.
25      A    Yes, and provide me the statute, the

D E G N A N & B A T E M A N, I N C.

Page 219

1  reason why you disapproved the job.
2      Q    So you don't want them to contact the
3  property owner --
4      A    No.
5      Q    -- to say you -- hold on.  You didn't
6  want them to contact the property owner to say all
7  the work you performed was correct?
8      A    I want them also to address that and
9  also provide me the statute, the reason why they
10  failed the job.  But there's no statute that lets
11  the customer know that there was nothing that they
12  could have come up with.
13      That's my way of saying to them and saying to
14  the customer, see?  They have nothing to go on,
15  they're just doing this here.  Because if you can't
16  provide a statute to substantiate what you're
17  saying, it's weak.
18      Q    That's my question.  So you wanted --
19  if they had provided a letter to Miss Holland saying
20  there was no violation, it was a mistake, the job
21  has been approved, you'd be okay with that?
22      A    Partially, along with the statute.  The
23  statute has to be on there.  In the contents of the
24  letter I wanted both things.  That's what I kept
25  asking Jim Rizzo to do.

D E G N A N & B A T E M A N, I N C.

Page 220

1      Q    I'm a little confused here.  Because if
2  they say in a letter, there is no statute, there is
3  no violation, wouldn't that be enough?
4      A    Yes, to some degree.
5      Q    What else would be necessary?
6      A    It's important to let them know that
7  they made a mistake as inspectors, not the
8  electrician, he did an acceptable -- code acceptable
9  job, not the electrician, and we were wrong for
10  making comments like that.  That's what I was asking
11  for.
12      Q    Okay.  If they had done that you would
13  be okay?
14      A    I would have been much more content
15  with that, if they had did that.  And not the harm
16  that they caused me as a contractor, because I lost
17  customers.  I can't count the amount of customers
18  I've lost over the years, because they don't call me
19  no more.
20      Q    Well, did you believe that you lost
21  customers as a result of the Holland property?
22      A    Not that particular job, because her --
23  me and her son-in-law, we have a good relationship
24  and I know the family well.  I don't think that
25  they -- that particular family will allow that one

D E G N A N & B A T E M A N, I N C.

Page 221

1  situation to taint our relationship.
2      Q    Do you believe --
3      A    Not that one.
4      Q    -- you lost business as a result of the
5  Tony's tattoo shop?
6      A    I believe I have.
7      Q    What business?
8      A    Because Tony don't want no problems.
9  Tony's the type of person he knows that if he calls
10  me for another job he's gotta deal with that
11  nonsense with the inspector.  So I know how Tony is,
12  Tony's the type of person; I like you man, but I
13  ain't going to deal with this nonsense, these
14  inspectors.  That's how Tony is.
15      Q    Well, Tony gave you the statement that
16  you requested, correct?
17      A    Yeah, he did that.
18      Q    Okay.
19      A    But on the flip-side of Tony, too,
20  he'll tell me that just so me and him's cool in
21  front of each other, but I know at the end of the
22  day he don't want no problem.
23      Q    Did you have any prospective work lined
24  up with Tony after the tattoo shop?
25      A    Tony meets a lot of people, it's -- and

D E G N A N & B A T E M A N, I N C.

3

1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
 2
        ------------------------------------------
 3   NICO ELECTRICAL CONTRACTOR, INC.:
     & MARSHALL B. WILLIAMS,            : Civil Action
 4                                      : No. 1:13-CV-06353
                                        :(JHR)(AMD)
 5                Plaintiffs            :
                                        :
 6       vs                             :      DEPOSITION OF:
                                        :
 7   CITY OF CAMDEN, EUGENE EMENECKER: WILLIAM F. REVAITIS
     WILLIAM REVAITIS, JAMES RIZZO    :
 8   & IRAIDA AFANADOR,               :
                                      :
 9                Defendants          :

10

11
             ------------------------------------------
12               Wednesday, November 5, 2014
             ------------------------------------------
13

14

15   R E P O R T E D   B Y :

16
        TRACY SWEETEN, Certified Court Reporter (License No.
17   1508), on the above date, commencing at 12:15 p.m. at
     the office of Weir and Partners, LLP, 457 Haddonfield
18   Road, Suite 420, Cherry Hill, NJ.

19
     A P P E A R A N C E S :
20

21      F. MICHAEL DAILY, JR., ESQUIRES
             For the Plaintiffs
22

23      WEIR & PARTNERS, LLP
        By:  Daniel Rybeck, Esquire and
24           Wesley L. Fenza, Esquire
             For the Defendants
25
```

REC'D NOV 1 : 2014

2

1               I N D E X
2  WITNESS          EXAMINING ATTORNEY      PAGE
3
   William F. Revaitis    Mr. Daily          3
4
                -------------------
5
         E X H I B I T S
6                              MARKED
   NUMBER    DESCRIPTION        FOR ID
7
8  Revaitis-1  Memo - Bates City-0008       15
9
                -----------------------
10
11    (By agreement of counsel, the signing, sealing and
12  certification of the depositions were waived, and all
13  objections, except as to the form of the questions, were
14  reserved to the time of trial.)
15
                -----------------------
16
17
18
19
20
21
22
23
24
25

3

1       WILLIAM F. REVAITIS, having been duly sworn, was
2       examined and testified as follows:
3  BY MR. DAILY:
4   Q.  Mr. Revaitis, my name is Mike Daily.  I'm an
5  attorney.  I represent Marshall Williams.  I'm going to
6  ask you some questions today to see what information you
7  might have that would be relevant to a lawsuit that Mr.
8  Williams has filed in federal court.  If there's any
9  question I ask you that you don't understand, tell me
10  and I'll rephrase the question and/or further explain it
11  so that you do understand when you respond.  If you
12  don't ask for an explanation, I'll have to assume that
13  you understood my question.
14       The court reporter is taking down everything
15  that's said, so you have to keep all your responses
16  oral.
17       Also, you should wait until you're sure I've
18  finished my question before you respond so that we don't
19  have a transcript that's broken up with half a question
20  and half a response and half a question.
21       What we want here is your knowledge.  Therefore,
22  if you don't know the answer to a question, the
23  appropriate response is that you can not answer the
24  question, you don't have the information, as opposed to
25  guessing or speculating.

4

1       Do you understand the instructions so far?
2   A.  Yes.
3   Q.  Do you understand you've been placed under oath
4  and have an obligation to tell us the truth here today?
5   A.  Yes.
6   Q.  Have you ever been deposed before?
7   A.  Yes.
8   Q.  How many occasions?
9   A.  One.
10  Q.  What kind of case was that in?
11  A.  I can't recall.
12  Q.  How long ago was it?
13  A.  1997 maybe.
14  Q.  Were you a party in that case where you were
15  deposed?  In other words, were you the person bringing
16  the lawsuit or the person against whom the lawsuit had
17  been filed?
18  A.  I was the city inspector at the time.
19  Q.  Did that case involve any sort of accident or
20  property loss, such as a fire or anything like that?
21  A.  I can't recall.
22  Q.  That's the only prior occasion you've been
23  deposed, is that correct?
24  A.  There might have been one other time.  I can't
25  recall the date.  I was questioned in city hall by an

5

1  attorney, a woman attorney, about my director.  And I
2  can't remember what that was about.
3   Q.  That sounds like that may have warranted an
4  internal investigation as opposed to a deposition as
5  part of litigation.
6   A.  Okay.  I'm associating lawyers with depositions.
7   Q.  The point is, you were put under oath and there
8  was a court reporter there?
9   A.  Honestly, I can't remember.
10  Q.  I understand.  When were you first hired by the
11  City?
12  A.  June of '96 I believe, or July.  Somewhere around
13  there.
14  Q.  What was your initial title?
15  A.  Electrical inspector.
16  Q.  What is your current title?
17  A.  Electrical subcode official.
18  Q.  When did you become an electrical subcode
19  official?
20  A.  I'm not really sure.
21  Q.  Well, has it been more than like four years?
22  A.  Oh, yeah.  It's been, I've been there close to 17
23  and some change as far as the time I've been there.  It
24  had to be, I want to say maybe 2000 or '99.  Somewhere
25  around in there.  My guy, it was, my boss at the time

6

1  left. He retired. And I can't remember the dates. I
2  have all that stuff.
3     Q. Now, Mr. Emenecker now holds the position of
4  inspector like you previously held?
5     A. Yes.
6     Q. You're his supervisor?
7     A. Yes.
8     Q. And your present supervisor is Mr. Rizzo?
9     A. Yes.
10    Q. He's the code official?
11    A. No, he's the construction official.
12    Q. Construction official. Above Mr. Rizzo is the
13 director?
14    A. Yes.
15    Q. That presently is Mr. Ruiz?
16    A. Yes.
17    Q. But previously it was Ms. Afanador?
18    A. Afanador.
19    Q. Where did you work, or where were you employed
20 before you worked for the City?
21    A. IBEW.
22    Q. So you worked out of the union?
23    A. Yes.
24    Q. Did you retire from the union?
25    A. No. I missed it by one year. I didn't have

7

1  enough time.
2     Q. What local were you in?
3     A. Montreal Local 568.
4     Q. And that local covered what geographic area?
5     A. It's an international. IBEW stands for
6  International Association -- International Brotherhood
7  of Electrical Workers. So it covers --
8     Q. I understand, the national union.
9     A. Okay, you get it. So it's international. It
10 means it's different countries. My ticket was out of
11 Canada, but I lived here in New Jersey. Montreal is in
12 Canada.
13    Q. Okay, right. So your local was actually a local
14 that was up in Canada, but because you had your card you
15 could work all over?
16    A. I could work anywhere in the --
17    Q. In the world?
18    A. Anywhere that's recognized that the International
19 Brotherhood of Electrical Workers is recognized.
20    Q. Where were you born?
21    A. Philadelphia, Pennsylvania.
22    Q. Have you always lived in this area?
23    A. Yes.
24    Q. How did it come about that you worked out of
25 Montreal? That was the local?

8

1     A. I met someone, and at the time I was nonunion.
2  And this someone said, would you like to get in the
3  union? If so, I have a guy you can meet and submit your
4  application and he'll take it, and I did.
5     Q. What is the IBEW local that covers the Camden
6  County Gloucester area?
7     A. Presently or back when I was working?
8     Q. Back when you were working.
9     A. Local 439.
10    Q. What is it presently?
11    A. Local -- I don't know because I haven't worked in
12 it since 1994 was my last job I believe with the union.
13    Q. Would you get your jobs from Local 439?
14    A. Yes, I would get them from Local 439, 269, 98,
15 211, which was Atlantic City. All over the place.
16    Q. While you were in -- back when you were doing
17 union work from time to time, did you have contact with
18 Donald Norcross?
19    A. No.
20    Q. Is there any particular reason why you left the
21 union?
22    A. Yes, I injured my shoulder and I couldn't perform
23 my duties anymore.
24    Q. Did you have to -- how did you obtain the
25 position of inspector with Camden?

9

1     A. I answered an ad for the job.
2     Q. Did you have to take any sort of civil service
3  test?
4     A. No.
5     Q. Presently, how many inspectors do you supervise?
6     A. One.
7     Q. At one point were there any more than one?
8     A. No.
9     Q. So it's only been one inspector and yourself?
10    A. Yes. Not always.
11    Q. Sometimes there's been no inspectors?
12    A. And me. I did it all.
13    Q. When did Mr. Emenecker --
14    A. I don't know.
15    Q. Come on.
16    A. I can't recall the dates. I don't know the
17 dates.
18    Q. Since he began working for Camden, have there
19 been any other inspectors that you supervised?
20    A. There are other, there have been other inspectors
21 in the office that have had the electrical license, but
22 -- yeah, there was. Duane Wallace was one of them I
23 guess now that you mentioned it. I was the subcode
24 official when he was there. And we have had one now in
25 the office who was the building subcode official, but

**10**

1 also has an electrical license, Keith Ravling.
2 Q. Had either Duane or Keith at some point in time
3 been IBEW members?
4 A. No.
5 Q. Do you know Marshall Williams?
6 A. Yes, I do.
7 Q. Do you recall the circumstances under which you
8 first met him or came to know of him?
9 A. Barely. Not in great depth.
10 Q. Would it be accurate to say that when you first
11 got any sort of knowledge of Mr. Williams you were both
12 union electricians?
13 A. No.
14 Q. Is it your recollection that Mr. Williams was not
15 -- strike that. Was Mr. Williams a union electrician
16 when you first got to know of him?
17 A. I just answered that question.
18 Q. So, no?
19 A. No.
20 Q. Were you working for the City of Camden when you
21 first got to know Mr. Williams?
22 A. Yes.
23 Q. Do you recall under what circumstances -- strike
24 that. Do you recall at any time Mr. Williams having any
25 contracts to do work for the City of Camden?

**11**

1 A. No.
2 Q. Did you ever know of an individual named Richard
3 Felicione?
4 A. Yeah, he was -- I don't know. I can't speak to
5 that. He worked for the City of Camden. I thought he
6 might have been the CFO or something like that.
7 Q. From time to time did you ever have any
8 conversations with Mr. Felicione?
9 A. No.
10 Q. Do you have any recollection of ever inspecting
11 any jobs that Mr. Williams did in the City of Camden?
12 A. Yes.
13 Q. Are there any specific jobs you recall where
14 there was any issue between you and Mr. Williams in
15 regards to the job?
16 A. No.
17 Q. To your knowledge did Mr. Williams ever complain
18 about anything you did?
19 A. Yes.
20 Q. What did he complain about?
21 A. You have to be more specific.
22 Q. Well, you said he complained, so do you recall
23 what it was that he complained about?
24 A. Not really, no. I don't remember.
25 Q. Did Mr. Rizzo or the director ever ask you for

**12**

1 information or question you about contacts with Mr.
2 Williams?
3 A. I don't understand the question.
4 Q. Did any of your supervisors ever come to you and
5 say, hey, this guy Williams has made a complaint --
6 A. Yes.
7 Q. -- about you?
8 A. Mr. Rizzo did.
9 Q. When approximately did that happen?
10 A. I don't know.
11 Q. What did Rizzo say was the nature of the
12 complaint of Mr. Williams, if you recall?
13 A. A job I think on South 7th Street.
14 Q. According to what Mr. Rizzo told you, what did
15 Mr. Williams accuse you of doing?
16 A. Failing a job.
17 Q. What was your side of the story in regards to
18 that particular job and it being failed?
19        MR. RYBECK: Objection to the form. Go ahead
20 and answer.
21 A. I never failed the job. I never wrote anything
22 out. I never did anything.
23 Q. Did you explain that to Mr. Rizzo?
24 A. Yeah.
25 Q. Any other supervisor besides Mr. Rizzo ever come

**13**

1 to you and say that Mr. Williams made any complaints?
2 A. No, there are no other supervisors except
3 Afanador, if you want to call her that.
4 Q. Did you ever have any meetings with her and Mr.
5 Rizzo present, or Mr. Rizzo not present, where at least
6 one of the topics discussed was Marshall Williams?
7 A. Yes.
8        MR. RYBECK: Objection to any questions where
9 I was present. You're not going to discuss those.
10 They're both defendants. I had a meeting with them.
11        MR. DAILY: Okay.
12 Q. I'm talking about before a lawsuit was filed.
13 A. Yes.
14 Q. And do you recall when that was?
15 A. I beg your pardon?
16 Q. Do you recall when that was?
17 A. No, I don't.
18 Q. Do you recall who requested the meeting?
19 A. Ms. Afanador.
20 Q. When you got to the meeting, what did Ms.
21 Afanador say?
22 A. That Mr. Williams was, I don't know how to put
23 it, Mr. Williams wasn't happy with the way I handled the
24 case on South 7th Street.
25 Q. And your understanding was that the issue for Mr.

**14**

1 Williams was that he had some sort of claim that you had
2 failed the job when it shouldn't have been failed, and
3 your position was, I never failed it, is that accurate?
4     A.  Yes.
5     Q.  Did Ms. Afanador ask for any more information
6 from you?
7     A.  No.
8     Q.  Do you recall what, if anything, Mr. Rizzo said?
9     A.  No.
10     Q.  At any point in time has it come to your
11 attention that Mr. Williams has accused you of making
12 improper, what he feels are improper remarks to
13 customers of his?
14     A.  Rephrase that, please.
15     Q.  At any time has -- well, let me go back.  Has Mr.
16 Williams himself ever complained to you about what he
17 felt were inappropriate remarks by you to his customers?
18     A.  No.
19     Q.  Has anyone else brought to your attention that
20 Mr. Williams has complained that you made inappropriate
21 remarks to his customers?
22     A.  Yes.
23     Q.  Okay, who did that?
24     A.  Mr. Rizzo.
25     Q.  What supposedly did you, according to Mr. Rizzo,

**15**

1 did Mr. Williams claim you said?
2     A.  I can't recall.
3     Q.  Do you ever remember a dispute involving the
4 property located at 1302 Browning Street?
5     A.  No.
6         (Reviatis-1 marked for identification)
7     Q.  Have you ever seen that document before?
8     A.  Yes.
9     Q.  How did it come about that you saw that document?
10     A.  Either Mr. Rizzo or Ms. Afanador showed it to me.
11     Q.  And that's supposedly signed by I guess Mr.
12 Miller.  Do you deny what is attributed to you in that
13 statement?
14         MR. RYBECK:  Objection to the form.  Go ahead
15 and answer.
16     A.  Yes.
17     Q.  Would it ever be appropriate as a general matter
18 for an electrical inspector, or someone in your position
19 employed by a governmental entity, to recommend to a
20 property owner a particular contractor?
21     A.  No.
22     Q.  To your knowledge did Mr. Williams ever make any
23 complaints that work performed by him was being failed
24 without a citation to the applicable section of the
25 electric code?

**16**

1     A.  Is this directed at me?
2     Q.  Yes.
3     A.  No.  Was I aware of it?
4     Q.  Yes.
5     A.  Yes.  But nobody -- he's never directed anything
6 at me.
7     Q.  I understand.
8     A.  He did everything through emails to Mr. Rizzo.
9     Q.  Okay.  Was it true that when a project would be,
10 when there would be a failure, that the applicable
11 section of the electric code would not be written on --
12     A.  Yes.
13     Q.  -- the thing?  Okay.  Did you ever have any
14 conversations with Mr. Williams where you did tell him,
15 this failed because you didn't do this, which is
16 required by this section of the code?
17     A.  Not that I can recall.
18     Q.  Mr. Williams complains about lack of citation.  I
19 gather that was brought to your attention by Mr. Rizzo?
20     A.  Yes.
21     Q.  What was your response?
22     A.  There was no reason to.  There's no reason to
23 cite something when you're not being failed for it.  Do
24 you have an instance where I failed Mr. Williams and
25 didn't give him a citation?

**17**

1     Q.  Let's look.  That's a good question.  Thank you
2 for asking it.
3         (Pause)
4     Q.  First, Mr. Revaitis, in the inspection section
5 there's an initial.  Is that your initial?
6     A.  Here?
7     Q.  Yes.
8     A.  Yes.
9     Q.  And then there's some printing to the right of
10 that?
11     A.  Repair shorted breaker service panel.  No lights
12 on second floor.  Not done.  And then over.  Do you have
13 the over?
14     Q.  No.
15     A.  There you go.  You should have had the over.
16     Q.  Talk to him about that.  These documents were
17 supplied to me.
18     A.  All right.
19     Q.  There was some statement on there, but, okay.
20         Now, according to the according to this document,
21 the document 61, there were two inspections, am I
22 correct?
23     A.  Uh-huh.
24     Q.  There was one in January and one in February --
25     A.  Right.

18

1    Q. -- of '12. And there was an initial failure, am
2  I right?
3    A. Yes, which I didn't issue any kind of, I didn't
4  issue a red sticker or anything. I spoke to Mr.
5  Williams on the phone at the time of the failure.
6    Q. Do you remember the content of that discussion on
7  the phone?
8    A. I told him the second floor had no lights and the
9  breaker wouldn't reset.
10    Q. And did he contest any of that or anything?
11    A. No, not to my knowledge. I don't remember if he
12  did or not. I just told him I was in a basement on
13  somebody's cell phone talking to him. I don't remember
14  I was in the basement of a job. After I thought about
15  it, I looked at it. I do so many inspections, I went
16  back, filed it away, and I don't know, I thought about
17  it and I said, well, the breaker did what it was
18  supposed to do. It wouldn't reset because there was a
19  direct short in it. So I passed the job and brought the
20  sticker to the homeowner.
21    Q. Well, did Mr. Williams make some sort of claim
22  that lights out of the second floor wasn't within the
23  scope of his work?
24    A. He might have, yes.
25    Q. Between the failure and the approval, did Mr.

19

1  Williams do anything? In other words --
2    A. Not to my knowledge.
3    Q. So you thought -- so in January you failed it and
4  you had a conversation with Mr. Williams?
5    A. No, I had a conversation with Mr. Williams on the
6  17th. Is that the date? 1/17/12? That's the only
7  conversation I had.
8    Q. But then Mr. Williams didn't change anything on
9  February 1st, you approved it?
10    A. Right.
11    Q. Why did you change your mind?
12    A. I already stated that. You want me to restate it
13  again?
14    Q. Yes, if you could.
15    A. I thought about it and breaker that was faulty
16  was doing its job. And he didn't do any -- I looked at
17  the work he had done on the job, the service and the
18  outlets, or whatever he put in on the second floor, I
19  think he put some stuff in, and they all were fine. But
20  he touched the service and I wasn't sure that the things
21  that he worked on weren't part of the problem on the
22  second floor with the lighting, so that's why I did what
23  I did. And then after thinking about it I said, the
24  breaker is doing what it's supposed to do. That's
25  what they do when there's a problem, they don't turn

20

1  back on. So I passed the job, sent the cutting card in
2  and brought the sticker to the owner, the approval
3  sticker, because she doesn't live at that address, she
4  lives at another address somewhere.
5    Q. At the meeting with Mr. Rizzo and the director,
6  was this job discussed?
7    A. I can't recall.
8    Q. Do you recall any other jobs that Mr. Williams
9  had where you had any conversations with him about
10  whether a job had failed or was approved?
11    A. I don't believe I ever failed him for any jobs.
12  I had a conversation about a job where he did a service
13  and there were some issues that I thought that he might
14  want to look into, but I didn't fail him for it.
15    Q. When you say you didn't fail, that means --
16    A. I gave him a heads up. That's what regular guys
17  do. I gave him a heads up, and he took it the way he
18  took it. I can't help that. I didn't fail the job. I
19  just gave him a heads up on something.
20    Q. Do you remember the location of that property?
21    A. No. It's off of Pine Street in South Camden. I
22  can't remember the street name. It's only a one block
23  long street.
24    Q. Do you have any opinion, and you very well may
25  not, but do you have any opinion as to Mr. Williams'

21

1  general competency as an electrician?
2      MR. FENZA: Objection to the form. Go ahead
3  and answer.
4    A. No. He's a licensed electrical contractor. He
5  can work anyplace in New Jersey, as long as his license
6  is current and in good standing. The job you were
7  speaking about, it's not on here. I can't see it.
8    Q. The city provided me with those two contractor
9  project lists.
10    A. That's my handwriting.
11    Q. Okay. Why -- first of all, what is that list?
12    A. This is a list of all the jobs that Marshall has
13  done dating back to whenever. There's no dates on here.
14  The only time I would know what the date is I think off
15  the top of my head would be there's a permit issued.
16    Q. Are you the individual that retrieved that
17  printout?
18    A. Did I?
19    Q. Yes.
20    A. I printed it out myself.
21    Q. And for what purpose did you print it out?
22    A. Because I was being sued by Mr. Williams.
23    Q. That's a good purpose. Was there --
24  specifically, what would that list show you that would
25  help you defend yourself in a lawsuit?



1

