UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| NICO ELECTRICAL CONTRACTOR, INC., and MARSHALL B. WILLIAMS,<br><br>         Plaintiffs,<br><br>         v.<br><br>CITY OF CAMDEN, EUGENE EMENECKER, WILLIAM REVAITIS, JAMES RIZZO, and IRAIDA AFANADOR,<br><br>         Defendants. | HONORABLE NOEL L. HILLMAN<br><br>CIVIL ACTION NO. 13-6353<br><br>**OPINION** |

**APPEARANCES:**

F. MICHAEL DAILY, JR., LLC
By: F. Michael Daily, Jr., Esq.
216 Haddon Avenue – Sentry Office Plaza
Suite 106
Westmont, New Jersey 08108
          Counsel for Plaintiffs

WEIR & PARTNERS LLP
By: Daniel E. Rybeck, Esq.
The Liberty View Building
457 Haddonfield Road, Suite 420
Cherry Hill, New Jersey 08002
          Counsel for Defendants

**HILLMAN**, United States District Judge:

   In this § 1983 suit, Plaintiff Marshall B. Williams[1] asserts

that Defendants, the City of Camden and its officials, Inspectors

---

[1] Plaintiff Williams is the sole owner and operator of Nico Electrical Contractor, Inc., which is also a plaintiff to this suit.

1

William Revaitis and Eugene Emenecker, their supervisor James Rizzo, and Rizzo's supervisor Iraida Afanador, took various "adverse actions" in retaliation for Williams's non-union status.[2] The Complaint asserts a single claim for violation of Plaintiffs' First Amendment rights under the United States Constitution.

Defendants move for summary judgment. For the reasons stated herein, the Court will grant the motion.

## I.

Plaintiff Williams is a New Jersey licensed electrical contractor. (Statement of Undisputed Facts, "SUF", ¶ 1) Williams had been a member of the International Brotherhood of Electrical Workers (IBEW) Union until 1998, when he left to work as a non-union independent contractor. (SUF ¶¶ 2-3)

In 2002, the City of Camden awarded Williams' company a two-year contract to "provide electrical installation and repairs" for the City of Camden on an "as needed" basis. (Defs' Ex. 1) It is undisputed that Williams never received any work pursuant to the contract. Williams believes this is because he was no longer a union member. He bases this belief on the following.

---

[2] Williams testified that Defendants Revaitis and Emenecker were former union members who maintained affiliation with the union after they were hired by the City. (Williams Dep. p. 106)

2

First, "within a month" of being awarded the contract, Williams had a conversation with "a CFO for Camden at the time," who allegedly relayed to Williams that a politically powerful union member was angry and "didn't want [Williams] performing any work." (Williams Dep. p. 25-26, 37-38)

Second, Williams reports that, also "within a month" of being awarded the contract, Defendant Revaitis asked Williams "how [he was] going to deal with the [union]," to which Williams replied, "I just deal with it as it comes," "I'm just trying to survive." (Williams Dep. p. 41-43)

Williams further testified that he had "three or four" similar conversations with Revaitis between 2002 and 2004 wherein Revaitis would inquire, "how you making out dealing with the union?" (Williams Dep. p. 86-87, 111)

Williams concedes that Camden's failure to assign work to Williams pursuant to the contract is not actionable because it is outside the limitations period. (See Opposition Brief, p. 17) However, he asserts that the contract, and the conversations related to it, establishes the context for what occurred next.

On four separate occasions spanning November 2011 through August 2013, Camden officials inspected Williams' electrical work at four different addresses.  Each time, Williams contends, City officials took adverse actions against him because of his non-union status.

November 2011 inspection at Mt. Ephraim Avenue

Williams performed a small, one-day job placing receptacles. (Williams Dep. p. 200; Defs' Ex. 7)[3] When Defendant Revaitis came to inspect Williams' work, Revaitis allegedly said to the property owner, "'I see you called Nico Electric up. . . . [Y]ou should call my man, . . . [he's] a good old boy . . . George Cassidy. Don't call Nico Electric, call him. . . . he'll give you a better price, his work is much better." (Williams Dep. p. 202; see also Defs' Ex. 16)  According to Williams, Defendant Revaitis "basically encouraged a customer not to utilize my services and he recommended another contractor, and that's illegal." (Williams Dep. p. 20)