```
 1              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEW JERSEY
 2
         -------------------------------------
 3  NICO ELECTRICAL CONTRACTOR, INC.:
    & MARSHALL B. WILLIAMS,         : Civil Action
 4                                  : No. 1:13-CV-06353
                                    :(JHR)(AMD)
 5             Plaintiffs           :
                                    :
 6       vs                         :    DEPOSITION OF:
                                    :
 7  CITY OF CAMDEN, EUGENE EMENECKER:   EUGENE R. EMENECKER
    WILLIAM REVAITIS, JAMES RIZZO   :
 8  & IRAIDA AFANADOR,              :
                                    :
 9             Defendants           :


11              -------------------------------------
12              Wednesday, November 5, 2014
                -------------------------------------


15  R E P O R T E D   B Y:

16
        TRACY SWEETEN, Certified Court Reporter (License No.
17  1508), on the above date, commencing at 10:00 a.m. at
    the office of Weir and Partners, LLP, 457 Haddonfield
18  Road, Suite 420, Cherry Hill, NJ.

19
    A P P E A R A N C E S:
20

21      F. MICHAEL DAILY, JR., ESQUIRES
             For the Plaintiffs
22

23      WEIR & PARTNERS, LLP
        By:   Daniel Rybeck, Esquire and
24             Wesley L. Fenza, Esquire
             For the Defendants
25
```

REC'D NOV 1 : 2014

6

1   A.  Henkels and McCoy.
2   Q.  What was your position with Henkels and McCoy?
3   A.  Electrician.
4   Q.  Were you in the union?
5   A.  Yes.
6   Q.  What union was that?
7   A.  At that time was 439 IBW.
8   Q.  Approximately what year did that deposition take
9   place?
10  A.  It was in the 70's.  I want to say the mid-70's.
11  Q.  What is your present, or who is your present
12  employer?
13  A.  City of Camden, building bureau.
14  Q.  What is your title?
15  A.  Electrical inspector.
16  Q.  Are you a civil service employee?
17  A.  Yes.
18  Q.  How long have you worked for the City of Camden?
19  A.  Going on 11 years.
20  Q.  So you started in 2003?
21  A.  4.
22  Q.  2004?  And were you initially hired as an
23  electrical inspector?
24  A.  Yes.
25  Q.  So your title has remained the same for the 11

7

1   years that you've worked in the City of Camden, is that
2   correct?
3   A.  That's correct.
4   Q.  Who was your employer immediately prior to
5   employment with the City of Camden?
6   A.  I was retired.
7   Q.  Who was your last employer before you retired?
8   A.  The actual contractor, I don't recall.
9   Q.  But it was union work?
10  A.  Yeah.
11  Q.  What union were you in when you last worked?
12  A.  IBW Local 351.  It was a merger.
13  Q.  Approximately when was the last time you worked
14  as a union electrician?
15  A.  November '99.
16  Q.  And that was with Local 351?
17  A.  Right.
18  Q.  When you retired, did you withdraw membership
19  from the union or did you remain in the union?
20  A.  No, you retire from the union.
21  Q.  I assume when you retire from the union -- strike
22  that.  Did the union administer a pension that you were
23  a beneficiary of when you retired?
24  A.  I don't know how to quite answer that because
25  it's not totally that way.  There's an administrator,

8

1   not just a union.
2   Q.  Okay.  But the payments into the pension had been
3   collected through the union, had they not?
4   A.  Part of your wage package.
5   Q.  And I assume you still receive your pension
6   benefits?
7   A.  No.
8   Q.  The plan, did the plan go bust?
9   A.  No, I took a lump sum disbursement.
10  Q.  You took a lump sum?  Okay.  Other than the
11  pension benefits, when you retired from the union did
12  you receive any other benefits, such as healthcare
13  coverage?
14  A.  Yeah, you have to maintain -- you have to have
15  pay COBRA payments to stay in the healthcare.
16  Q.  After the 18 months for COBRA --
17  A.  Two years.
18  Q.  Two years?
19  A.  You still have to pay.  I still pay as a retiree.
20  Q.  Who was the business agent of local 351 when you
21  retired?
22  A.  Ed Gant was the business manager.
23  Q.  In 1999 when you retired did Donald Norcross have
24  any position with Local 351?
25  A.  Yes.

9

1   Q.  What was his title?
2   A.  Assistant business manager.
3   Q.  Then from November 1999 when you retired from the
4   union until 2004 when you started working for Camden you
5   were not employed, was that accurate?
6   A.  No, it's not accurate.
7   Q.  What was your employment in that period?
8   A.  Well, I traveled and took a couple jobs out of
9   state.
10  Q.  Were they union or nonunion?
11  A.  They were union.
12  Q.  Any other employment?
13  A.  I worked at a golf course.
14  Q.  Between '99 and 2004 did you have any
15  governmental employment, like a part-time inspector for
16  a small municipality?
17  A.  No.
18  Q.  How did you go about obtaining employment with
19  the City of Camden?
20  A.  Filed an application.
21  Q.  Did you have to take any sort of civil service
22  exam?
23  A.  Yeah, you fill out -- yeah, a civil service exam.
24  But in order to do that, you have to have the proper
25  licenses.

14

1     MR. DAILY:  Yes.
2     A.  I don't know how long ago it was.  It was
3  probably in the early 70's.
4     Q.  At that time was Marshall Williams a member of
5  the IBEW?
6     A.  Yes.
7     Q.  You were a member at the same time?
8     A.  That's right.
9     Q.  Did you ever work on the same jobs with Marshall
10  Williams?
11     A.  Maybe once.  I don't know.  I don't think that
12  many times.
13     Q.  When you were both in the union, did Marshall
14  Williams have any sort of reputation that you know of?
15     MR. RYBECK:  Objection to form.
16     A.  None that I can recall.
17     Q.  While you were in the union did you ever hear
18  that Marshall Williams had made complaints about job
19  consignments?
20     A.  Nope.
21     Q.  Were you ever an officer in the union?
22     A.  No.
23     Q.  At the time you retired from Local 351,
24  approximately how many members were in that local?
25     A.  12 to 1400 maybe at that time in '99.

15

1     Q.  What geographic area did the union cover?
2     A.  Parts of Burlington County, all of Camden, all of
3  Gloucester and some of Cumberland, I think.  I'm not
4  sure if they went into Atlantic County.  You know,
5  without looking at the jurisdictional map, I can't give
6  you a specific area, but that's close.
7     Q.  Do you remember at some point in time Marshall
8  Williams leaving the union?
9     A.  I don't know exactly when.  I might have heard he
10  left.
11     Q.  Do you have any recollection that he had left?
12  You said you might have heard.  Is that --
13     A.  Not specifically.  I couldn't give you a specific
14  date, no.
15     Q.  Would it be accurate to say that to some degree,
16  you seem to have a recollection that there came some
17  point in time when Marshall Williams was no longer in
18  the union?
19     A.  Yeah.
20     Q.  After you began working for the City of Camden,
21  did you become a member of a union?
22     A.  Only Council 10 Union, the city employee's union.
23     Q.  So you became a member of that union?
24     A.  Yes.
25     Q.  Now, as an inspector with the City of Camden,

16

1  have you had contacts with Marshall Williams in regards
2  to Marshall Williams being a contractor doing electrical
3  work in Camden?
4     A.  Yes.
5     Q.  Do you recall approximately when your first
6  contacts with him may have been?
7     A.  No, I don't.
8     Q.  As you sit here today, do you have any specific
9  recollections of any conversations that you ever had
10  with Marshall Williams concerning the quality of the
11  work that he performed?
12     A.  No.
13     Q.  Do you have a specific recollection of Marshall
14  Williams doing work in Camden which you inspected?
15     A.  I've inspected some of his jobs, yes.
16     Q.  Do you have any specific recollection of any jobs
17  in particular that he did that you inspected?
18     A.  No.
19     Q.  Do you have any recollection of Marshall Williams
20  ever complaining about any of the jobs that you
21  inspected?
22     A.  I think there was a time that something was said
23  to the construction official.  I can't tell you the
24  specific date, job, whatever.
25     Q.  What is your recollection as to what the nature

17

1  of the complaint was?
2     A.  To tell you the truth, I can't even recall what
3  the nature of the complaint was.
4     Q.  In preparation for this deposition, have you
5  reviewed any records of the City of Camden?
6     A.  Briefly.
7     Q.  What were the records you reviewed?
8     A.  Permits that were issued to Nico Electric.
9     Q.  To do electric work in Camden does a contractor
10  have to obtain a permit?
11     A.  Yes.
12     Q.  And how do they go about doing that?
13     A.  Make application to the building bureau in our
14  office.
15     Q.  Who makes the actual decision to issue the
16  permit?
17     A.  Subcode official.
18     Q.  That would be Mr. Rizzo?
19     A.  No.
20     Q.  That would be?
21     A.  Mr. Revaitis.  Ultimately, the construction
22  official signs the permit after it's approved.
23     (Emenecker-1 marked for identification)
24     Q.  First I ask you, Mr. Emenecker, do you recognize
25  the type of document that is being shown to you?

26

1    Q.  So that would have been two years after the
2  permit was issued?
3    A.  That would have been done as a cleanup.
4    Q.  And what do you mean by the term cleanup?
5    A.  That is when we have a light day, we go back in
6  the old permits and look at ones that have never been
7  inspected and put them in the log and go look at the job
8  the best we can, and then send.  When you come back, we
9  don't get in, we send a letter.
10    Q.  So, is the practice that the contractor takes out
11  a permit when he has the work done, he contacts your
12  office and you or another inspector go out and inspect
13  the work?
14    A.  If he in fact schedules an inspection for that
15  permit, yes.
16    Q.  If the contractor does not schedule an inspection
17  for a particular permit, it kind of lays there until you
18  guys have a slow day and you go back and look and say,
19  here's some permits, we never were asked to do an
20  inspection?
21    A.  That's correct.
22    Q.  It could be a couple years later that the fact
23  that there was a permit issued and no inspection hits
24  the radar, so to speak?
25    A.  Yes.

27

1    Q.  Now, do you recognize the initial as to who did
2  the inspection in October of '11?
3    A.  Yes.
4    Q.  Whose initial is that?
5    A.  That's me, GE.
6    Q.  So you conducted the inspection?
7    A.  That's right.
8    Q.  As you sit here today, do you have any
9  recollection of this particular project?
10    A.  No.
11    Q.  Is that your printing to the left of your, or to
12  the right of your initial?
13    A.  I believe it is.
14    Q.  What did you print there?
15    A.  No entry service done 12/24, and I can't tell if
16  you that's a 14 or not.
17    Q.  Or a 13?
18    A.  Or 13.  Sometimes the pen.
19    Q.  So the printing might relate to a subsequent
20  inspection?
21    A.  It might.
22    Q.  Initially this failed in October of '11, you
23  failed it?  You don't recall what the reason for the
24  failure?
25    A.  No entry.

28

1    Q.  Oh, okay.  Yeah, but the no entry relates to a
2  date of --
3    A.  No, the no entry relates to that date.  The
4  12/24/13 is another time gone by.
5    Q.  Oh, I see.  So the NE relates to the October
6  inspection, and the service done 12/24/13 relates to an
7  inspection in December?
8    A.  That's gone by.  And seeing that the work was
9  done, not an actual inspection per se.
10    Q.  Well, what would you -- okay, let me get this
11  straight here according to this document.  There was a
12  permit taken out in 2009 that involved -- what was the
13  scope of the project?  What was supposed to be done?
14    A.  12 lighting fixtures, one switch, eight emergency
15  exit lights, 200 amp service and a 60 amp subpanel.
16    Q.  In October you went out, and October of, it looks
17  to be 2011, you went out, or you tried to go out to
18  inspect it, but you couldn't gain entry, so you marked
19  it as a failure, is that correct?
20    A.  That's the way it's handled, yes.
21    Q.  And then in December of 2013 you somehow
22  determined that the service was done?
23    A.  Yeah, by looking at the outside, seeing a new
24  service cable, and maybe a new meter.  And that's as far
25  as they could go because they couldn't get in.

29

1    Q.  You have no recollection of talking to Mr.
2  Williams about this particular project?
3    A.  No.
4        (Emenecker-4 marked for identification)
5    Q.  Now, this is -- could you compare this exhibit
6  with the last exhibit?  And this actually is the same
7  project, right?
8    A.  Right.
9    Q.  It's got the same control number?
10    A.  Same permit number.
11    Q.  Except on document 0031 the date issued and the
12  permit number is typed in?
13    A.  Right, the other ones are handwritten.  I mistook
14  the bar on the first one as a 16, when in fact it's the
15  line between the month the day and the year.
16    Q.  But this document for this permit it's got the
17  service done notation on 31, just as on 30.  Do you have
18  an explanation for why this, why there's two documents
19  for the same job?
20    A.  It could be doing cleanups and for whatever
21  reason we couldn't find the original one and went into
22  the system and printed another one.
23    Q.  Now, in this situation where there was a permit
24  issued and you see evidence that the job has been
25  possibly completed, what course of action, if any, do

42

1   A.  That note probably pertains to the failure on
2   1/17/12.  You don't put notes when you approve it.
3   Q.  Right.  So what was the problem on the 17th?
4   A.  I don't know.  I didn't do that, and it's not my
5   writing.
6   Q.  But in any event, did you do the final approval?
7   A.  Negative.
8   Q.  Whose signature is that, Mr. Revaitis?
9   A.  Mr. Revaitis.
10  (Emenecker-30 and 31 marked for identification)
11  Q.  So this 62 and 63 apply to 1658 Mt. Ephraim
12  Avenue, do they not?
13  A.  That's correct.
14  Q.  This is another one where there was a permit
15  taken out and no inspection was accomplished?  There was
16  no entry?
17  A.  At that time, that date, 2/24/14, yes.
18  Q.  So, I mean, obviously we can agree, can we not,
19  that if you can't gain entry and inspect the work done
20  by Mr. Williams, or any other electrician, you don't
21  know whether it was done properly or not?
22  A.  You can assume that.
23  (Emenecker-32 marked for identification)
24  MR. RYBECK:  Can we take a minute break?
25  MR. DAILY:  Yeah.

43

1   (Brief recess)
2   BY MR. DAILY:
3   Q.  This is 1571 South 8th Street.  And on this one
4   there was an initial failure, and then there was an
5   approval.  What was this one about?
6   A.  Same as the note says, service head not attached
7   to the building.
8   Q.  But eventually that did occur because you
9   approved it?
10  A.  That's right.
11  Q.  Do you have any independent recollection of this
12  job --
13  A.  No.
14  Q.  -- at that location?
15  (Emenecker-33 to 38 marked for identification)
16  Q.  1596 Kaign Avenue goes from 64 to 69?
17  A.  I don't have 64.
18  Q.  I guess it's 65, sorry.
19  MR. RYBECK:  That's correct.
20  Q.  Could you, based upon a review of these
21  documents, provide me with a narrative of what occurred
22  from a project standpoint on this job?
23  A.  Document 65 says, installation of smoke
24  detectors, heat detectors, rough inspection approved by
25  me.  Item 66, rehab, demolition of walls, ceiling,

44

1   sheetrock, removal of trim, interior doors, insulation,
2   200 amp service.  Appears not to be inspected.  67,
3   light fixtures, receptacles, switches, rough permit
4   update and it was approved by Mr. Revaitis.
5   Q.  What was the update?
6   A.  I can only guess that numbers were changed.
7   Q.  And then there's --
8   A.  Rewire single family dwelling.  Evidently, there
9   was no smoke monitor system installed by others.  And 69
10  appears to be a floor plan.
11  Q.  On 68, who is the contractor?  Marshall Williams.
12  I see, never mind.  I'm sorry.  Do you have any
13  independent recollection of this project?
14  A.  Not really, no.
15  Q.  Is there anything you recall about it?
16  A.  No, just on the inspections, evidently they were
17  okay for what I did.  I approved.
18  Q.  70 apparently is an application for a permit, but
19  the permit was never issued?
20  MR. RYBECK:  Objection to the form.  Go ahead
21  and answer.
22  A.  I disagree with that.
23  Q.  Okay, was the permit issued?
24  A.  According to the total fee at the bottom
25  right-hand corner, it was issued.

45

1   Q.  Shouldn't it have had a permit number?
2   A.  I can't explain why they don't have numbers on
3   them.
4   Q.  No inspections were done according to this
5   document?
6   A.  According to this document, that's correct.
7   (Emenecker-39 marked for identification)
8   Q.  Do you recognize this form?
9   A.  Looks like a log sheet.
10  Q.  Looks like it's a printout from some sort of
11  database, am I correct?
12  A.  That's correct.
13  Q.  And does it concern one particular property or
14  does it -- no, it's multiple properties, correct?
15  A.  There's five different properties listed on
16  there.  There's five different inspections.
17  Q.  These were inspections done by Mr. Revaitis?
18  A.  That's whose name appears on the top of the log
19  sheet.
20  (Emenecker-40 marked for identification)
21  Q.  This also appears to be some sort of printout
22  from a database.  What does this data cover, or what
23  does it appear to?
24  A.  I can't tell you.  I've never -- I don't see or
25  use this type of document.

5

1