There is no evidence that George Cassidy was a union member. To the contrary, Williams testified, "[George Cassidy] was never a member of the electrical union." (Williams Dep. p. 19)

January 2012 inspection at South 7th Street

Williams installed new electrical service and interior wiring at the property. (SUF ¶ 48; Defs' Ex. 7)[4]  At the inspection, Defendant Revaitis "failed" the work because "repair shorted

---

[3] Williams testified that he charged the customer "maybe 400 some odd dollars."  (Williams Dep. p. 200)

[4] Williams testified that the quoted price for the job was somewhere between $4,000 and $5,000. (Williams Dep. p. 138)

4

breaker in service panel[;] no lites [sic] on 2nd Fl." (Defs' Ex. 10)

According to Williams, the problem with the breaker was not caused by his work. He explained at his deposition that Defendant Revaitis should have "look[ed] into [the problem] in detail to find out whether it was the old existing work or something I did. . . . He could have very simply removed the [breaker] panel, and that would have identified the old wiring from the new wiring." (Williams Dep. p. 142)[5] When the inspection failed, Williams' customer was very upset with him because she believed he botched the job. (Williams Dep. p. 144)[6]

After Williams returned to the property to verify that his work was unrelated to the problem, he called Defendant Revaitis and said "you failed [the inspection] for something that's not related to what I did." (Williams Dep. 143) Williams further testified,

> [a]nd he said, the only thing I know is there was a breaker off. And I says, but you didn't take the cover off to identify what was old and new. And he said, . . . you get busy and I just didn't take the cover off.

---

[5] More specifically, Williams testified the problem was that the property "had . . . an old knob and tube circuit and the circuit breaker tripped out. That's pretty common." (Williams Dep. p. 141)

[6] Later, however, the customer's opinion apparently changed. In a letter addressed to Defendant Iraida Afanador, dated October 8, 2013, the customer wrote, "the inspector did fail us but not due to Marshall." (Defs' Ex. 11)

5

(Id.)

Defendant Revaitis recalls having a conversation with Williams about the issue but does not recall the content of the conversation. (Revaitis Dep. p. 18-19)

Approximately two weeks later, Revaitis passed the job without Williams changing anything. (Revaitis Dep. p. 18-20; Defs' Ex. 10) When asked to explain why Revaitis changed his mind about the inspection, he stated,

> [a]fter I thought about it, I looked at it. I do so many inspections, I went back, filed it away, and I don't know, I thought about it and I said, well, the breaker did what it was supposed to do. It wouldn't reset because there was a direct short in it. So I passed the job.

(Revaitis Dep p. 18)

Williams complained about this incident to Revaitis' supervisor, Defendant James Rizzo. An in-person meeting was held with Williams, Revaitis and Rizzo. (Williams Dep. p. 145; Rizzo Dep. p. 11) Williams explained that his customer was very upset with him for the inspection failing even though the failure was unrelated to Williams' work. (Williams Dep. p. 145) Williams said to Rizzo and Revaitis, "you gotta see[,] this [customer's] very temperamental, she came at me with some aggression." (Id.)

Williams characterizes Defendant Rizzo's response as "really nonchalant, like it was no big thing." (Id.) Williams testified that he asked Rizzo to "send [his customer] something in writing"

6

explaining that there had been a mistake, but that Rizzo "wouldn't do it." (Id. at p. 146)

Rizzo testified that the meeting was about Williams "not being treated fairly," and explained, "there was a difference of opinion" between Williams and Revaitis. (Rizzo Dep. p. 11)

December 2012 inspection at Browning Street

Williams performed an emergency repair on a service cable between the customer's house and the electric company's utility pole. (SUF ¶ 33; Defs' Ex. 7; Williams Dep. p. 114-15)[7]  Defendant Eugene Emenecker inspected the work.  Plaintiff contends that Emenecker failed the job, although -- in contrast to the other failed inspections in the record -- there is no documentation of this asserted failure.  In any event, it appears to be undisputed that a problem arose during the inspection.