```
 1              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW JERSEY
 2
       -----------------------------------------
 3  NICO ELECTRICAL CONTRACTOR, INC.:
    & MARSHALL B. WILLIAMS,          : Civil Action
 4                                   : No. 1:13-CV-06353
                                     :(JHR)(AMD)
 5              Plaintiffs           :
                                     :
 6       vs                          :    DEPOSITION OF:
                                     :
 7  CITY OF CAMDEN, EUGENE EMENECKER:    JAMES R. RIZZO
    WILLIAM REVAITIS, JAMES RIZZO    :
 8  & IRAIDA AFANADOR,               :
                                     :
 9              Defendants           :

10

11       ------------------------------------------
              Wednesday, November 5, 2014
12       ------------------------------------------

13

14  R E P O R T E D   B Y:

15
       TRACY SWEETEN, Certified Court Reporter (License No.
16  1508), on the above date, commencing at 2:30 p.m. at the
    office of Weir and Partners, LLP, 457 Haddonfield Road,
17  Suite 420, Cherry Hill, NJ.

18
    A P P E A R A N C E S:
19
       F. MICHAEL DAILY, JR., ESQUIRES
20          For the Plaintiffs

21
       WEIR & PARTNERS, LLP
22     By:  Wesley L. Fenza, Esquire
            For the Defendants
23

24  A L S O   P R E S E N T:

25     Iraida Afanador
```

REC'D NOV 1 7 2014

## 6

1    A.  I went into a business in construction.
2    Q.  Were there any disciplinary charges pending
3  against you when you retired from the police department?
4    A.  No.
5    Q.  How long were you -- strike that.  Did you
6  operate a construction company or did you work for
7  somebody?
8    A.  I had a construction company.
9    Q.  What was the name you operated under?
10    A.  Jim Rizzo Construction.
11    Q.  How long did you engage in that?
12    A.  About 15 years.
13    Q.  And what was your next employment?
14    A.  Habitat for Humanity.
15    Q.  How long were you connected with them?
16    A.  Four years.
17    Q.  Have we arrived with when you started back with
18  the City?
19    A.  I left there and I went to the City.
20    Q.  What was your first title when you returned to
21  the City?
22    A.  Building inspector.
23    Q.  Now, had you obtained licenses in any building or
24  construction trades when you became, before you became a
25  building inspector?

## 7

1    A.  There were no licenses for builders.
2    Q.  Well, there are licenses for like plumbers and
3  electricians?
4    A.  I wasn't a plumber or electrician.
5    Q.  You were just a general --
6    A.  Builder.
7    Q.  And what year was it that you went back to the
8  City?
9    A.  2005.
10    Q.  Did you receive a promotion at some point?
11    A.  Yeah.
12    Q.  What was the next title that you were promoted
13  to?
14    A.  Building subcode official.
15    Q.  When did that occur?
16    A.  I don't know exactly.
17    Q.  Was Miss Afanador the director when you became
18  the building subcode official?
19    A.  Yes.
20    Q.  Who did you replace as building subcode official?
21    A.  Duane Wallace.
22    Q.  As building subcode official, you would supervise
23  certain inspectors?
24    A.  Building inspectors.
25    Q.  Did you supervise Mr. Revaitis?

## 8

1    A.  He's not a building inspector.
2    Q.  Who was Mr. Revaitis' supervisor?
3    A.  Construction official.
4    Q.  And that is?
5    A.  Was?
6    Q.  Was, yeah.
7    A.  Bob Schooler.
8    Q.  After Mr. Schooler left?
9    A.  I was.
10    Q.  You became Mr. Revaitis' supervisor, correct?
11    A.  Yes.
12    Q.  Where did Mr. Schooler leave, if you know?
13    A.  I don't know.
14    Q.  After you became the -- you went from inspector
15  to building subcode official, and is that your position
16  today?
17    A.  I'm construction official.
18    Q.  When did you become construction official?
19    A.  Approximately 2009.
20    Q.  That's when you became the supervisor of Mr.
21  Revaitis?
22    A.  Yeah.
23    Q.  Are you familiar with the UCC?
24    A.  Yes.
25    Q.  And that's from your days, that's from going all

## 9

1  the way back to your days in construction?
2    A.  Not necessarily.
3    Q.  When is the first time that you heard that an
4  individual by the name of Marshall Williams had some
5  sort of complaints with regard to how he was being
6  treated by inspectors you supervised?
7    A.  It was several years back.
8    Q.  Do you recall the circumstances as to how this
9  was brought to your attention?
10    A.  By Mr. Williams.
11    Q.  By who?
12    A.  Mr. Williams.
13    Q.  How did he do that?  Did he call you?  Did he
14  write you?
15    A.  Came in the office.
16    Q.  When he came in the office, what did he say?
17    A.  He said he had a complaint.
18    Q.  And how did he explain what his complaint was?
19    A.  It was a long conversation, which I don't recall
20  the details, except that he had some issues with the
21  electrical inspector.
22    Q.  Who was that, or whom was that?
23    A.  Eugene Emenecker.
24    Q.  Did he mention he had any problems with Mr.
25  Revaitis?

10

1    A.  No, quite the contrary.
2    Q.  Now, this first time he came with a complaint,
3  was there anybody present besides you and him?
4    A.  I don't think so.
5    Q.  Do you recall anything else that he said other
6  than what you just mentioned to us?
7    A.  I don't remember all the details.  It was a
8  conversation.
9    Q.  What, if anything, did you do in response to the
10  information that Mr. Mr. Williams had given you?
11    A.  Questioned Gene Emenecker.
12    Q.  What did Gene say?
13    A.  He said he had no problem with Mr. Williams.
14    Q.  After you had that conversation with Gene, did
15  you do anything further, or did you consider the matter
16  closed?
17    A.  Well, the issue there was there was a difference
18  of opinion between him and Mr. Williams.  It was
19  resolved.  He passed the job and that was the end of the
20  story.
21    Q.  Now at some point after that was it brought to
22  your attention that Mr. Williams still had complaints?
23    A.  Yes.
24    Q.  How did that occur?
25    A.  Mr. Williams came in, again along with at least a

11

1  couple of emails which you probably have in your file.
2    Q.  Uh-huh.  Was there another meeting?
3    A.  Yes.
4    Q.  Who was present at this meeting?
5    A.  Bill Revaitis.
6    Q.  Anyone else?
7    A.  Me and Mr. Williams.
8    Q.  What was Mr. Williams' complaint this time?
9    A.  Similar to the last time, that he was not being
10  treated fairly.
11    Q.  Was there any particular property or properties
12  that seemed to be the point of contention?
13    A.  The last one was 931 South 7th.
14    Q.  What was the situation there?
15    A.  Same thing, there was a difference of opinion.
16  In the end he passed the job.
17    Q.  Well, at the time Mr. Williams came in was the
18  job, had the job been passed or did it get passed after
19  the meeting?
20    A.  I'm not sure.
21    Q.  Was there a subsequent time when Mr. Williams yet
22  again appeared and had complaints?
23    A.  Not directly to me.
24    Q.  Did he go to the director?
25    A.  I'm understanding that he did.

12

1    Q.  Were you ever present at a meeting with the
2  director and Mr. Williams?
3    A.  I'm not sure if I was at the meeting.  I know I
4  was privy to a phone call.  I wasn't at the meeting.
5    Q.  The phone call was from whom the, director?
6    A.  The phone call was between the director and Mr.
7  Miss Jordan.
8    Q.  Why were you privy to that phone call?
9    A.  Because I'm part of the supervision.
10    Q.  Who dialed Miss Jordan?
11    A.  I assume it was the director on her phone.
12    Q.  She asked you to pick up?
13    A.  It was a speaker.
14    Q.  So you and the director were in an office
15  together?
16    A.  That's correct.
17    Q.  Did she indicate to you why she wanted you
18  present when she called Miss Jordan?
19    A.  She didn't indicate anything specific.  It was so
20  I would know what was going on.
21    Q.  Do you remember what Miss Jordan had to say?
22    A.  The substance of the conversation was that a
23  negative feeling on her part toward Mr. Williams as to
24  his behavior.  Other than that, I don't know the
25  specifics, other than that she had to resort to her

13

1  husband getting on the phone to keep the individual from
2  calling her back and texting her.
3    Q.  What was he calling her about to your
4  understanding?
5    A.  I don't know what that conversation was.
6    Q.  Do you recall whether part of the situation with
7  this individual was that Mr. Williams wanted her to be a
8  witness or give a statement indicating how he had been
9  treated and that that's what he had been pressing her
10  for?
11    A.  It could be.
12    Q.  In any opinion event, whatever Mr. Williams did,
13  she said she didn't want to get involved in it and said
14  she resorted to her husband telling Mr. Williams to
15  basically get lost?
16    MR. FENZA:  Object to the form.  You can
17  answer it if you understand the question.
18    A.  Not exactly.
19    Q.  Whatever the exact issue between Jordan and
20  Williams was, it was your understanding that she didn't
21  want to have anything more to do with Mr. Williams, and
22  she had her husband try to intervene and basically tell
23  Mr. Williams to get lost?
24    A.  I saw it as just a disagreement between the
25  parties.



1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF NEW JERSEY
 2       -------------------------------------------
 3   NICO ELECTRICAL CONTRACTOR, INC.:
     & MARSHALL B. WILLIAMS,            : Civil Action
 4                                      : No. 1:13-CV-06353
                                        :(JHR)(AMD)
 5              Plaintiffs              :
                                        :
 6        vs                            :     DEPOSITION OF:
                                        :
 7   CITY OF CAMDEN, EUGENE EMENECKER:      IRAIDA AFANADOR
     WILLIAM REVAITIS, JAMES RIZZO   :
 8   & IRAIDA AFANADOR,               :
                                      :
 9              Defendants            :

10

11       -------------------------------------------
              Wednesday, November 5, 2014
12       -------------------------------------------

13

14   R E P O R T E D   B Y:

15

16       TRACY SWEETEN, Certified Court Reporter (License No.
     1508), on the above date, commencing at 1:50 p.m. at the
17   office of Weir and Partners, LLP, 457 Haddonfield Road,
     Suite 420, Cherry Hill, NJ.

18

19   A P P E A R A N C E S:

20       F. MICHAEL DAILY, JR., ESQUIRES
              For the Plaintiffs
21

22   WEIR & PARTNERS, LLP
     By:  Wesley L. Fenza, Esquire
23            For the Defendants

24   A L S O   P R E S E N T:

25       James R. Rizzo
```

REC'D NOV 1 7 2014

2

1                    I N D E X
2   WITNESS         EXAMINING ATTORNEY      PAGE
3
    Iraida Afanador        Mr. Daily          3
4
5                    ------------------
6            E X H I B I T S
                                    MARKED
    NUMBER      DESCRIPTION              FOR ID
7
8   Afanador-1   Note - Bates City-0014     21
9
                    -------------------------
10
11  (By agreement of counsel, the signing, sealing and
12  certification of the depositions were waived, and all
13  objections, except as to the form of the questions, were
14  reserved to the time of trial.)
15
                    -------------------------
16
17
18
19
20
21
22
23
24
25

---

3

1        IRAIDA AFANADOR, having been duly sworn, was
2        examined and testified as follows:
3   BY MR. DAILY:
4   Q.  You pronounced it Afanador?
5   A.  Very good.
6   Q.  Mrs. Afanador --
7   A.  Ms..
8   Q.  Ms. Afanador, my name is Mike Daily. I'm going
9   to ask you some questions today in order to determine
10  what information you may have that might be relevant to
11  a lawsuit that has been instituted on behalf of my
12  client, Marshall Williams. If there's any question I
13  ask you that you don't understand, indicate that to me
14  so I can explain the question, or further explain it,
15  before you answer. If you don't ask for an explanation,
16  I'll have to assume you fully understood my question.
17       What we want here today is your knowledge. We
18  don't want you guessing or speculating. Therefore, if I
19  ask a question where you don't know the answer, the
20  appropriate response is that you don't know rather than
21  thinking that because I asked you the question, it must
22  be something you know. Many questions I ask invariably
23  end up I ask for information that the witness just
24  doesn't possess.
25  A.  Uh-huh.