According to Williams, an existing service cable was embedded in the mortar facial of the home.  Rather than cutting into the mortar and "defacing the [customer's] property," Williams chose to cut the service cable "where it couldn't be reenergized." (Williams Dep. p. 97)  Williams contends the way he cut the cable was "legal."  (Williams Dep. p. 98)

---

[7] Williams testified that "the amount of the contract" to perform the work was approximately $1300. (Williams Dep. p. 114)

7

Williams testified at his deposition that, while conducting the inspection, Defendant Emenecker spoke to Williams on the phone, saying, "no disrespect . . . you're going to do the job according to the F'ing way I want it done or you're not going to get it passed." (Williams Dep. p. 98)  Emenecker also allegedly said, "you know how you supposed to do it, y'all worked out of the local before." (Id. at p. 110)  There was "a lot of screaming back and forth" between Williams and Emenecker and then Emenecker hung up on Williams.  (Id. at 118-19)

Shortly thereafter, Williams complained to Defendant Rizzo about the verbal confrontation.  It appears that there was a telephone conversation (the contents of which are not disclosed by the record), and then Williams and Rizzo exchanged emails concerning Williams' complaint. (Defs' Ex. 8)

Rizzo wrote, "what was it that constituted conduct unbecoming a public official? I need specific information not vague and unclear allegations.  Give me a comprehensive written account of these disrespectful actions that you elude to."  (Defs' Ex. 8)

Williams responded,

> I requested originally the section in the code which would support the inspectors' position for failing the job and also I meant to ask isn't it a standard procedure for an electrical inspector to have in his possession the of [sic] the electrical technical portion of the application available during the time of and inspection or should this be reviewed prior to doing an inspection to avoid misunderstanding between all parties?  In respect to your question if I have a complaint I await your response to

8

>   the question I have directed to you for the second time
>   mention [sic] above, thank you for reaching out to speak
>   to me pertaining to this matter and hopefully some form
>   of resolution can be meant. [sic]

(Defs' Ex. 8)

Five days later, Williams followed-up with another email requesting a response from Rizzo. (Defs' Ex. 9)  Within half an hour Rizzo responded, "[w]e discussed this issue at length.  I explained to you that the job was approved and it's a closed subject.  Thanks."  (Id.)

Rizzo testified that in response to Williams' complaint, Rizzo "questioned" Emenecker and then concluded, "there was a difference of opinion between him and Mr. Williams.  It was resolved.  He passed the job and that was the end of the story." (Rizzo Dep. p. 10)

August 2013 inspection at South 8th Street

Williams performed a one-day project replacing an electrical panel and upgrading the ground system at the property.  (SUF ¶ 63; Williams Dep. p. 210-11)[8]  Defendant Emenecker[9] inspected Williams'

---

[8] Williams testified that the quote for the job was "$1,200 or $1,300." (Williams Dep. p. 210-11)

[9] Williams testified at his deposition that Defendant Revaitis inspected the South 8th Street project.  However, the official records from the City of Camden indicate that it was Defendant Emenecker who inspected the property, and Plaintiffs do not dispute that. (See Plaintiffs' Response to SUF ¶ 73)

work and failed it, noting in his records, "service head not attached to building." (Defs' Ex. 15)  Williams asserts that the service head was not related in any way to the work he performed at the property. (Williams Dep. p. 213)

Williams also contends that during the inspection Emenecker told the customer that she "should have never paid [Williams]" for his work.  (Williams Dep. p. 211:19 - 212:3; Defs' Ex. 14). Nonetheless, Williams testified that he went back to the property and corrected the problem free of charge "just to show good faith and to let [a nice old lady] know I'm not as bad as inspectors are saying." (Williams Dep. p. 214)  Emenecker later passed the inspection. (Defs' Ex. 15)

Within a week of the inspection, Williams wrote a letter to Defendant Rizzo complaining about "continuing problems encountered with inspectors within the City of Camden." (Williams Dep. p. 40; Defs' Ex. 13)  Specifically, Williams stated that the inspection at South 8th Street was improperly performed because "the scope of work was not followed and the job failed for reasons which had nothing to do [with] the work performed by Nico Electric." (Defs' Ex. 13)

Williams testified that he also met in person with Defendant Rizzo to complain that "once again the scope of work that you guys failed the job for didn't relate to nothing I did. . . . [Y]ou gotta stop doing that to me, you're hurting me." (Williams Dep. p.