---

4

1   Q.  As you can see, the court reporter is recording
2   everything that's said here today. Therefore, it's
3   important to make all of your responses oral.
4       It's also important to wait until I finished each
5   of my questions before you begin your response,
6   otherwise we can have the transcript broken up between
7   half a question and half an answer and the second half
8   of the question.
9       Do you understand those instructions?
10  A.  Absolutely.
11  Q.  Do you understand you've been placed under oath
12  and have an obligation to tell us the truth here today?
13  A.  Yes.
14  Q.  Do you understand you should consider what you
15  say here today to be just as important as if you were
16  testifying in court?
17  A.  Absolutely.
18  Q.  By whom are you presently employed?
19  A.  I am not presently employed. I was a municipal
20  department head for the Department of Code Enforcement
21  up until January in the City of Camden.
22  Q.  That was as director?
23  A.  Municipal department head for code enforcement.
24  Q.  Your title was director, was it not?
25  A.  Yeah, that was the same as commissioner. But

---

5

1   they don't use director here in New Jersey.
2   Q.  That was up until January of 2014?
3   A.  Correct. I presently just do consulting work
4   here and there.
5   Q.  What have you been doing since January of 2014?
6   A.  Well, I was unemployed for six months, and
7   thereafter I used my pension. Lived off my pension.
8   And now I will hopefully be doing some consulting work,
9   and have done some consulting work.
10  Q.  What kind of consulting work have you done?
11  A.  Presently or in the past? Presently?
12  Q.  Well, recently?
13  A.  Recently, I did a proposal. I write grants.
14  That's one of my things that I do, I write grants. I
15  wrote a grant for my former employer information in
16  technology management for medicine, ITM. And I do --
17  Q.  Are you a political consultant?
18  A.  No, I was a grant writer. I presently still do
19  volunteer work.
20  Q.  Did you do that as a sole proprietor or were you
21  connected with some business?
22  A.  I used to work there prior to coming to the City
23  of Camden. I was the chief operating officer there.
24  Q.  There being who?
25  A.  At ITM, I'm sorry.

**6**

1  Q.  That's the Institute of what?
2  A.  It's the Information Technology and Management,
3  Incorporated, 6 Kilmer Road, Edison, New Jersey.  They
4  were my former employers before I came to the City.
5  Q.  Did that company do any business for anybody
6  other than governmental entities?
7  A.  No, they are a private company.
8  Q.  Were their clients all governmental entities?
9  A.  No, they have a votech school, which is partially
10  funded by the Department of Labor, but mostly it's a
11  private sector corporation.
12  Q.  Where is the votech school located?
13  A.  The corporation is located at 6 Kilmer,
14  K-I-L-M-E-R.
15  Q.  Oh, in Edison, New Jersey?
16  A.  Yes.
17  Q.  Is that the location of the votech school?
18  A.  That's everything, yes.  And in India.
19  Q.  The graduates of the votech school, do they get
20  some sort of diploma?
21  A.  They get certificates in various computer
22  technology courses.
23  Q.  So it's vocational training as opposed to basic
24  high school level?
25  A.  Oh, absolutely.  You have to have a high school

**7**

1  degree, and it's mandated by the State.
2  Q.  When were you first employed by City of Camden?
3  A.  I believe in 2007.
4  Q.  And you are in your title of director?
5  A.  Yes.
6  Q.  What in your background qualified you for that?
7  A.  I have a bachelor's from Rutgers University.  I
8  have a master's in criminal justice.  I have a master's
9  in administrative science from Fairley Dickinson.  And
10  35 plus years of CEO, COO, executive director,
11  government employee at the Department of Labor.
12  Q.  None of that had to do with construction though,
13  did it?
14  A.  The Department of Labor, yes.
15  Q.  In what way?
16  A.  Well, in the Department of Labor you had to know
17  OSHA standards.  You also had to know Title 6 federal
18  guidelines, as well as understanding the codes that,
19  codes and standards of the State.
20  Q.  Title 6 is an EEO category, isn't it?
21  A.  Correct.
22  Q.  That has nothing to do with construction?
23  A.  No.
24      MR. FENZA:  Objection to the form.
25  Q.  OSHA is workplace safety?

**8**

1  A.  Uh-huh.
2  Q.  In all kinds of workplace, not just construction,
3  right?
4  A.  Yes.
5  Q.  How many people did you supervise as director?
6  A.  I started, I'm just going to say, I started off
7  supervising maybe 58.  And by the time I finished, it
8  might have been 30 something.  Possibly.
9  Q.  How much were you paid for this title?
10  A.  Before benefits it was $96,866, I believe.  I'm
11  sorry, 94.  I'm so sorry.  Retract that, it was 94,866.
12  Q.  You know, you weren't in civil service, this was
13  a policy level position?
14  A.  Correct.
15  Q.  You supervised Mr. Rizzo, correct?
16  A.  Yes.
17  Q.  Mr. Rizzo supervised Mr. Revaitis, correct?
18  A.  He oversaw, as construction official, he oversees
19  all of the building bureau and its work and the staff.
20  Q.  At some point in time did a Marshall Williams
21  contact you in regards, in respect to your position as,
22  or because you were the director?
23  A.  Yes, because I was the director, yes.
24  Q.  And do you remember the first contact?
25  A.  I really can't remember.  It's been a while.

**9**

1  It's been a long time.
2  Q.  Do you remember what he indicated to you as being
3  the reason for contacting you?
4  A.  He stated he wanted, if memory serves, he stated
5  he wanted to talk to me regarding my electrical building
6  subcode and inspector, and wanted to speak to me
7  directly because he did not want to speak to anyone
8  else.
9  Q.  Did you afford him that opportunity?
10  A.  Absolutely, as all constituents and/or
11  contractors.
12  Q.  And did you have a meeting, face-to-face meeting
13  with him?
14  A.  Yes.  Myself and my secretary.  And I believe, if
15  memory serves me well, it was first my secretary and Mr.
16  Williams and myself.
17  Q.  Did you make any notes of that meeting?
18  A.  My secretary made notes and I made notes, yes.
19  Let me just add, it was moreso Mr. Williams just
20  explaining to me his situation.  His concerns.
21  Q.  You know, you made notes, am I correct?
22  A.  I made some notes, yes.
23  Q.  Your secretary made notes?
24  A.  Yes.
25  Q.  Did you preserve your notes?

14

1  Q. No, did you ask for and receive any other
2  information besides the names of property owners who
3  could corroborate what Mr. Williams was saying?
4  A. I didn't receive any other information, other
5  than the two I mentioned. I don't remember the young
6  lady's name. It sounded like Ayana or something like
7  that. And also the people from the funeral home. And I
8  also asked Jimmy to look into the situation of his
9  alleged failing of inspections.
10  Q. What information did Jimmy get back to you with,
11  if any?
12  A. If memory serves me, he said that Mr. Nico was
13  not failed. What was indicated was that he was told
14  that certain, a certain box was not put in right, and he
15  was given advice from the subcode as to how it needed,
16  something needed to be done. I can't really remember
17  what it was at that time. But I remember Jim said, we
18  didn't fail him. Subcode Revaitis just asked him to fix
19  something, and he said he would.
20  Q. So that involved one particular property?
21  A. To my knowledge, yes.
22  Q. Did you ask to see the permit or any other
23  documents for that property?
24  A. No.
25  Q. Do you recall if Mr. Williams made any complaints

15

1  regarding other than that one property?
2  A. Again, just the funeral home and the property of
3  Ayana or something.
4  Q. What was his complaint regarding the funeral
5  home?
6  A. I do not remember. I really don't.
7  Q. Did you, as part of -- did you perform any sort
8  of investigation yourself?
9  A. Well, what I usually do is, I ask Jimmy to
10  investigate with the subcodes. Once my construction
11  official and I do our investigation and we receive
12  letters and/or phone call, whoever he gives me phone
13  calls for, then I get outside staff to come in to
14  meetings that are not related to the building bureau and
15  have no reason to be. It's mostly an impartial
16  investigation, yes.
17  Q. Who outside the department was involved in any
18  sort of investigation with regards to Mr. Williams'
19  complaints?
20  A. Under the municipal codes, once I serve not only
21  as a director, but I also serve as commissioner of
22  investigations and parties that are not part of any of
23  the departments being complained about. And at that
24  time, if memory serves me, it was Ms. Doris Arch. And
25  she's my license and inspection chief, and Judith Lugo,

16

1  who is my assistant, was my assistant superintendent of
2  weights and measures. And Terry Britt, of course, was
3  in there as well taking notes.
4  Q. Did you have Mr. Williams write out any sort of
5  formal complaint?
6  A. I asked him to give me information as to, you
7  know, what his complaint was. And I don't remember if
8  in fact he did give me a complaint, to be honest. But
9  he did give me numbers of people to call.
10  Q. Do you recognize the document that's been marked
11  that's Bates City-0008?
12  A. Yes.
13  Q. Is that your handwriting on the bottom of it?
14  A. Yes.
15  Q. And this appears to be a statement from an Israel
16  Miller?
17  A. Correct.
18  Q. Looks like he's the owner of a tattoo shop?
19  A. I guess -- well, it says Twisted Tattoos here,
20  but I don't remember other than that.
21  Q. In this statement apparently Israel Miller makes
22  some sort of allegation that Mr. Revaitis made some
23  comments to him?
24  A. Yes.
25  Q. And you called, so you --

17

1  A. I called in front of my secretary and Mr. Rizzo
2  on speaker phone and informed Mr. Miller that he was on
3  speaker phone.
4  Q. He said that this was true what he had written in
5  this statement?
6  A. At that time he said when I spoke to him the
7  first time, yes. He said, yeah, this is what happened.
8  And he emphatically said that, hence why the quotations.
9  Q. Was there a second time that you talked to him?
10  A. The second time I called him again I asked him,
11  did you write this letter, and he said, no. He said Mr.
12  Miller did, and I signed it. So then I asked him, Mr.
13  Miller, I said, Mr. Miller, I need a statement directly
14  from you, not something that was written from Mr.
15  Miller. And he says, I want nothing to do with this.
16  Q. I don't understand what you're saying here.
17  A. I asked him, did you write this letter or type
18  this letter, and he said, no. And then I said, well
19  then --
20  Q. He admitted he signed it?
21  A. He said he signed it, but he said that Mr. Miller
22  was the one who wrote it. I'm sorry, Mr. Miller said
23  Mr. Williams wrote it and he signed it. And I said, I
24  need a letter from you directly, not something signed by
25  your contractor, or not something -- strike that. Not

18

1  something written by or typed by your contractor.
2    Q.  Let me understand this.  Because this statement
3  was typed by Mr. Williams but signed by Mr. Miller, you
4  found that this statement was, or you felt that you
5  needed a follow-up statement that was actually typed by
6  Mr. Miller and signed by Mr. Miller?
7    A.  Correct, due to the fact that Mr. Miller stated
8  he did not type this, but he signed it.
9    Q.  How is that significant?
10   A.  Well, the significance is that when I asked
11  someone to sent me a letter, it has to be typed or
12  written, however you want to do, it by the person that
13  I'm trying to talk to.  At that time I called him, I
14  must have called a couple times, he said, I didn't want
15  to talk about it.  Finally, when I did speak to him, I
16  said, did you write this letter, and he said, no, I
17  didn't.  I said, but your signature is on it.  And he
18  said, well, I didn't.  Mr. Miller wrote it, and I just
19  signed it.
20   Q.  Mr. Williams?
21   A.  Strike that, Mr. Williams wrote it, but I signed
22  it.  And I want nothing to do with it.
23   Q.  First you get this statement signed by Mr.
24  Miller.  And it's dated September 25th, 2013?
25   A.  Correct.

19

1    Q.  Okay.  A few days later, October 3rd, 2013, you
2  call --
3    A.  Mr. Miller.
4    Q.  -- Mr. Miller, and he at that time emphatically
5  stated that the above statement was true?
6    A.  Uh-huh.
7        MR. FENZA:  Is that a yes?
8        THE WITNESS:  I'm sorry, yes.
9    Q.  And then?
10   A.  He further continued to say -- I said, so, this
11  is your statement that you wrote and you signed?  And he
12  said no, I did not write it, Mr. Williams wrote it, but
13  I signed it.  And I want nothing else to do with this.
14   Q.  And then you asked him, well, I want you to send
15  me one that you actually typed and signed?
16   A.  And he said, no, he would not.
17   Q.  Now, Mr. Miller, to your knowledge Mr. Miller was
18  a property owner in the city of Camden?
19   A.  To my knowledge, yes.
20   Q.  And Mr. Miller said to you that what was in the
21  statement that he signed was true?
22   A.  At that moment on October 3rd, yes.
23   Q.  Why did you need further verification if he said
24  what was in there was true?
25   A.  I again reiterated to him, what you typed up here

20

1  is true?  And he said, well, I didn't type it.  That's
2  when a flag raised up for me as an administrator.  I
3  said, who typed it?  He said, Mr. Miller typed it and
4  asked me, or made me sign it.  I said, okay, I'm going
5  to need a statement from you, Mr. Williams, not -- Mr.
6  Miller.  You need to write a statement, or write me a
7  letter what took place with a little more detail.  And
8  he said, absolutely not.  I don't want anything to do
9  with this.  And that's...
10   Q.  Yes?  I'm sorry?
11   A.  No, nothing else.
12   Q.  You can go ahead and clarify your answer.
13   A.  No, I'm very clear about what my answer is.
14   Q.  Is there anybody else you contacted?
15   A.  Mr. Williams, Nico Electric gave me a number of
16  Ayana.  I can not remember or recall her last name.  But
17  I said, can I have someone else or anyone else that can
18  verify these alleged allegations against my building
19  subcode and electrical subcode and electrical inspector?
20  Mr. Williams then said, this lady by the name of Ayana.
21  I just can't remember her full name at this moment.
22   Q.  Jordan?
23   A.  Maybe, yes.
24   Q.  Have you seen that document before?
25   A.  Yes.

21

1        (Afanador-1 marked for identification)
2    Q.  Is that a statement Mr. Williams gave you, or is
3  that a statement that was provided at your request or
4  someone in your office's request?
5    A.  No.  Actually, it was hard getting in touch with
6  her, but I finally got in touch with her, and had Miss
7  Ayana on speaker phone, and myself, construction
8  official Rizzo and my secretary, Terry Britt.  And she
9  said, I don't want anything to do with this man.  He's
10  been harassing me and my husband.  I said, please,
11  ma'am, I need a statement from you as to what took place
12  at that moment when Mr. Williams went and inspected your
13  home.  She said, can I write it to you and fax it to
14  you?  I said, sure, I have no problems you writing it,
15  faxing it, however you want, as long as it's legible.
16   Q.  What did she say in the statement, or what did
17  you take out of the statement, let's put it that way?
18   A.  What I took out of the statement was that, well,
19  she called me and she said, did you receive it?  I said,
20  yes.  I said, so this is factual as to what happened?
21  And she said, yes, this is exactly what happened.  She
22  said also Mr. Williams has been harassing me at two
23  o'clock in the morning, four o'clock in the morning, so
24  much so to the point where my husband had to intervene
25  and tell him to stop calling me.  And she said, quite

22

1  frankly I was taken aback by the fact that he called Mr.
2  Revaitis a cracker. And I said, what do you mean by
3  that? And she said, while he was waiting, while we were
4  waiting for Mr. Revaitis to come to the inspection, Mr.
5  Williams said to me, you see that cracker over there?
6  He's a racist, quote/unquote. Miss Ayana then stated
7  that she was quite embarrassed and taken aback because
8  she has Caucasian members in her family. She didn't
9  know what to do and she kept quiet. And I said, okay.
10  Just, you know, she said, I want nothing to do with this
11  man. I'm going to somebody else on Craig's List.
12     Q. Anybody else that you talked to or got
13  information from as part of your investigation other
14  than your staff?
15     A. Mr. Williams could not provide me with anyone
16  else that I could recall. He just said, those two
17  people, and then he mentioned someone from DCA. I don't
18  remember the name of the person from DCA. And I said,
19  well, if that's the case, I will have my construction,
20  if DCA does call me or come, they must speak to my
21  construction official, as is the regulations. First
22  they speak to Mr. Rizzo as construction official, then
23  me and Mr. Rizzo if there is an issue that needs further
24  investigation.
25     Q. Did you ever talk to anybody from DCA about Mr.

23

1  Williams?
2     A. Absolutely not. Not to my recollection.
3     Q. Was the conclusion arrived at at the end of your
4  investigation that nobody had done anything
5  inappropriate?
6     A. Correct, at least from my staff.
7     Q. Do you know Donald Norcross?
8     A. Yes.
9     Q. Have you ever worked for him?
10     A. Not for him, no. I've just known him as I'm a
11  committeewoman, so I know him through politics, like I
12  know everybody else in the state of New Jersey.
13     Q. Committeewoman for what, the democratic party?
14     A. Correct, and my town as well.
15     Q. And your town is? I'm sorry?
16     A. Collingswood. Can I preface that by saying,
17  irregardless of who I know and what I know, and Mr.
18  Rizzo is here and can attest to that, I don't play
19  politics. My job is my job. I do it to the best of my
20  ability and knowledge. And I do not play favoritism.
21     Q. Politics had nothing to do with you getting a
22  $96,000 job with the City of Camden?
23     A. 94,000.
24        MR. FENZA: Objection.
25     Q. Had nothing to do with it?