216-17) Rizzo allegedly reacted "like it's no big thing," "don't worry about it." (Id.; Williams Dep. p. 116)

After these incidents, Williams began to take his complaints to other people. He first sent a letter to the New Jersey Department of Community Affairs complaining about electrical inspectors' "conduct" and stating that he had "experience[d] problems for a long time." (Defs' Ex. 17) That letter led to a conversation between Williams and non-party Ken Verbos, wherein Williams complained that Camden inspectors were "requiring him to fix things that weren't his responsibility" and "making derogatory remarks about him to his customers and recommending other contractors." (Verbos Dep. p. 9)

No formal investigation was ever conducted (SUF ¶ 86), although Verbos did have an in-person "discussion" with a Camden subcode official. (Verbos Dep. p. 17) Verbos advised the official of Williams' complaints and explained that inspectors "cannot cite him" for work he did not do, and that inspectors were required to give him "code cites" when failing a job. (Id.; Verbos Dep. p. 38)

Around the same time (September 2013), Williams requested in writing a meeting with Defendant Iraida Afanador. (Defs' Ex. 19) Williams testified that Afanador "was receptive to meeting with [him]," (Williams Dep. p. 183), and shortly thereafter, a meeting was held between Williams, Afanador and several other City personnel. (SUF ¶ 95)

11

Williams testified that Afanador "listened to me divulge all my information," "[s]he brought me in and they all sat there and gathered as much information as they could from me. . . . They wanted to hear everything." (Williams Dep. p. 158, 162)  Afanador testified that Williams gave her "numbers of people to call." (Afanador Dep. p. 16)

After the meeting, Afanador "asked [Defendant Rizzo] to look into the situation of his alleged failing of inspections" and Rizzo verbally reported back that Williams "was not failed." (Afandador Dep. p. 14)  Afanador also twice spoke to the owner of the property at Mt. Ephraim Avenue (Afanador Dep. p. 16-17), and spoke to Ayana Jordan, who was present at the South 7th Street inspection (Id. at p. 21), to find out from them what happened at the inspections.

Afanador testified that Ms. Jordan said that Williams was the problem; that he had been "harassing" her and had called Defendant Revaitis "a cracker." (Id. at p. 21-22)  Afanador obtained a written statement from Jordan as well. (Id. at 21; Defs' Ex. 11)

Afanador then concluded "that nobody [from her staff] had done anything inappropriate," (Afanador Dep. p. 23), and "formally closed" Williams' complaint "for lack of evidence / merit" in early October, 2013.  Defs' Ex. 21)

## II.

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, the court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 252.

## III.

Plaintiffs contend: (A) Defendants Revaitis and Emenecker violated Plaintiffs' First Amendment right to not associate with a union; (B) Defendants Rizzo and Afanador "acquiesced in" Revaitis' and Emenecker's violations; and (C) the City of Camden "had a

13

custom of hindering nonunion contractors who had previously been union members." (Opposition Brief, p. 24).[10]

### A.

"[Q]ualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal citation and quotation omitted). The qualified immunity analysis first considers whether there was a constitutional violation and, if so, whether the right violated was clearly established at the time of the misconduct. *Id.* at 232.

**Defendant Revaitis**

To establish retaliation under the First Amendment, Williams must demonstrate that: (1) he engaged in protected activity, (2) he was subjected to adverse actions by a state actor, and (3) his protected activity was a substantial motivating factor in the

---

[10] The individual Defendants are sued in both their individual and official capacities. The official capacity claims will be dismissed as duplicative of the claim against the City of Camden. *See McCachren v. Blacklick Valley Sch. Dist.,* 217 F. Supp. 2d 594, 599 (W.D. Pa. 2002); *see also* Martin A. Schwartz, Fed. Judicial Center, Section 1983 Litigation 94 (3d ed. 2014) ("when a § 1983 complaint asserts a claim against a municipal entity and municipal official in her official capacity, federal district courts routinely dismiss the official capacity claim as duplicative or redundant.").

state actor's decision to take adverse action. *Kimbleton v. White*, 608 Fed. Appx. 117, 120 (3d Cir. 2015) (*citing Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)); *see also Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006) ("a plaintiff must allege (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action.").

As to Defendant Revaitis, Plaintiffs' claim fails on the third prong; a reasonable factfinder could not conclude on this record that non-union animus motivated Revaitis' adverse actions.