24

1        MR. FENZA: Object to the form.
2     Q. He didn't tell you not to answer.
3        MR. FENZA: You can answer the question if
4  you understand it.
5     A. No, it didn't have anything to do with it. I
6  think my credentials speak for itself. I have a
7  master's in government and public policy. I have over
8  30 years experience as an executive level person. If I
9  didn't have that, why would I have the job?
10     Q. Through politics.
11        MR. FENZA: Object to the form. I think
12  she's answered the question.
13        MR. DAILY: Never mind. I'm not going to go
14  any further with this anyway.
15        That's all I have. Thank you.
16
17        (Deposition concludes 2:25 p.m.)
18
19        ------------------
20
21
22
23
24
25

25

1        C E R T I F I C A T E   O F   O F F I C E R
2
3     I, TRACY SWEETEN, a Certified Court Reporter, do
4  hereby certify that prior to the commencement of the
5  examination, the witness was duly sworn by me.
6     I DO FURTHER CERTIFY that the foregoing is a true and
7  accurate transcript of the testimony as taken
8  stenographically by and before me at the date, time and
9  place aforementioned.
10     I DO FURTHER CERTIFY that I am neither a relative nor
11  employee, nor attorney or counsel to any parties
12  involved; that I am neither related to nor employed by
13  any such attorney or counsel, and that I am not
14  financially interested in the action.
15
16
17  _____ C.R.
    NJ C.C.R. License No. XI-01508
18
19
20  Date: _____
21
22
23
24
25

7

**Contractor Project Listing -** _____

10/3/2013  7:28:12AM

Contractor Information

| Name: | License | | Expiration Date |
|---|---|---|---|
| Contact: | License No.: | | |
| Email: | Builder Reg No.: | | |
| Address: | Irrigation Cert No.: | | |
| City/State/Z | Home Improv No. | | |
| Phone Number | Elec Lic No.: | | |
| Federal ID. | Plumb Lic No.: | | |
| Status: Active | Elev Lic No.: | | |
| | Mech Lic No.: | | |
| | Fire Contractor No.: | | |
| | Fire Installer No.: | | |
| | Fire Permit No.: | | |

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier | Owner | | | Work Description | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | Owner Address | | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |

City of Camden

Page 1 of 6

City-0072

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier | Owner | | | Work Description | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |





| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | | | | Work Description | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |



City-0074

City of Camden

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | | | | | Work Description | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |

City-0075

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier | Owner | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |
| 26245 | 20110979 | 0 | 10/28/2011 | 11/25/2011 | 410 | 1 | | RELIANT ENTERORISES | | | | INSTALLATION OF (4) G. F. I. PROTECTED RECEPTACLES | | | |
| 1207 MT EPHRAIM AVENUE | | | | 14 SORREL AVE | | | | | Yes | No | Yes | No | No | No | No |
| 30506 | 20111170 | 0 | 12/08/2011 | 02/03/2012 | 312 | 74 | | ROSS BOGER | | | | LIGHT FIXTURES, RECEPTACLES, SWITCHES, 150 AMP SERVICE | | | |
| 931 SO 7TH ST | | | | 931 SO 7TH STREET | | | | | Yes | No | Yes | No | No | No | No |
| 33006 | 20121397 | 0 | 12/19/2012 | 01/03/2013 | 1377 | 5 | | LEWIS EUGENE C & VYNE | | | | 100 AMP SERVICE | | | |
| 1302 BROWNING ST | | | | 1302 BROWNING ST | | | | | Yes | No | Yes | No | No | No | No |

City of Camden

City-0076

City-0077

| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | Work Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Site Address | | | | Owner Address | | | | Agent | Building | Electrical | Plumbing | Fire | Elevator | Mechanical |



| Control No. | Permit No. | Upd No. | Permit Dt | Close Dt | Block | Lot | Qualifier Owner | | Work Description | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 34154 | 20130759 | 0 | 06/27/2013 | 09/19/2013 | 523 | 24 | | HOLLAND W ET UX | | 100 AMP SERVICE | | | | | |
| 1571 SO 8TH ST | | | | 1571 SO 8TH ST | | | | Yes | No | Yes | No | No | No | No |



**marshall willaims**

| | |
|---|---|
| **From:** | marshall willaims <nicoelectric@comcast.net> |
| **Sent:** | Friday, January 04, 2013 4:44 PM |
| **To:** | 'James Rizzo' |
| **Subject:** | FW: NICO ELECTRICAL Basic heading  Letter to Jim Rizzo-City of Camden |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | 'James Rizzo' | Read: 1/4/2013 4:47 PM |

**From:** marshall willaims [mailto:nicoelectric@comcast.net]
**Sent:** Friday, January 04, 2013 4:42 PM
**To:** 'James Rizzo'
**Subject:** RE: NICO ELECTRICAL Basic heading Letter to Jim Rizzo-City of Camden

Mr. Rizzo

In respect to your email, I requested originally the section in the code which would support the inspectors' position for failing the job and also I meant to ask isn't it a standard procedure for an electrical inspector to have in his possession the of the electrical technical portion of the application available during the time of an inspection or should this be reviewed prior to doing an inspection to avoid misunderstanding between all parties? in respect to your question if I have a complaint I await your response to the question I have directed to you for the second time mention above, thank you for reaching out to speak to me pertaining to this matter and hopefully some form of resolution can be meant.

Marshall/Nico Electrical Contractor

**From:** James Rizzo [mailto:JaRizzo@ci.camden.ni.us]
**Sent:** Thursday, January 03, 2013 6:10 PM
**To:** 'marshall willaims'
**Cc:** Eugene Emenecker; William Revaitis; James Rizzo
**Subject:** RE: NICO ELECTRICAL Basic heading Letter to Jim Rizzo-City of Camden

MR WILLIAMS,

YOU HAVE MISQUOTED SEVERAL THINGS CONCERNING OUR PHONE CONVERSATION, NAMELY THAT I WOULD FIND DOCUMENTATION TO SUPPORT THE INSPECTOR'S POSITION.
I TOLD YOU THAT I WOULD SPEAK TO THE ELECTRICAL INSPECTOR AND HAVE HIM EITHER PROVIDE A CODE SECTION TO SUPPORT HIS DECISION OR REVERSE IT. THAT IS WHAT I SAID!

NOW TO YOUR COMPLAINT , IF YOU HAVE ONE, WHAT WAS IT THAT CONSTITUTED CONDUCT  UNBECOMING A PUBLIC OFFICIAL? I NEED SPECIFIC INFORMATION NOT VAGUE AND
UNCLEAR ALLEGATIONS. GIVE ME A COMPREHENSIVE WRITTEN ACCOUNT OF THESE DISRESPECTFULL ACTIONS, THAT YOU ELUDE TO.

I THANK YOU FOR CONTACTING ME TO RESOLVE WHATEVER HAS TAKEN PLACE CONCERNING 1302 BROWNING ST.
PLEASE FORWARD THE INFORMATION THAT I HAVE REQUESTED, AT YOUR EARLIEST CONVENIENCE.

JAMES R RIZZO, CONSTRUCTION OFFICIAL
CITY OF CAMDEN

1

## William Revaitis

| | |
|---|---|
| **From:** | James Rizzo |
| **Sent:** | Thursday, January 03, 2013 6:10 PM |
| **To:** | 'marshall willaims' |
| **Cc:** | Eugene Emenecker; William Revaitis; James Rizzo |
| **Subject:** | RE: NICO ELECTRICAL Basic heading  Letter to Jim Rizzo-City of Camden |

MR WILLIAMS,

YOU HAVE MISQUOTED SEVERAL THINGS CONCERNING OUR PHONE CONVERSATION, NAMELY THAT I WOULD FIND DOCUMENTATION TO SUPPORT THE INSPECTOR'S POSITION.
I TOLD YOU THAT I WOULD SPEAK TO THE ELECTRICAL INSPECTOR AND HAVE HIM EITHER PROVIDE A CODE SECTION TO SUPPORT HIS DECISION OR REVERSE IT. **THAT IS WHAT I SAID!**

**NOW TO YOUR COMPLAINT , IF YOU HAVE ONE.** WHAT WAS IT THAT CONSTITUTED CONDUCT  UNBECOMING A PUBLIC OFFICIAL? I NEED SPECIIFIC INFORMATION NOT VAGUE AND
UNCLEAR ALLEGATIONS. GIVE ME A COMPREHENSIVE WRITTEN ACCOUNT OF THESE DISRESPECTFULL ACTIONS, THAT YOU ELUDE TO.

I THANK YOU FOR CONTACTING ME TO RESOLVE WHATEVER HAS TAKEN PLACE CONCERNING 1302 BROWNING ST.
PLEASE FORWARD THE INFORMATION THAT I HAVE REQUESTED, AT YOUR EARLIEST CONVENIENCE.


*JAMES R RIZZO, CONSTRUCTION OFFICIAL*
*CITY OF CAMDEN*
*BUILDING BUREAU, ROOM 403*
*(856)-757-7489*
*E-MAIL JARIZZO@CI.CAMDEN.NJ.US*


---

**From:** marshall willaims [mailto:nicoelectric@comcast.net]
**Sent:** Thursday, January 03, 2013 1:23 PM
**To:** James Rizzo
**Subject:** NICO ELECTRICAL Basic heading Letter to Jim Rizzo-City of Camden

Attn: Jim Rizzo

Attached you will find a confirmation letter in respect to our conversation as of yesterday, hopefully I will hear from you before the close of the day as promised.

Marshall/Nico Electrical Contractor

9

## marshall willaims

| | |
|---|---|
| **From:** | marshall willaims <nicoelectric@comcast.net> |
| **Sent:** | Thursday, January 10, 2013 1:06 PM |
| **To:** | 'James Rizzo' |
| **Subject:** | RE: Requesting Response pertaining to Statute |

| **Tracking:** | **Recipient** | **Read** |
|---|---|---|
| | 'James Rizzo' | Read: 1/10/2013 1:19 PM |

Attn: James Rizzo

This issue was discussed at length to your satisfaction and all I requested of you was documentation that as a contractor that from my understanding should be documented and available to the Public/Public record/available for review and unfortunately it appears that this matter and all the conversation that we discussed in your office on 1/3/2013 and in the past has produced no positive or productive result and should be addressed by a HIGHER AUTHORITY.

Marshall/Nico Electrical Contractor

**From:** James Rizzo [mailto:JaRizzo@ci.camden.nj.us]
**Sent:** Wednesday, January 09, 2013 1:58 PM
**To:** 'marshall willaims'
**Cc:** William Revaltis; Eugene Emenecker
**Subject:** RE: Requesting Response pertaining to Statute

MR WILLIAMS.

WE DISCUSSED THIS ISSUE AT LENGTH. I EXPLAINED TO YOU THAT THE JOB WAS APPROVED AND IT IS A CLOSED SUBJECT.

THANKS

JAMES R RIZZO. CONSTRUCTION OFFICIAL
CITY OF CAMDEN
BUILDING BUREAU, ROOM 402
(856)-757-7489
E-MAIL  JARIZZO@CI.CAMDEN.NJ.US

**From:** marshall willaims [mailto:nicoelectric@comcast.net]
**Sent:** Wednesday, January 09, 2013 1:24 PM
**To:** James Rizzo
**Subject:** Requesting Response pertaining to Statute

Attn: James Rizzo

As of today, originally we spoke on 1/3/2013 and as of today I have not received a response in regard to my request pertaining to a written explanation/providing the statute why the job failed inspection originally and what supporting documentation can be provided to support the issue presented which when we last spoke you stated that you would have the inspector research the issue, I would appreciate your response.

1

10

**ELECTRICAL SUBCODE TECHNICAL SECTION**

City of Camden

Date Received: 11/10/2011
Control #: 30506

Date Issued: 12/8/11
Permit #: 0   11-1120

**A. IDENTIFICATION APPLICANT: COMPLETE ALL APPLICABLE INFORMATION. WHEN CHANGING CONTRACTORS, NOTIFY THIS OFFICE.**

Block: 312   Lot: 74   Qualification Code:
Work Site Location:   931 SO 7TH ST
Owner in Fee:   ROSS BOGER
Address:   931 SO 7TH STREET
            CAMDEN  NJ 08104

E-mail:
Telephone:   Ω
Contractor:   NICO ELECTRICAL CONTRACTOR
              ATTN:
Address:   P.O BOX 1427
            DELRAN NJ  08075
Telephone: (856) 488-8344
Fax:

E-mail:
Home Improvement Registration No. or Exemption Reason: 13957
Contractor License No.:   Exp Date:
Federal Emp. No.:   14-9526668

**B. ELECTRICAL CHARACTERISTICS**
Use Group:   Present   R-5   Proposed
[   ]Pole/Pad #   [   ]Temporary   [   ] Other
Building Occupied as   Utility Co.
1. New Building $0.00   2. Rehabilitation $3,500.00
3. Demolition $0.00   Est.Cost of Elec.Work (1+2+3) $3,500.00

**Job Summary(Office Use Only)**

| PLAN REVIEW | Date | Initial | INSPECTIONS | | Dates(Month/Day) | | |
|---|---|---|---|---|---|---|---|
| | | | Type: | Failure | Failure | Approval | Initial |
| [ ] No Plans Required | | | Rough | | | | |
| Joint Plan Review Required | | | Barrier-Free | | | | |
| [ ] Building   [ ] Plumbing | | | Trench | | | | |
| [ ] Fire   [ ] Elevator | | | Temp.Serv | | | | |
| [ ] Elec.Plans Approved | | | Constr.Serv | | | | |
| Date: | | | TCO | | | | |
| Approved by: | | | Other | | | | |
| | | | Service | | | | |
| SUBCODE APPROVAL | | | Final | | 1-17-12 | 2-1-12 | |
| [ ] CO   [ ] CCO [ ] CA | | | Barrier-Free | | | | |
| Date: 2-1-12 | | | Temp Cut-in-Card Date Issued | | | | |
| Approved by: | | | Final Cut-in-Card Date Issue | | | | |
| | | | Annual Pool Inspection | | | | |
| | | | Date of Grounding and Bonding | | | | |
| | | | Certification | | | | |

**C. CERTIFICATION IN LIEU OF OATH**
I hereby certify that I am the (agent of) owner of record and am authorized to make this application and perform the work listed on this application.

[ ] Licensed Electrical Contractor
[ ] Certified Landscape Irrigation Contractor
[ ] Exempt Applicant

Applicant's Signature/Contractor's seal and Signature

U.C.C.F1200/re

**D. TECHNICAL SITE DATA**

| QTY. | SIZE | ITEMS | FEE (Office Use Only) |
|---|---|---|---|
| 1 | | Lighting Fixtures | |
| 12 | | Receptacles | |
| 1 | | Switches | |
| | | Detectors | |
| | | Light Poles | |
| | | Motor-Fract.HP | |
| | | Emergency&Exit Lights | |
| | | Communication Points | |
| | | Alarm Devices/F.A.C. Panel | |
| | | Other 1: | |
| | | Other 2: | |
| | | TOTAL NUMBER     14 | $61.00 |
| | | Pool Permit/with UW Lights | |
| | | Storable Pool/Spa/Hot Tub | |
| | | KW Elec. Range/Receptacle | |
| | | KW Oven/Surface Unit | |
| | | KW Elec. Water Heater | |
| | | KW Elec. Dryer/Receptacle | |
| | | KW Dishwasher | |
| | | HP Garbage Disposal | |
| | | KW Central A/C Unit | |
| | | HP/KW Space Htr./Air Handler | |
| | | KW Baseboard Heat | |
| | | HP Motors 1/+HP | |
| | | KW Transformer/Generator | |
| 1 | 150.00 | AMP Service | $102.00 |
| | | AMP Subpanels | |
| | | AMP Motor Control Center | |
| | | KW Elec. Sign/Outline Light | |
| | | KW Photovoltaic Systems | |
| | | Other 3: | |
| | | Other 4: | |
| | | Other 5: | |
| | | Other 6: | |
| | | Other 7: | |
| | | Other 8: | |
| | | Other 9: | |

Repair Shorted Broken in Service Panel Notices on 2ND FL

Not Done

(owe)

| | |
|---|---|
| Administrative Surcharge | |
| Minimum Fee | |
| State Permit Surcharge Fee | $6.00 |
| TOTAL FEE | $169.00 |

$169.00

Applicant: When submitting this form to your local Construction Code Enforcement Office, please pr...
and three photocopies

City-0061

11

To Director of Alexander.

I Ayana Jania Jordan did not
get my Reedmations from
the inspectors at all at
no time. The 2nd electrician
I found uasm craigs list or
angies list. I head Marshall
the electrican say "Oh hes
a racist son of a Bitch." When
the gentleman got out of the
car. I was then a lil puzzled
on what was going on. The
Inspector did fail us but
not due to Marshall. When I
spoke to him about the situation
he said he had him before and
"I didn't know him". I then no
longer used him and found
John my current electrican. He
fixed the problem and we
passed. I was really pleased.

Ayana Jordan
10-8-13

City-0014

12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 1:13-cv-06353 (JHR-AMD)


NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B.
WILLIAMS,
                                    Plaintiffs,

          vs.

CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS,
JAMES RIZZO and IRAIDA AFANADOR,
                                    Defendants.