First, there is no record evidence demonstrating that Defendant Revaitis treated union electricians more favorably than Williams. Indeed, there is no record evidence at all concerning any Defendant's interactions with union electricians.

Second, the evidence that is in the record is far removed in time from the two inspections Revaitis performed in November 2011 and January 2012. The conversations between Revaitis and Williams about Williams's non-union status occurred, at the very latest, in July, 2004-- more than seven years earlier. There is no temporal proximity between this evidence and the adverse actions at issue to support an inference that Williams's non-union status was a substantial motivating factor for the actions.

In an attempt to buttress their case, Plaintiffs argue that Revaitis's failure to provide a reason for his adverse actions supports "an inference of causation." (Opposition Brief, p. 21) The Court disagrees. To conclude that because Revaitis gives no reason, Plaintiffs' proffered reason must be true is simply unreasonable on this record. There are far too many other plausible reasons unrelated to Plaintiffs' exercise of their First Amendment rights that could have motivated Revaitis. It is Plaintiffs' burden to raise a triable issue of fact as to whether Revaitis's actions were caused by non-union animus. They have not done so.

Plaintiffs' evidence is insufficient to support a reasonable inference that non-union animus motivated Revaitis. Absent such evidence, there can be no constitutional violation; therefore Plaintiffs' claim against Revaitis fails. Summary judgment will be granted to Revaitis on the claim against him in his individual capacity.

**Defendant Emenecker**

The Court reaches the same conclusion as to Defendant Emenecker.

First, as already noted, there is no record evidence demonstrating that Emenecker, or any other Defendant, treated union members more favorably than Plaintiffs.

Second, there is insufficient record evidence supporting a reasonable inference that Emenecker's asserted animus toward Plaintiffs was because of Plaintiffs' nonunion status. While the Court views this as a closer call than the claim against Defendant Revaitis, Plaintiffs' evidence-- consisting of two vague references, on two separate occasions, to the fact of Plaintiffs' former union association [11] -- is simply not enough to support a reasonable inference that Emenecker acted for a reason prohibited by the First Amendment. Taken individually or together, a reasonable juror would consider these statements as reflecting a decision to fail temporarily the contested inspections not because of union status but rather because of the perceived quality of the work regardless of union status. Stated differently, Plaintiffs do not offer any evidence that Emenecker would have passed inferior work simply because it had been performed by a union member.

Accordingly, summary judgment will be granted as to the First Amendment claim against Defendant Emenecker in his individual capacity.

---

[11] One comment was made during the December 2012 inspection, *see supra* p. 8. At another unspecified time, Defendant Emenecker allegedly criticized Williams' work, saying, "[s]ince you've been working nonunion you got away from all the good habits that we use out at the local." (Williams Dep. p. 109)

**B.**

Absent a constitutional violation by any individual officer, there can be no supervisory liability. *See Gordon v. Morton*, 131 Fed. App'x 797, 799 (3d Cir. 2005) ("because Gordon fails to demonstrate he suffered a constitutional violation, he cannot satisfy any theory of supervisory liability.")(citing *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004)).[12]

Accordingly, Defendants Rizzo and Afanador are entitled to summary judgment on the claims against them.

**C.**

Lastly, Plaintiffs' *Monell* claim against the City of Camden fails.

"Custom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well settled and permanent as virtually to constitute law." *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990); s*ee also Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("[A]n act performed pursuant to a 'custom' that

---

[12] *See also* Third Circuit Model Jury Instructions for Civil Rights Claims Under Section 1983, § 4.6.1 Liability in Connection with the Actions of Another – Supervisory Officials ("If you find that [subordinate] violated [plaintiff's] federal rights, then you must consider whether [supervisor] caused [subordinate's] conduct.").

18

has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.").

Nothing in the record supports a finding that retaliation against nonunion contractors was either "well settled," "permanent," or "widespread" in the City of Camden.

The Motion for Summary Judgment will be granted as to the City of Camden.

## IV.

For the reasons set forth above, Defendants' Motion for Summary Judgment will be granted in its entirety.

An appropriate Order accompanies this Opinion.

Dated:  December 30, 2015
At Camden, New Jersey                    _s/ Noel L. Hillman_____
                                         Noel L. Hillman, U.S.D.J.