                -------------------

                January 13, 2015

                -------------------


          Oral sworn deposition of MARSHALL B.
WILLIAMS, 5328 Browning Road, Pennsauken, New
Jersey, was taken at the law office of F. MICHAEL
DAILY, JR., LLC, 216 Haddon Avenue, Suite 106,
Westmont, New Jersey, before Jean B. Delaney,
Certified Shorthand Reporter and Notary Public of
the State of New Jersey, on the above date,
commencing at 10:19 a.m., there being present:

A P P E A R A N C E S:

     F. MICHAEL DAILY, JR., LLC
     216 Haddon Avenue, Suite 106
     Westmont, New Jersey  08108
     (856) 833-0006
     Attorneys for Plaintiff

     WEIR & PARTNERS, LLP
     BY: RUSSELL T. ULIASE, ESQUIRE
     457 Haddonfield Road, Suite 420
     Cherry Hill, New Jersey  08002
     (856) 740-1490
     Attorneys for Defendants

---

3

               I N D E X

1
2    Witness                              Page
3    MARSHALL B. WILLIAMS
4    By Mr. Uliase                          4
5            E X H I B I T S
6
7    Marked for I.D.                      Page
8    Williams-1   Plaintiff's discovery     4
9    Williams-2   Defendant's discovery     4
10   Williams-3   Drawing                  28
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

MARSHALL B. WILLIAMS
4

1           MARSHALL B. WILLIAMS, having been duly
2    sworn, was examined and testified as follows:
3                (Williams-1   Plaintiff's discovery
4           marked for identification.)
5                (Williams-2   Defendant's discovery
6           marked for identification.)
7    BY MR. ULIASE:
8           Q      Again, I'm Russel Ulaise.  I'm the
9    attorney for Camden.  We are here to take your
10   deposition on the case that you filed against
11   Camden.  Have you taken a deposition before?
12          A      Yes.
13          Q      Okay.  And regarding what case?  What
14   kind of case was it?
15          A      This case here.
16          Q      Before that at any point?
17          A      Oh, boy.  Long, long time.  I guess I
18   was a young kid then.  I think it was an accident.
19   That's a long, long time ago, though.
20          Q      Do you have an approximation as to a
21   year?
22          A      I would say maybe -- it might be -- if
23   I'm 58, maybe about 35 years ago, maybe.
24          Q      Okay.  All right.  So the court
25   reporter swore you in.  That's the same thing as

MARSHALL B. WILLIAMS                                                    17

```
1     A     No.  They were saying that you have to
2  state the reason why you failed a job.  It has to be
3  actually on the sticker.  Either it is approve --
4  approved or a failure sticker, and you have to state
5  the statute, and that was the primary issue.
6     Q     My question is, would they have to
7  make that citation?  Did the DCA say that the
8  inspector had to make that citation even if it was
9  ultimately approved?
10    A     No.  That had to be done at the time
11 of the inspection, if I'm answering your question
12 correctly.  They were saying at the time of the
13 inspection, that citation would have to be done at
14 that time.  When the inspector is on the site, he
15 would have to note the citation at that time.
16    Q     Okay.  Okay.  All right.  Let's move
17 onto the next property then.
18          The next property is 1207 Mount Ephraim,
19 Tony's Tattoo shop.  It is Williams-17 within
20 Williams-1.  Take a second to review that.
21    A     I remember that.
22    Q     Who prepared this document?
23    A     I prepared it.
24    Q     Okay.  And then she signed it, he
25 signed it?
```

MARSHALL B. WILLIAMS                                                    18

```
1     A     Yes.  As a matter of fact, it was
2  presented to me, and I asked Tony, I said to him,
3  would you be willing to provide a statement because
4  he called me and explained to me what happened word
5  for word.  And he said, sure, I don't have a problem
6  with it.  It is the truth.  I will sign it.  So
7  that's basically what happened.
8     Q     When you say he presented it to me?
9     A     He called me.  He said to me, do you
10 have a problem with the electrical inspectors in the
11 City of Camden?  And I said, what's going on?  And
12 he explained to me the situation with Mr. Revaitis
13 came out and did the inspection, and I said to him,
14 I appreciate you calling me and informing me on
15 that.  I said, would you be willing to provide a
16 statement on that?  He said, you know, prepare it
17 for me.  I prepared it for him.  I said, is this
18 exactly what happened?  He said I don't have a
19 problem signing it.  It's the truth.  That's exactly
20 what they did.
21    Q     Mr. Miller indicated that Mr. Revaitis
22 stated to Mr. Miller that if Mr. Miller needed any
23 additional work performed, that he had a good old
24 boy by the name of George Cassidy that is an
25 electrical contractor, and that Mr. Revaitis would
```

MARSHALL B. WILLIAMS                                                    19

```
1  recommend Mr. Cassidy as opposed to you; correct?
2     A     Correct.
3     Q     So at this time, was Mr. Cassidy a
4  member of the union?
5     A     George Cassidy?
6     Q     Yes.
7     A     No.  He was never a member of the
8  electrical union.  No.
9     Q     Okay.  So, it is not your
10 understanding that the inspector was recommending
11 someone from the union over you?
12    A     No.  The issue pertaining to the union
13 never was the issue.
14    Q     Okay.  Then what is the issue?
15    A     The issue is the inspector does not
16 have the authority to recommend myself or anyone to
17 do any work, and he doesn't have the authorization
18 to basically put down, badmouth another contractor.
19 He is supposed to stay neutral in that position.
20    Q     You are not concerned about any
21 inspectors giving favorable treatment to the union
22 as opposed to you?
23    A     The issue -- when you bring the issue
24 pertaining to the union, that's two separate
25 issues -- the issue of the union, but an inspector
```

MARSHALL B. WILLIAMS                                                    20

```
1  pertaining to this exhibit you are presenting,
2  that's a different issue.  The issue there was that
3  the inspector for the City of Camden, he basically
4  encouraged a customer not to utilize my services and
5  he recommended another contractor, and that's
6  illegal.  An inspector is not supposed to do that.
7     Q     Is there a specific section or code
8  that you can cite to?
9     A     It was brought to my attention.  I
10 would have to reach out to someone in regard to
11 that.  It is unethical.  It is just not a common
12 practice to do that.
13    Q     Nothing off the top of your head then?
14    A     I'm sure I could provide information.
15 I could research it.
16    Q     If you could do so and provide
17 something to your attorney or have your attorney
18 find it, that would be fantastic.
19          So Mr. Miller stated that he was happy with
20 all the work that you performed for his family;
21 correct?
22    A     Yes.  I've done work for his family
23 for a long time.
24    Q     Okay.  I guess aside from what is
25 mentioned here, what problems did Tony have with
```

MARSHALL B. WILLIAMS                    37

1  do that as to have a paper trail in regard to
2  showing that I've communicated with certain
3  officials.  I would say that this was written after
4  the inspection.  This was a follow-up.
5        Q       I'm asking about the document we were
6  just talking about.  Turn to Williams-7.
7        A       Seven, okay.  Let me go back to seven.
8        Q       Was this or Williams-20 written first?
9        A       This was after.
10       Q       This being?  You have to say it out
11 loud.
12       A       This was after.
13       Q       What document was after?
14       A       The one on page 20 was after.
15       Q       After seven through eight?
16       A       Right.
17       Q       Okay.  So at the point Williams-20 was
18 written, the approval was out, it was already
19 approved?
20       A       Now, the approval -- I can't be exact
21 on that.  Was the approval out?  I'm looking at the
22 time period.  I don't think the approval was out yet
23 because they never respond quickly.  Normally when
24 you have an issue with the City of Camden, you might
25 get a response back maybe a month later.  I went to

MARSHALL B. WILLIAMS                    38

1  my P.O. Box one day, and I said they approved the
2  job.  That doesn't clarify the issue.  I always --
3  when there is an issue, they always turn around and
4  make it look like you are doing it right.  They send
5  out the approval stickers.  All they are doing is
6  saying, basically, we approve your job.  And
7  sometimes I would call Mr. Rizzo and say, Jim, we
8  are not addressing the issue here.  I know finally
9  the job is approved, but that does not resolve the
10 job at hand.  He didn't want to hear that.
11       Q       All right.  So as of the date that
12 this letter was written, this letter being the
13 letter from February 10th, 2012, Williams-20, were
14 you represented by an attorney?
15       A       I don't believe at that time I was
16 represented by an attorney.
17       Q       All right.  Because I'm just
18 referencing the quote, which is -- I just saw it.
19 Excuse me.  Okay.  Four lines up from the bottom.
20       A       Page 20?
21       Q       On page 20, it says, for legal reasons
22 I would not bring to a count the multiple facts
23 which have acquired and can be identified.
24       A       That was my way of telling him that I
25 document everything.  I put that in.  That was me

MARSHALL B. WILLIAMS                    39

1  speaking.  There was no attorney speaking on behalf
2  of me.  I was letting Jim know that I was keeping a
3  record of what's going on.
4        Q       So there is not an actual reason that
5  you can identify like you say in that sentence?  I
6  was just confused by, I guess, the phrasing of that
7  sentence.
8        A       That's just the way I talk.  I just
9  do --
10       Q       You didn't really mean anything
11 towards legal reasons?
12       A       I was leaning towards reaching out to
13 an attorney but I didn't have an attorney at the
14 time.
15       Q       That said for blank, blank, blank --
16       A       That's to let him know I'm not
17 ignorant of what you are doing to me.  If I have to
18 reach out to an attorney, I will do that.  That's me
19 saying I'm not ignorant to what you are doing and it
20 is getting old.
21       Q       Okay.  Let's move onto the next
22 property.  1571 East 8th Street, Bernice Holland.
23       A       What page is that on?
24       Q       During the last deposition you said
25 Ninth Street.  It is Eighth Street.

MARSHALL B. WILLIAMS                    40

1        A       I think Ms. Bernice lives on Ninth
2  Street.  I believe that's Ninth Street she lives on.
3        Q       Let's turn to 19 then, the page
4  before.  That's in the exhibit marked as Williams-1.
5        So do you think this document is right in
6  saying Eighth Street?
7        A       Let me take a minute to review it.
8        Q       Please, please.
9        A       I believe -- I believe that is Eighth
10 Street.  I think that's Ms. Holland.
11       Q       You think it is Eighth Street?
12       A       I'm sure that's Eighth Street.  I'm
13 thinking Ninth Street, and she lives the next street
14 over.  I'm sure that's Eighth Street.
15       Q       Okay.  So with Williams-19, when did
16 you send this letter?  It is not dated.  Do you have
17 an approximation?
18       A       I would say it had to be within --
19 within a week after the inspection.
20       Q       Within a week.  Is there a reason you
21 didn't date it?
22       A       That's one of the times I didn't --
23 oversight on my part.  I didn't date it.  Normally,
24 if I went back to my computer, if I put something
25 together, I try to keep a trail, a paper trail.  I

MARSHALL B. WILLIAMS 41

1 would say it had to be within a week from the time
2 of the occurrence.
3      Q     All right.  You say in the first
4 paragraph toward the end, he made comments, he being
5 Revaitis, made comments to the homeowner which have
6 been directed at me as a contractor, an individual
7 who takes pride in his integrity to others which was
8 questioned due to the inspector's comments.  What
9 comments are you referring to?
10      A     Okay.  When I received a phone call
11 from Ms. Holland, as a matter of fact, it came from
12 her son-in-law who lives directly across the street
13 from me.  He said the inspector came out and failed
14 the job.  And when I went out there, same thing
15 again.  He didn't look at the scope of work.  What I
16 was hired to do was replace the panel on the load
17 side.  He failed the job because -- there was a fail
18 because of the line side of cable side of the
19 meter.  When I was there, Ms. Holland said the
20 inspector said you shouldn't have paid him.  That's
21 terrible what he did.  She turned around and shared
22 with me what he said.  And I turned around and I
23 reached out and spoke to Mr. Rizzo about that and,
24 you know, and I said you failed the job.  Did you
25 look at the scope of work that was on the dec sheet?

MARSHALL B. WILLIAMS 42

1      No.  It was a service.  No, it is not a service.
2 You have to look at the dec sheet.  If it says
3 replace panel, anything beyond that, I'm not
4 responsible for.
5      Q     Okay.  So he looked at the old work
6 that wasn't yours at all and said this is shoddy
7 work, you shouldn't have hired him?
8      A     No.  I didn't say that.
9      Q     Okay.
10      A     He told her, well, you shouldn't have
11 paid him.
12      Q     Okay.  For what reason?
13      A     Because the line side of the cable
14 wasn't supported properly.  Line side, meaning the
15 cable that's on the upper side of the meter, the top
16 or line meaning the same.
17      Q     And that was a piece of work that you
18 performed?
19      A     No.  That was existing.
20      Q     So he saw existing work, like I
21 said, he saw existing work, old work, thought it was
22 yours and said it was shoddy?
23      A     He didn't say shoddy, but along those
24 lines.
25      Q     Okay.

MARSHALL B. WILLIAMS 43

1      A     He said that he failed the job and
2 that she should -- should not have paid me.
3      Q     So at the end of the day, so to speak,
4 did she understand that the work he was referring to
5 wasn't your work?
6      A     Did she say --
7      Q     Uh-huh.
8      A     Oh, yes.  Once I spoke with her and
9 her son-in-law came over and also her daughter,
10 they've known me for some time, and so I turned
11 around, and as a courtesy I went over there and did
12 some additional work, didn't get paid for it, but I
13 did it to maintain a good relationship, not to lose
14 that relationship.  But I should have not had to go
15 over and do work free of charge, but I didn't want
16 Ms. Holland to have negative thoughts about me.  I
17 try to keep good relationships with people.  I
18 mentioned to Mr. Rizzo that that had nothing to do
19 with my scope of work but, once again, maybe a month
20 later, he sent me this approval sticker, and it was
21 never put on the sticker why the job failed.  They
22 don't put on there the reason why.  That's the whole
23 issue.
24      Q     All right.  So I guess back to my
25 original question, she understood that

MARSHALL B. WILLIAMS 44

1 Mr. Revaitis's comments saying you should not have
2 paid him were in reference to work that you didn't
3 do?  She understood, okay, Marshall's work was good.
4 The inspector was referring to work that he didn't
5 do.
6      A     No.  She didn't understand because she
7 don't have the knowledge of electrical work.  The
8 only thing she understood was the job failed.
9 People's mind sets are very narrow.  They look at,
10 the bottom line is I got a red sticker on my panel
11 and it means it is failed.  It is an open issue.
12 They want to finalize things.  They don't want
13 problems.  In her mind, I had to go over and explain
14 to her what it was and make a phone call and say
15 what's it about.  This is nothing to do with my
16 work, and I said I will tell you what I will do.  I
17 just want you to understand I didn't do anything
18 wrong, but what I will do as a courtesy, I will take
19 care of the other things.  But I want you to
20 understand, too, that I didn't do anything wrong.
21 She understood exactly once -- her son-in-law, he is
22 an inspector, too.  He explained it to her, too.  It
23 helped her to clarify.  He said Marshall is okay.
24 It brought clarification.  But she is not bitter
25 with me like the other person.

MARSHALL B. WILLIAMS
45

1  Q     That other person being --
2  A     Ayanna.  I guess that's how you say
3  her name.  Yeah.  Yeah.
4  Q     So, I guess, just to sum that, she
5  thought -- she didn't feel that you were to blame
6  for anything and that the inspector failed, like none of
7  it was your fault?
8  A     She just felt as though it should have
9  been communicated with her a lot clearer, and I said
10  I will see if I can get Mr. Rizzo or somebody to
11  call you to explain it, but nobody called her to
12  explain it to her.
13  Q     So was your business relationship with
14  her ultimately affected after everything was said
15  and done?
16  A     No.  She -- she is okay.  She is the
17  type of person, if she doesn't like you, she will
18  let you know.  She is very direct.
19  Q     And she didn't let you know, I guess?
20  A     She is a feisty old lady.  She let you
21  know if she is not satisfied.  Once I took the time
22  and clarified it and didn't charge her, she was
23  thrilled with me.
24  Q     Turning to Williams-16, take a look at
25  that for me.

MARSHALL B. WILLIAMS
46

1  A     Yes, I'm familiar with this.
2  Q     Who prepared this statement?
3  A     I prepared it.
4  Q     Okay.  It says, I was informed that
5  the job failed due to the fact that the service head
6  was not supported, and that the electrician that
7  performed the work should not have been paid for the
8  work which was not performed correctly; correct?
9  That's what it said in that letter?
10  A     Uh-huh.
11  Q     Tony Parker then called you and stated
12  that the service head was attached to the property
13  when you performed the work; correct?  Tony parker
14  was her --
15  A     Tony Parker stated --
16  Q     So Tony Parker called you and informed
17  you that the service head was attached to the
18  property?
19  A     Was not attached?
20  Q     Was attached when you performed the
21  work.  He made that contact with you?
22  A     That's her son-in-law.
23  Q     Right.  So, again, I guess, just to
24  make sure we are clear, Tony Parker called you and
25  said, hey, that service head was attached when you

MARSHALL B. WILLIAMS
47

1  were working on it?
2  A     That's correct.
3  Q     Okay.  So is it your understanding
4  that the service head, at some point in between your
5  work and the inspection, became detached?
6  A     That's a possibility.  Had to.
7  Q     How so?
8  A     Because it was attached at the time
9  when I did the job but the inspector, he wanted
10  additional straps put up, and he wanted the service
11  head reattached.  I think we might have had a storm
12  during that time.  I think we got a real bad
13  rainstorm during that period, and maybe it became
14  detached during that time.
15  Q     Okay.  So you testified on the first
16  day of the deposition that Mr. Revaitis wanted a
17  couple more straps on the service head.
18  A     Service cable, on the service cable.
19  Q     Would that solve the issue with the
20  service head?
21  A     No.  You put the service head up and
22  then you put the straps up so many feet away.  That
23  was not on the scope of work.  That was not my scope
24  of work.
25  Q     Okay.  Okay.  All right.  Let's move

MARSHALL B. WILLIAMS
48

1  onto the next property.  And now we are going to
2  move onto Williams-2, which is this packet right
3  here.  We are going to switch back eventually, but
4  first I'm going to refer to City-15, which is the
5  1596 Kaighns Avenue.
6  A     Okay.
7  Q     Just take a look at that document.
8  A     Okay.
9  Q     Okay.  Was there any improper action
10  on behalf of the City of Camden in regards to this
11  property or was this one of the --
12  A     Okay.  This is something more recent.
13  Q     Okay.
14  A     This particular job on Kaighns Avenue
15  and the situation there, the owner hired a general
16  contractor initially and then she went with another
17  contractor.  She fired the initial general
18  contractor.  She brought another guy on board, and
19  this guy turned around and he is a general
20  contractor.  He is limited in what he can do, and he
21  allowed some of the workers on the job to start
22  doing electrical work on the job.
23  Q     Okay.  And who is this general
24  contractor you are referring to?
25  A     Global Construction.

MARSHALL B. WILLIAMS                    113

```
 1      Q       And those conversations were with --
 2      A       Mr. Verbos.
 3      Q       Okay.  And in your note you say,
 4  direction was presented.  Starting there, read that
 5  sentence for me.
 6      A       Okay.
 7      Q       So who was presented this direction,
 8  quote/unquote?
 9      A       Mr. Rizzo.
10      Q       What was that direction?
11      A       The direction, after Mr. Verbos
12  visited the City of Camden, he said to me that I
13  gave you guys specific instructions in regard to how
14  to perform their inspections.  They were supposed to
15  cite the violations.  If they fail, they are
16  supposed to identify the violation.
17      Q       Who was given this direction, which
18  code officials?  Do you know?
19      A       Mr. Verbos told me that he had shared
20  that with Mr. Rizzo, and he was supposed to
21  downstream, pass it on to his inspectors.
22      Q       Okay.  Was that relayed by letter, by
23  phone?
24      A       We spoke on the phone several times.
25      Q       His contact with Mr. Rizzo, he said he
```

MARSHALL B. WILLIAMS                    114

```
 1  called him?
 2      A       He told me the -- the week before,
 3  visiting City of Camden, he told me he was going to
 4  go to City of Camden.  His boss had authorized for
 5  him to go to Camden to, you know, question him in
 6  regard to the problems I had been experiencing.
 7      Q       Who was his boss?
 8      A       Carmine.  I can't think of his last
 9  name.
10      Q       Who?
11      A       Mr. Verbos's superior.  What happened
12  was, I had to send a complaint to his superior for
13  him to authorize for him to go to the City of
14  Camden.  So once I spoke with his superior, first
15  name is Carmine, I can't think of his last name, he
16  scheduled for Mr. Verbos to come to the City of
17  Camden.
18      Q       What documents were attached to this?
19      A       I would have to look at my emails.
20  You said what documents were attached?  I'm not
21  totally sure.
22      Q       Okay.  Yeah.  There we go.  This is
23  the accompanying email possibly in Williams-2.
24      A       Two.
25      Q       The exhibit marked as Williams-1.
```

MARSHALL B. WILLIAMS                    115

```
 1      A       Exhibit-2, you say?
 2      Q       Williams-2, Exhibit-1.
 3      A       Okay.  I believe this was -- sent to
 4  him initially, I believe.  I'm looking at the date
 5  on it, also, in August.  I would have to actually
 6  look at my emails to be totally sure.
 7      Q       All right.  Would you please do that
 8  and send us some sort of letter stating what was in
 9  it along with everything else I requested today?
10      A       All right.  So I guess turning now to
11  Williams-3, so you met with Mr. Rizzo in January.
12  What was the purpose of that January meeting?
13      A       To discuss the problems encountered,
14  the problems that we were having with respect to the
15  inspectors.
16      Q       Okay.  Were there any meetings between
17  January and August when this -- when this email was
18  sent?
19      A       I believe I met with Mr. Rizzo on
20  maybe two or three occasions physically at his
21  office downtown on the fourth floor.  I couldn't get
22  any kind of favorable response from him.  I kept
23  reaching out for Afanador.  When you go in the
24  office and you ask for Afanador, the secretaries
25  pretty much direct you to Mr. Rizzo.  They like, no,
```

MARSHALL B. WILLIAMS                    116

```
 1  you don't want Ms. Afanador to hear any complaints.
 2  I was always redirected to Mr. Rizzo.
 3      Q       And all three of those meetings, two
 4  of those three meetings were regarding the same
 5  topics?
 6      A       They were different jobs.  I would
 7  say, Mr. Rizzo, I have another issue here.  They
 8  would downplay it like it is no big thing.  Don't
 9  worry about it.
10      Q       Because?
11      A       In my opinion, I can't say why.  But
12  it was quite obvious that he was very protective of
13  his employees, the guys working under him, his
14  inspectors.
15      Q       Were all these jobs that you were
16  referring to that you met with him regarding, were
17  they all ultimately approved or did any of them stay
18  as a violation?
19      A       They never stayed the violation.  They
20  would ultimately approve them.
21      Q       Okay.  So what were the attachments to
22  this email?  Was it the same situation?
23      A       The attachment here?
24      Q       This is Williams-3.
25      A       If I sent it to Ken Verbos, I sent him
```

MARSHALL B. WILLIAMS                    117

```
 1   a copy of what I sent to Mr. Rizzo.  Because of the
 2   time lapse, I would have to go on the computer and
 3   see what was sent out.
 4        Q        Okay.  Let's turn to Williams-4.  So
 5   when was this sent?  I'm not seeing a date here.
 6        A        This was prior to Mr. Verbos visiting
 7   the City of Camden.  I would say approximately,
 8   maybe a couple weeks prior to his visit.
 9        Q        Okay.  Is there a reason there is no
10   date here?
11        A        Just an oversight on my part.  If I
12   went on the computer, it would show me what date I
13   generated that.  And I think I faxed this over to
14   DCA, also.
15        Q        Right.  Did you fax over what we had
16   marked as Williams-3?
17        A        Yes, I believe I did.  Yeah.  Yeah,
18   I -- it shows an attachment, also.  I spoke to
19   Mr. Verbos, and he told me that any formal
20   correspondence, send it over to him.  So I would
21   have to see what was actually sent over.  That's how
22   he would say, and that's how he would do it.  He was
23   telling me, when he went to the City of Camden, they
24   didn't know he was coming in that day.
25        Q        All right.  Back to Williams-4.  You
```

MARSHALL B. WILLIAMS                    118

```
 1   refer, I guess, the letter -- to the attention of
 2   Carmine Gangeruso.  G-A-N-G-E-R-U-S-O.  Who is that?
 3        A        He was the -- if I'm not mistaken, he
 4   was the head in regard to that department,
 5   regulatory affairs.
 6        Q        How did you get your -- his
 7   information?
 8        A        When I spoke to Mr. Verbos, he said
 9   that, you know, we've been talking about this for
10   years.  He said, I spoke to my boss about this here.
11   Put a letter together requesting, you know, your
12   concerns, and he will authorize for me to come to
13   the City of Camden.
14        Q        Okay.  So what was discussed?
15        A        What was discussed between me and
16   Mr. Verbos?
17        Q        Did you ever actually meet with Ms. --
18   Mr. Gangeruso?
19        A        We spoke on the phone briefly.
20        Q        What was discussed?
21        A        I told him some of the problems I had
22   been experiencing for some time, and Ken Verbos
23   confirmed that, also.  And they felt as though, with
24   the amount of time that has gone on, he thought it
25   was worth paying a visit to the City of Camden.  He
```

MARSHALL B. WILLIAMS                    119

```
 1   said he would make arrangements for him to come to
 2   the City of Camden.
 3        Q        Did he ever come to the City of
 4   Camden?
 5        A        Ken Verbos --
 6                 That's V-E-R-B-O-S.
 7        A        -- called me and told me when he
 8   visited the City of Camden.
 9        Q        So could you read the first paragraph
10   for me?  Not aloud.  Just to yourself.
11        A        All right.
12        Q        What is the meaning of the first
13   paragraph?  What are you referring to?
14        A        I'm requesting that someone that has
15   the authority come to the City of Camden and bring
16   it to the attention of Mr. Rizzo that there are
17   certain guidelines that must be followed in regard
18   to their inspections.  It would have to come from a
19   higher source.  That's why I went to the State of
20   New Jersey.
21        Q        And you did say that that ultimately
22   did happen?
23        A        He spoke to him, but they never
24   followed up in regard to providing statutes.
25        Q        Okay.  What was attached to this?
```

MARSHALL B. WILLIAMS                    120

```
 1        A        Probably supporting documentation of
 2   communications that I sent out to Mr. Rizzo.  I had
 3   to, you know, validate what I was saying.  I
 4   couldn't verbally say this, so I sent him copies of
 5   things.  And I think after they reviewed everything,
 6   they made a decision that they were going to come to
 7   the City of Camden.
 8        Q        How did they relay that decision to
 9   you?
10        A        We spoke on the phone.
11        Q        Do you recall exactly what was
12   attached to it?
13        A        I don't like to assume, but I'm almost
14   sure I had to validate my communications to
15   Mr. Rizzo.  So more than likely I sent copies of
16   those documents to the state DCA.
17        Q        Okay.  All right.  Let's turn to 12
18   and 13 in Williams-1.  Familiarize yourself with
19   this.
20        A        Okay.
21        Q        Was this document drafted and sent
22   before the meeting with Afanador?
23        A        I believe this was sent after.
24        Q        After?
25        A        As a matter of fact, I know it was
```

13

# NICO ELECTRICAL CONTRACTOR, INC.



## MARSHALL B. WILLIAMS, OWNER/PRESIDENT
### We're Wired for Hire



P.O. Box 1427•Delran, NJ 08075-0147
Phone: (856) 488-8344•Fax: (856) 488-8268
Email: nicoelectric@comcast.net • http://nicoelectric.web.officelive.com

To: James Rizzo, Code official-City of Camden, 4th Floor, Building Inspection Department, Camden, NJ 08101

From: Marshall B. Williams

Re: Permit No.130759

Complaint-Failure of inspector to inspect scope of work outlined on permit application/Comments made to homeowner which are beyond the scope of the inspection

*Continuing problems encountered with inspections within the City of Camden

The purpose of this letter is bring to your attention that on 8/26/2013 an inspection was performed at 1571 S. 8th Street and the scope of work was not followed and the job failed for reasons which had nothing to do pertaining to the work performed by Nico Electric and the inspector that performed the inspection not only failed the job due to something that he notice during his inspection but, failed to review the scope of work outlined, also he made comments to the homeowner which had been directed at me as contractor and individual who takes pride in his integrity to others which was question due to the inspectors comments.

I will provide you a statement to validate the above, once again we have revisited an old situation that I have ask you previously to address, unfortunately it is not being handled in the proper manner.

Marshall/Nico Electrical Contractor

14

To: Whom it may concern

From: Bernice Holland

Re: Inspection Performed on 8/26/2013-Permit No. 13-0759

The purpose of this memo is to state for the record that during the inspection which was performed on my property by the electrical inspector for the City of Camden, I was informed that the job failed due to the fact that the service head was not supported and that the electrician that performed the work should not have been paid for work which was not performed correctly, after the inspector departed my step son contacted the electrician and the electrician, Marshall Williams stated that this was not in the scope of his work and he also stated that during the time that he performed the work the service head was attached to the property, finally he wanted to make it clear that he would return to attach the service head as professional tradesmen and a person of integrity, but he stated that it should be made known to the City of Camden that the job failed not due to the work performed by his company, but due to the inspectors failure to review the scope of work report.

Bernice Holland 8/27/13

*Bernice Holland*

15

ELECTRICAL SUBCODE TECHNICAL SECTION

City of Camden

Date Received: 06/07/2013
Control #: 34154

Date Issued: 6/27/13 PB
Permit #: 0 13-0759

A. IDENTIFICATION APPLICANT: COMPLETE ALL APPLICABLE INFORMATION. WHEN OBTAINING PERMITS BY MAIL, IN-PERSON, AND IN THIS OFFICE. CALL UTILITY DIG N.J. 1-800-272-1000.

Block: 522    Lot: 24    Qualification Code:
Work Site Location: 1571 SO 8TH ST

Owner in Fee: HOLLAND W ETUX

DESCRIPTION OF WORK:
100 AMP SERVICE

Address:   1571SO 8TH ST
           CAMDEN NJ 08104

E-mail:
Telephone:   Q
Contractor:   NECO ELECTRICAL CONTRACTOR
ATTN:
Address:   P.O BOX 1427
           DEER AN NJ 08075

Telephone: (856) 488-8344
Fax:

E-mail:
Home Improvement Registration No. or Exemption Reason: 13957
Contractor License No.:   Exp Date: 13957
Federal Emp. No.:  14-9526668

B. ELECTRICAL CHARACTERISTICS
Use Group:   Present   R-5      Proposed

[  ] Pole/Pad #              [  ] Temporary    [  ] Other
Building: Occupied as        Utility Co.
[  ] New Building $0.00       2. Rehabilitation $800.00
3. Demolition $0.00           Est.Cost of Elec.Work (1+2+3) $800.00

| Job Summary (Office Use Only) | INSPECTIONS | | | | |
|---|---|---|---|---|---|
| | Type | Failure | Approval | Initial | Dates(Month/Day) |
| PLAN REVIEW | Rough | | | | |
| [ ] No Plans Required | Barrier-Free | | | | |
| [ ] Partial-Underslab Utilities Approved | Trench | | | | |
| Date:           Approved by: | Temp-Serv | | | | |
| Electric Plans Approved! | Count-Serv | | | | |
| Date:           Approved by: | TCO | | | | |
| Joint Plan Review Required | Other | 7/2/13 | | | | |
| [ ] Building   [ ] Plumbing | Service | | | 100 | |
| [ ] Fire       [ ] Elevator | Final | | | | |
| SUBCODE APPROVAL for PERMIT | Barrier-Free | | | | |
| Date: | Temp Cut-in Card Date Issued | | | 6-1-13 | |
| Approved by: | Final Cut-in Card Date Issue | | | | |
| [ ] CO   [ ] CCO   VG | Annual Pool Inspection | | | | |
| Date: | Date of (Grounding and Bonding | | | | |
| Approved by: | Certification | | | | |

SUBCODE APPROVAL for CERTIFICATE

C. CERTIFICATION IN LIEU OF OATH
I hereby certify that I am the (agent of) owner of record and am authorized to make this application and perform the work listed on this application.

Applicant's Signature/Contractor's seal and Signature     Print Name
[ ] Licensed J**icial Contractor   [ ] Certified Landscape Irrigation Contractor   [ ] Exempt A__agent

| D. TECHNICAL SITE DATA | | |
|---|---|---|
| QTY. | SIZE | ITEMS |
| | | Lighting Fixtures |
| | | Receptacles |
| | | Switches |
| | | Detectors |
| | | Light Poles |
| | | Motor-Frac.HP |
| | | Emergency/Exit Lights |
| | | Communication Points |
| | | Alarm Devices/F.A.C. Panel |
| | | Other 1: |
| | | Other 2: |
| | | TOTAL NUMBER |
| | | Pool Permit/with UW Lights |
| | | Storable Pool/Spa/Hot Tub |
| | | KW Elec. Range/Receptacle |
| | | KW Oven/Surface Unit |
| | | KW Elec. Water Heater |
| | | KW Elec. Dryer/Receptacle |
| | | KW Dishwasher |
| | | HP Garbage Disposal |
| | | KW Central A/C Unit |
| | | HP/KW Space Htr/Air Handler |
| | | KW Baseboard Heat |
| | | HP Motors 1/4HP |
| | | KW Transformer/Generator |
| 1 | 100.00 | AMP Service |
| | | AMP Subpanels |
| | | AMP Meter Control Center |
| | | KW Elec. Sign/Outline Light |
| | | KW Photovoltaic Systems |
| | | Other 3: |
| | | Other 4: |
| | | Other 5: |
| | | Other 6: |
| | | Other 7: |
| | | Other 8: |
| | | Other 9: |

FEE (Office Use Only)

Service but
not upgrade
To Build.

$61.00

| Administrative Surcharge | $1.00 |
| Minimum Fee | |
| State Permit Surcharge Fee | $62.00 |
| TOTAL FEE | |

EXHIBIT
Fujiwala-3
5-14-15

City-0064

16

To: Whom it may concern

From: Owner: Israel Miller/Tony-Twisted Tattoos

Re: Inspection Performed at 1207 Mt Ephraim Ave/Tattoo Shop

Previously during an inspection at my place of business at the above location, the electrical sub code official William Rivaitis, during the course of his inspection,  stated to me , Mr. Miller that if I needed any additional work performed that he had a "Good old boy" by the name of George Cassidy that is an electrical contractor and that he would recommend Cassidy as opposed to calling Nico Electric for future work, I explain that he has done work for my family previously and we have been happy with all of his work,  I was surprised at the inspectors comments and I shared this information with Marshall the owner of Nico Electric.

Israel Miller/Tony-9/23/2013

9/25/2013

17



# NICO ELECTRICAL CONTRACTOR, INC.

## MARSHALL B. WILLIAMS, OWNER/PRESIDENT

### We're Wired for Hire



P.O. Box 1427 • Delran, NJ 08075-0147

Phone: (856) 488-8344 • Fax: (856) 488-8268

Email: nicoelectric@comcast.net • http://nicoelectric.web.officelive.com

To: Regulatory Affairs

Attn: Carmine Gangeruso

Re: Failure of Pubic Official to supply contractor code statue for failure of job

   *Conduct exhibited unbecoming of a public official/Failure of superiors to address issues requested

The purpose of this communication to your department is that I may request assistance in respect to having the authorities locally acknowledge the statute mandated by the State of New Jersey and that those statutes be respected and enforced by those having jurisdiction to monitor such laws, attached you will find supporting documentation that will validate a simple request that I placed before a code official, and as of today it has been not acknowledged and has not been addressed in manner which is outlined by our mandated statute by the State of New Jersey, that from my understanding and account inspectors must follow and acknowledge.

Note: My primary objective during this communication to you is to primarily stay focus on the subject matter in respect to the responsibilities and obligation of a public official and the manner of conduct that must exhibited, but I will say that I have experience problems for a long time period whenever I'm granted an opportunity to work in the City of Camden and I ask only that if someone could offer any form of assistance or inquire why?  I ask for no special treatment, but to be granted the same opportunity without unfair treatment.

Your assistance to this matter will be greatly appreciated

Marshall/Nico Electrical Contractor-Cell No. 609-760-2185

Pages Attached Including Cover Letter-6

18

1

1            UNITED STATES DISTRICT COURT

             FOR THE DISTRICT OF NEW JERSEY

2            CIVIL ACTION NO. 1:13-cv-06353 (JHR-AMD)

3

4    NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B.
     WILLIAMS,

5                                    Plaintiffs,

6            vs.

7    CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS,
     JAMES RIZZO and IRAIDA AFANADOR,

8                                    Defendants.

9

10                   -------------------

11                   January 16, 2015

12                   -------------------

13

14           Oral sworn deposition of KENNETH W.

15   VERBOS, 2060 Yardville-Hamilton Square Road,

16   Hamilton, New Jersey  08690 was taken at the law

17   office of WEIR & PARTNERS, LLP, 457 Haddonfield

18   Road, Cherry Hill, New Jersey, before Jean B.

19   Delaney, Certified Shorthand Reporter and Notary

20   Public of the State of New Jersey, on the above

21   date, commencing at 10:09 a.m., there being present:

22

23

24

25

6

1        A        101 South Broad Street, Trenton, New

2   Jersey 08625.

3        Q        And what's the highest grade or level

4   of education that you have?

5        A        Some college.

6        Q        Some college?

7        A        Apprenticeship throughout the UEW.

8        Q        What years?

9        A        I started my apprenticeship in 1976.

10  I guess until 1980, '81.  When it finished, college,

11  I -- appears -- I started in '70 to about '72,

12  stopped, and I've taken courses throughout the time

13  up to about '86.  Maybe later.

14       Q        Did you receive a certificate for the

15  apprenticeship?

16       A        Yes, I did.

17       Q        What kind?

18       A        Journeyman electrician.

19       Q        Okay.  With what entity are you

20  currently employed?

21       A        I'm employed by the State of New

22  Jersey through the Department of Community Affairs.

23  I work out of the Office of Regulatory Affairs.

24       Q        And what years were you employed by

25  them?

7

1          A          I started with DCA in 1993.

2          Q          Okay.  Have you ever been arrested for

3    a crime or offense in the State of New Jersey

4    before?

5          A          No.

6          Q          What involvement have you had with any

7    unions of any sort?  Have you been --

8          A          I was a union -- IBEW Local 143 out of

9    Harrisburg.  I'm still a member, still pay my dues.

10   I'm a member of the CWA, I think 1039, which is the

11   union for the state employees.

12         Q          And what is the -- the number for

13   IBEW?

14         A          143.

15         Q          What years did you start with each of

16   these unions?

17         A          In the union, in the IBEW, I started

18   my apprenticeship in 1976.  I worked out of a hall

19   on -- numerous halls up to 1993 when I went to work

20   for the state.

21         Q          Okay.  How did you become familiar

22   with the claimant in this case, Mr. Williams?

23         A          Mr. Williams, I believe, contacted my

24   former supervisor, Carmine Gangeruso, and Carmine --

25         Q          How do you spell that name?

8

1      A       Good question.  Let's see.  I think

2   it's in one of the emails he sent to me.

3   G-A-N-G-E-R-U-S-O.

4      Q       Okay.  And when did you first speak

5   with him, the claimant in this matter?

6      A       The complainant?  Sometime in 2012.

7   I'm not really sure.

8      Q       Aside from today, when's the last time

9   you spoke with him?

10     A       Was it last week I called you, you

11  called me?

12             MR. WILLIAMS:  I believe the week

13  before.  I believe you called me -- I think you

14  might have called me Monday, maybe.

15  BY MR. ULIASE:

16     Q       What were your conversations with

17  Mr. Williams regarding the legality of Camden

18  inspector's conduct?  Do you recall them?

19     A       There were --

20             MR. DAILEY:  I don't think he

21  mentioned anything about the topic of the

22  conversations.  He just said that there were

23  conversations.  So the record is clear, you should

24  first ask him whether the conversation was about

25  Mr. Williams claiming illegality, or legality, or

9

1 whatever.

2 BY MR. ULIASE:

3  Q  Let's just leave the conduct of the

4 city inspectors, just conversations with

5 Mr. Williams regarding inspector's conduct in

6 Camden.

7  A  The complaints that they were not

8 given code citations.  They were improperly

9 enforcing, requiring him to fix things that weren't

10 his responsibility.  They were -- Mr. Williams

11 stated that they were making derogatory remarks

12 about him to his customers and recommending other

13 contractors.

14  Q  Okay.  Did you give him any advice

15 with regard to those complaints?  What was your

16 response?

17  A  As far as the code issues, not given

18 code cites, I told him I would make arrangements,

19 and I've talked to the inspectors in Camden about

20 that, the electrical inspectors, which I did.  And

21 as far as the demeanor, that's a local issue to take

22 up with the local authorities.  And he complained

23 that the construction official wasn't doing it.  The

24 other things, if there was enough, that it would

25 become official misconduct, we could look at it, but

10

1     just the demeanor and how they addressed people is a

2     local issue.

3          Q       Did you ever get to the point of

4     addressing their demeanor or did you just say it is

5     a local issue?

6          A       When I talked to them about the code

7     issues, I did mention it that, you know, they can't

8     be doing this, but I let it drop there for the most

9     part.  And that was handled by the then director.  I

10    forget her name.

11         Q       Okay.  All right.  So you never cited

12    them for anything regarding their demeanor, solely

13    their demeanor?

14         A       No.

15         Q       In what form were your discussions

16    with Mr. Williams about this conduct of the city

17    officials?  Was it by telephone, letter?

18         A       Emails, faxes, I believe.  Phone

19    conversations.

20         Q       Okay.  All right.  Do you have the

21    emails from Mr. Williams?

22         A       The ones that I still have.  I thought

23    there was one more, but Carmine would have -- again,

24    it wasn't a case, so it was more, handle the

25    situation, and what Carmine would have had or what I

13

1    specific work, what are they supposed to do with the

2    customer?

3         A       The customer, they got to, again,

4    notify the customer either through a red sticker,

5    here, this is yours, here is the approval from

6    Mr. Williams.

7         Q       And they are supposed to explain to

8    the customer what happened, as well?

9         A       Well, yeah, that it is not his

10   responsibility.

11        Q       Is that pursuant to a statute or rule?

12   Is there anything that you can cite?

13        A       As far as -- rephrase that.

14        Q       Is there any statute, code, or rule

15   that says whenever a code official mistakenly

16   believes that an electrician failed their --

17   performed work that constituted failure, do they

18   have to explain to the customer --

19        A       As far as how they explain, no.  They

20   have to, again -- if Mr. Williams' job was approved

21   or did not cause a code violation, if the scope of

22   his work was compliant, they are required to give

23   him approval, and an approval is a sticker.  Now, if

24   there is outstanding code violations that they

25   noticed that were an issue that should have been

14

1    addressed, such as the owner did work without a

2    permit, took something apart or was unsafe, then

3    they have to address that to the owner.

4         Q         Right.  Right.  And -- and back to

5    square one.  If they mistakenly believed that it was

6    Mr. Williams' work, do they have to relay that to

7    the customer, and if so, pursuant to what rule or

8    statute?

9         A         Well, again, through their inspection

10   process, they are required either to cite the code

11   violation that the contractor made or approve it.

12        Q         Okay.  So if they ultimately approve

13   it --

14        A         That's -- they've given -- they've

15   approved it.  It is done.

16        Q         So do they have to explain to the

17   customer what happened?

18        A         I don't think there is anything to say

19   other than here is your approval for Mr. Williams'

20   work.  No.

21        Q         Do they have to cite a violation if

22   they ultimately approve the work, and if so,

23   pursuant to what work?

24        A         If they find an unsafe condition, what

25   we would call an unsafe condition that was in the

15

1    house that Mr. Williams did not cause, a contractor

2    did not cause?  Or are you saying -- trying to say a

3    violation that Mr. Williams caused?

4         Q       Any sort of violation.  If there is a

5    violation, they don't approve it, and then they say

6    for whatever reason, it was our mistake, it was

7    supposed to be approved, and then they send an

8    approval, do they have to send anything with that

9    approval?  Do they have to send anything else?

10        A       No.

11        Q       Okay.  Did you ever speak with

12   Mr. Williams regarding specific interactions with

13   any Camden officials that he had?  Were their names?

14   Were there addresses?

15        A       Yes, and the emails.  I don't remember

16   them without going through each one of them.

17        Q       Do you have an approximation of about

18   how many different instances you spoke with him

19   about?

20        A       No.  I truthfully can't remember.

21        Q       Less than ten, more than ten, around

22   ten?

23        A       I would be guessing.

24        Q       I forgot to mention that.  Don't

25   guess.  Just approximate where you can.  Don't

16

1    guess.

2         A      Like I said, I don't remember how many

3    conversations we had on different issues and the

4    demeanor of the issues with the people.

5         Q      Okay.  Did you speak with

6    Mr. Williams, to your recollection, in September of

7    2013 or around that area?

8         A      I don't recall.

9         Q      Maybe this will jog your memory.  Did

10   you have an ongoing investigation into the conduct

11   of Camden City electrical inspectors and other

12   employees in the Department of Code Enforcement?

13   Was there a formal investigation?

14        A      In regards to Mr. Williams?

15        Q      In regards to Mr. Williams.

16        A      Never a formal investigation.

17        Q      Okay.  Did you ever visit the Camden

18   officials unannounced due to an informal

19   investigation regarding Mr. Williams?

20        A      I don't remember if it was

21   unannounced, but I did visit them.

22        Q      Okay.  You don't remember if you

23   contacted them beforehand telling them that you were

24   coming?

25        A      I don't remember, because there

17

1    were -- there was another issue going on in Camden

2    at the time that we were dealing with.

3         Q       So were you there pursuant to that

4    other reason, and then at the same time you brought

5    up the code --

6         A       I was there for a recycling plant, and

7    I discussed Mr. Williams' issues with what's his

8    name, Bob, the subcode official, and one of the

9    electrical inspectors.

10        Q       What was the primary reason for your

11   visit?

12        A       With regard to Mr. Williams?

13        Q       Yes.

14        A       I discussed the fact that Mr. Williams

15   complained that they weren't giving him code cites

16   and they are required to do that.  I discussed the

17   fact that if there was work done that Mr. Williams

18   didn't do, they cannot cite him, and there was a

19   rehab issue.  I'm not sure what it was.  It would

20   have been something that they did in rehab which was

21   not required.  They were requiring something that

22   was taken out of the rehab.  I remember discussing

23   it, because we went into their storeroom to discuss

24   those issues, not out in the open.

25        Q       Okay.  I guess what I was asking is,

22

1    could write citations against the city but you never

2    did because you wanted them to work it out?

3         A       I didn't hear you.

4         Q       Did you ever say, their conduct

5    constitutes enough for me to write them a citation,

6    but I'm not going to.  I'm going to let them work it

7    out.

8         A       I don't remember saying something like

9    that.

10        Q       Do you feel like you could have cited

11   them for some misconduct?

12        A       For misconduct?  The courts have ruled

13   that the demeanor is local --

14        Q       Okay.

15        A       -- if they are not enforcing Uniform

16   Construction Code properly.  As far as the issues

17   that were brought up for code, we did not feel

18   talking to -- I remember talking to Carmine, we

19   didn't feel they came up to the level that we should

20   take action, and if they did not --

21        Q       And what do you mean?

22        A       Well, citing contractors for work that

23   they didn't do, enforcing the rehab code improperly.

24        Q       Okay.  And if that's all the

25   occurrences they subsequently approved, would that

23

1    rise to the level for you to cite them?

2         A        Well, after discussing with them, if

3    they approved it, then the issue was no longer an

4    issue.

5         Q        So you wouldn't cite them if that was

6    the case?

7         A        No.

8         Q        Did any DCA officials visit the

9    department at all or was it only you?

10        A        On that day?

11        Q        In regards to Mr. Williams.

12        A        In regards to Mr. Williams, it was

13   only me.

14        Q        Okay.  Was the DCA ever in receipt of

15   a formal complaint from Mr. Williams?

16        A        We had gotten written complaints, and

17   then it is up to my bosses or my supervisors to

18   determine which route we are going to take.  Are we

19   going to try to work with the building department to

20   try to get them on the correct path, say, or apply

21   the Uniform Construction Code properly?  Or is this

22   a level where they are just so far out that we need

23   to investigate and maybe take action against them?

24        Q        And how would you describe the route

25   that you took?

38

1     should be documentation.

2          Q        One of the reasons for documentation,

3     if you are a cynical guy or if you are a regulator,

4     is you want to be sure that you know the accurate

5     history, that there wasn't a groundless failure,

6     followed by a bribe, followed by an approval;

7     correct?

8          A        Correct.

9          Q        Now, Marshall's grumble, in part, was

10    that these guys are failing me and they are not

11    telling me why I got failed on some jobs.  That was

12    part of his complaint, was it not?

13         A        They weren't citing code sections,

14    yes.

15         Q        Did they admit that they weren't doing

16    that?

17         A        The conversation, when I said you have

18    to give it, I don't think I even gave them -- if he

19    wants code cites, you have to give it.  I don't

20    think I gave them a choice.

21         Q        At any time did they say, when you

22    said you have to do that or in the course of your

23    conversation, at any time did they say Marshall is

24    full of BS, we do that?

25         A        No.

46

1    violation for reception spacing which does not exist

2    in the rehab code, and they cited receptacle spacing

3    and all of a sudden realized, hey, I can't do that

4    under the rehab code, and then they approve it, and

5    say rehab, and just mark it rehab.

6         Q        So when they do see a violation

7    outside of the work, they have to send a violation

8    to the homeowner?

9         A        Yes.

10        Q        How about to the electrician?

11        A        No.  He is not responsible for it if

12   it is outside his scope of work.

13        Q        So the distinction we are making here

14   at this point from my understanding is that if they

15   go out, they see a violation, say it is a violation,

16   go back, realize it is out of the scope and then

17   approve it, nothing needs to be said about that

18   violation?

19        A        No.  If the violation exists that was

20   not caused by the contractor, they approve his

21   permit, his scope of work, then they have to follow

22   up to the homeowner.  Hey, we got a violation here,

23   a code issue that could be dangerous.

24        Q        Again, nothing to the electrician.

25        A        Nothing to the electrician.  The

47

1    homeowner.

2         Q       But if they come out and see that

3    there is a violation that's to that electrician's

4    work and within the scope of their work, go back,

5    but then subsequently approve that, they have to

6    tell that electrician what the violation was even

7    though there was an approval?

8         A       Well, they -- again, if they saw a

9    violation, they should not approve it until the

10   violation is fixed.  So if they have a violation,

11   they have to notify the electrician so he can fix

12   it.

13        Q       So if they say there is a violation to

14   this project and then realize that it wasn't a

15   violation and then approve it --

16        A       Okay.

17        Q       -- do they have to say to the

18   electrician what the violation was and pursuant to

19   what rule?

20        A       Well, they failed the electrician.

21   And all of a sudden they realize that's not a

22   violation.  That electrician has the notice of

23   violation or the sticker that has the violation.

24        Q       Before they got the notice of

25   violation, they realized --

**19**




# NICO ELECTRICAL CONTRACTOR, INC.

## MARSHALL B. WILLIAMS, OWNER/PRESIDENT
### We're Wired for Hire

P.O. Box 1427 • Delran, NJ 08075-0147
Phone: (856) 488-8344 • Fax: (856) 488-8268
Email: nicoelectric@comcast.net • http://nicoelectric.web.officelive.com

To: Director-City of Camden, City of Camden-4th Floor-Building Inspection Dept.-Camden, NJ 08101

From: Marshall B. Williams

Re: Meeting with Director of Building Dept.

The purpose of my requesting to meet with you is to provide some form of clarity in respect to the difficulty that I have experienced in the course of my operation as a business owner attempting to perform work in the City of Camden, and secondly I would like to thank you for taking the time out to hear my concerns and complaint. I remember not too long ago speaking to you pertaining to the problems that I was experiencing previously and you mention that if the problems continued that you would be available and I have exercise patience and tolerance prior to approaching and reaching out for your assistance.

First I would like to bring to your attention that I have requested to speak to you and on several occasions and in the process I have been constantly directed to speak to the Sub Code Official and on each occasion he has diligently worked to suppress the matter and protected the wrongful act of his inspectors, and has concluded that they have conducted themselves correctly, I have spoken to the State of NJ over the years pertaining to this ongoing problem and most recently a visit was conducted by a State Investigator and at present a clear understanding has been reached.

Note: Direction was presented in respect to the violation and as of today I have not received a response from the Code Official who was granted direction in regard to the correct format that should be followed, based upon the guidelines outlined for inspectors.

Your assistance to this matter will be greatly appreciated.

Marshall B. Williams

*Marshall B. Williams* 9/20/13

20

## William Revaitis

| | |
|---|---|
| **From:** | Iraida Afanador, Dir. of Code Enforcement |
| **Sent:** | Friday, October 04, 2013 12:46 PM |
| **To:** | William Revaitis |
| **Cc:** | Terri L. Britt; Christine T. J. Tucker, Business Administrator; James Rizzo |
| **Subject:** | RE: nico electric accusations |

*Thank you Bill.*

*Iraida Afanador, M.A.S*
*Municipal Department Head*
*Department of Code Enforcement*
*Suite 403, City Hall*
*520 Market Street,*
*Camden, NJ 08102*
*(Office) 856-757=-7345*
*(Fax)   856-968-4723*

---

**From:** William Revaitis
**Sent:** Friday, October 04, 2013 12:14 PM
**To:** Iraida Afanador, Dir. of Code Enforcement; James Rizzo
**Subject:** nico electric accusations

Director,
      I WOULD LIKE TO REFUTE THE LETTER FROM MR.MILLER CONCERNING NICO ELECTRIC AND STATEMENTS
ALLEGEDLY MADE BY ME. I BILL REVAITIS ELECTRICAL SUB CODE UNEQUIVOCALLY DENY THE STATEMENTS AND/OR
ACCUSATIONS MADE IN SAID LETTER.

THANK YOU,<br>BILL REVAITIS

1

21

## James Rizzo

| | |
|---|---|
| **From:** | Iraida Afanador, Dir. of Code Enforcement |
| **Sent:** | Thursday, October 03, 2013 3:13 PM |
| **To:** | William Revaitis |
| **Cc:** | James Rizzo; Terri L. Britt; Christine T. J. Tucker, Business Administrator |
| **Subject:** | Mr. Marshall's and mar Miller's statements |

*Thank you Bill for your honesty. I am pleased that you were able to give a detailed account and dispute the statements made by Mr. Marshall Williams and Mr. Israel Miller regarding you and how you handle yourself.*

*That being said, kindly ensure you send me a email to that affect, as I will be sending Mr. Marshall Williams a formal letter regarding this, and that it has been found to have no merit based on the telephone conversation Jim and I had with Ms. Ayana, (who was the one acting on behalf of her mother-in-law at 931 SO 7ᵗʰ Street .*

*In fact she stated that you were very friendly and professional to her and even pointed out some to her things that needed to be fixed and she was appreciative.*

*Moreover, I will inform Mr. Williams, that based on the lack of any concrete written statements, other than Mr. Miller, which you have stated that you will put in writing, that this is not true, and that it never took place; we have nothing other than "hearsay" evidence, and we cannot proceed any further and I am formally closing this complaint for lack of evidence/merit to his complaints.*

*Iraida Afanador, M.A.S*
*Municipal Department Head*
*Department of Code Enforcement*
*Suite 403, City Hall*
*520 Market Street,*
*Camden, NJ 08102*
*(Office) 856-757=-7345*
*(Fax) 856-968-4723*

1